IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

_____

A.A.R.P., on his own behalf and on behalf
of all others similarly  situated, et al.,

             Petitioners–Plaintiffs,

v.

DONALD J. TRUMP, in his official
capacity as President of the United States,
et al.,

             Defendants.

Civil Action No. 1:25 -CV-059-H

**APPENDIX IN RESPONSE TO MOTION FOR TEMPORARY  RESTRAINING ORDER**

YAAKOV M. ROTH
ACTING ASSISTANT ATTORNEY
GENERAL
CIVIL DIVISION

*/s/Drew C. Ensign*
Drew C. Ensign
Deputy Assistant Attorney General
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044-0878
(202) 514-2000
drew.c.ensign@usdoj.gov

CHAD E. MEACHAM
ACTING UNITED STATES
ATTORNEY

*/s/ George M. Padis*
George M. Padis
Texas Bar No. 24088173
Assistant United States Attorneys
Ann E. Cruce-Haag
Texas Bar No. 24032102
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
214.659.8600
Fax: 214.659.8807
george.padis@usdoj.gov
ann.haag@usdoj.gov

*Contents on next page*

Exhibit A: Declaration of Deputy Assistant Director Selwyn Smith

Exhibit B: Declaration of Acting Assistant Director Marcos D. Charles

Exhibit C: Declaration of Michael G. Kozak

Exhibit D: Declaration of Deputy Assistant Director Matthew L. Elliston

Exhibit E: Declaration of Yousuf Khan

Respectfully submitted,

YAAKOV M. ROTH                                    CHAD E. MEACHAM
ACTING ASSISTANT ATTORNEY GENERAL                 ACTING UNITED STATES ATTORNEY
CIVIL DIVISION

                                                  */s/ George M. Padis*
*/s/ Drew C. Ensign*                              George M. Padis
Drew C. Ensign                                    Texas Bar No. 24088173
Deputy Assistant Attorney General                 Assistant United States Attorney
Office of Immigration Litigation                  1100 Commerce Street, Third Floor
Civil Division                                    Dallas, Texas 75242-1699
U.S. Department of Justice                         214.659.8600
P.O. Box 878, Ben Franklin Station                Fax: 214.659.8807
Washington, DC 20044-0878                          george.padis@usdoj.gov
(202) 514-2000
drew.c.ensign@usdoj.gov                           Ann E. Cruce-Haag
                                                  Texas Bar No. 24032102
                                                  Assistant United States Attorney
                                                  1205 Texas Avenue, Suite 700
                                                  Lubbock, Texas 79401
                                                  806.472.7351
                                                  Fax: 806.472.7394
                                                  ann.haag@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of April 2025, a true and correct copy of the foregoing was electronically filed with the Court's CM/ECF system, and I served all parties electronically or by another means authorized by Federal Rule of Civil Procedure 5(b)(2).

                                                  */s/ George M. Padis*
                                                  George M. Padis

Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| J.G.G.*, et al.*, | |
| | |
| Petitioner, | |
| v. | No. 1:25-cv-766 (JEB) |
| DONALD J. TRUMP, *et al.*, | |
| | <u>Declaration Of Deputy Assistant Director</u> |
| Respondents. | <u>Selwyn Smith</u> |

**DECLARATION OF SELWYN SMITH**

I, Selwyn Smith, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

     1.     I am a Deputy Assistant Director ("DAD") for Homeland Security Investigations ("HSI") at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS").

     2.     As the DAD of Countering Transnational Organized Crime, Public Safety and Border Security division ("PSBS"), I oversee a wide variety of investigative and special operations programs targeting Transnational Criminal Organizations involved in human smuggling, narcotics trafficking, racketeering and violent gang activity as well as other crimes enforced by HSI. These programmatic areas support the targeting of cross border criminal organizations that exploit America's legitimate trade, travel, and financial systems for illicit purposes.

3.      I am aware that the instant lawsuit has been filed regarding the removal of Venezuelan members of Tren de Aragua ("TdA") pursuant to the Alien Enemies Act ("AEA").

4.      I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, and information portals maintained and relied upon by DHS in the regular course of business.

5.      On March 15, 2025, President Trump announced the Proclamation *Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua* stating that, "Evidence irrefutably demonstrates that TdA has invaded the United States and continues to invade, attempt to invade, and threaten to invade the country; perpetrated irregular warfare within the country; and used drug trafficking as a weapon against our citizens" (the Proclamation) (https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/). In the same Proclamation, President Trump announced that, pursuant to 50 U.S.C. § 21, "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies."

6.      Members of TdA pose an extraordinary threat to the American public. TdA members are involved in illicit activity to invoke fear and supremacy in neighborhoods and with the general population. This has been evident from investigations throughout the nation where TdA members coalesce to conduct their criminal acts. For example, TdA's takeover of Denver apartment buildings stoked fear in the tenants when TdA committed burglaries, narcotics, and weapons violations. Other inquiries into the actions of member of TdA have resulted in criminal investigations and prosecution of cases of human trafficking, to include trafficking of women

from Venezuela; bank fraud; federal narcotics violations; extortion of human smuggling victims; and homicide, to name a few. This, along with the myriad state violations and investigations of groups of TdA members committing crimes throughout the nation are evidence of their criminal enterprise.

7.    TdA is a violent transnational criminal organization (TCO) which originated in the mid-to-late 2000's as a prison gang founded by inmates of the Tocorón prison in the Venezuelan state of Aragua. TdA has since evolved from Venezuela's most powerful homegrown prison gang into a TCO which by 2018, had expanded throughout South America and grew to have an estimated 3,000 to 5,000 members. As TdA continues its expansion throughout South America it is currently proliferating into North America.

8.    Much like MS-13, as TdA's influence and power expanded to other prisons throughout Venezuela and then across the southern hemisphere, the global leadership of the organization exploited the prison system to develop a base of operations for the gang to coordinate logistics, revenue streams, and recruitment. TdA was also able to grow its numbers from the steady prison population and build its criminal enterprise through the extortion of inmates. The founding members, senior leaders, and a vast number of TdA members escaped the Tocorón prison in September 2023. The subsequent destruction of the prison resulted in the displacement of the senior leaders and the decentralization of the global command-and-control structure for the organization.

9.    Over the course of the past three years, TdA has expanded throughout North America and are now known to be present and committing criminal activity in at least 40 states in the continental United States and Canada. TdA has proven to leverage many of the same expansion tactics and strategies in the United States that they previously employed throughout

South America. Due to the migration patterns of the Venezuelan diaspora and the vast expansion of the organization throughout the United States, TdA has become a loosely affiliated collection of independent cells committing disorganized and opportunistic crimes of violence against the Venezuelan population and rival gangs, terrorizing local communities. Detention of TdA leaders and members would potentially result in the unintended consequence of consolidating and centralizing their command-and-control structure and thereby providing an opportunity for TdA to organize and prolong the violent activities of their criminal enterprise within the United States.

10.     Historically, TdA has been found to be either, or both, strategic and opportunistic in their evolution and expansion. Within the Venezuelan penitentiary system, TdA methodically pursued geographic expansion by taking control of selected prisons in Aragua and surrounding states. Throughout the gang's expansion across international borders, the establishment and disbursement became more random and responsive to the environment and driven by profitability. As TdA continues its geographical expansion it has shown to operate as a loosely organized criminal syndicate serving as an umbrella organization for franchise networks under the TdA banner.

11.     TdA establishes their presence in a three-phase expansion methodology through force and dominance in an urban population within a geographical region. This pattern of behavior has been documented in TdA's expansion throughout South America, including into Colombia, Perú, and Chile. The three known phases of expansion are the Exploration, Penetration, and Consolidation phase.

12.     Exploration - In this step, TdA has been known to infiltrate and control groups of Venezuelan refugees traveling along migratory routes. By mixing with these migrants TdA

members can keep a low profile and pass into new regions. They have been known to exploit these migrants for the gang's profit through extortion and sexual exploitation.

13.     Penetration - In this step, TdA members begin to establish themselves within their new territory. This is often accompanied by a corresponding increase in crime and violence as they begin to set up their criminal activities and confront existing gangs previously established in the area. In general, TdA has historically targeted opportunistic areas with a relatively low volume of rival organizations present and with elevated profitability. During this phase TdA will typically engage in extortion, low-level drug distribution, human trafficking and sexual exploitation, kidnapping, and other violent crimes of intimidation.

14.     Consolidation - Once TdA members have firmly established themselves within an area and overcome and/or absorbed competing gangs through domination they move to consolidate their power and position within the territory into an enterprise.

15.     Reporting reveals TdA is attempting to expand its presence and criminal activity throughout the Western Hemisphere by exploiting the record mass migration resulting from Venezuela's recent political, economic, and humanitarian crises. According to key assessments, if left unchecked, TdA is likely to establish increasingly sophisticated human smuggling and sex trafficking networks into the United States leading to an increase in criminal activity and likely adding further strain to law enforcement resources as seen in Chicago, New York, Denver, and along our southern border.

16.     As of September 2024, ICE HSI reporting indicates that TdA members have been identified in at least 40 states across the United States. ICE HSI has opened approximately 472 investigations targeting members and/or TdA criminal networks across domestic and international offices. The violations in these investigations include, but are not limited to,

murder, robbery, human smuggling, human trafficking, sex trafficking, hostage taking, narcotics trafficking, and firearms violations.

17.    In January 2024, the New York Police Department ("NYPD") recorded a surge in moped robberies that are attributed by police as likely orchestrated by TdA recruits. NYPD CompStat reporting indicates that moped-based armed robbery patterns during this period were 158% higher than the same period the previous year. NYPD attributes this surge to be a result of TdA recruitment of Venezuelans in New York City migrant centers. Accused leaders have admitted to a complex network connected to Florida and Texas with profits shipped back to South America. Associated crews of this TdA network are allegedly involved in extortion and ransom schemes connected to human smuggling and human trafficking networks.

18.    In June 2024, multiple suspected TdA members participated in a nationally publicized series of robberies including the armed robbery of $2 million in merchandise from a high-end jewelry store in Denver, Colorado. In total, 13 subjects were apprehended by ICE HSI in a multi-agency, coordinated enforcement operation as the group attempted to flee to Venezuela.

19.    In January 2025, as a result of a joint ICE HSI investigation, nine TdA members were criminally charged in Colorado state court for their participation in the December 17, 2024, armed home invasion, kidnapping, and torture of two Venezuelan nationals at the Edge of Lowry Apartments in Aurora, Colorado. In total, 12 subjects were charged, with three Venezuelan nationals remaining at large. The court granted the City of Aurora an emergency order to temporarily close the Edge of Lowery Complex due to "an imminent threat to public safety and welfare."

20.     In February 2025, a joint multi-jurisdictional ICE HSI investigation with the Federal Bureau of Investigation and Tennessee Bureau of Investigation, dismantled a transnational commercial sex trafficking enterprise charging eight subjects with ties to TdA. The defendants operated an illegal commercial sex and sex trafficking enterprise out of Nashville motels from July 2022 through March 2024. The defendants facilitated the victims' arrival into the United States and used online commercial sex websites to post advertisements and internet or cellular communications to conduct illicit criminal activities.

21.     It is critical to use all available law enforcement tools to disrupt TdA activities quickly. These individuals are designated as foreign terrorists. Within Venezuela, TdA was able to grow its numbers from the steady prison population and build its criminal enterprise through the extortion of inmates. Keeping them in ICE custody where they could potentially continue to recruit new TdA members poses a grave risk to ICE personnel; other, nonviolent detainees; and the United States as a whole.

22.     Though many TdA members subject to the AEA do not have criminal records in the United States, due to their origin as a prison gang, it is safe to assume these subjects have criminal histories in their home countries, which U.S. law enforcement cannot verify due to the lack of diplomatic relations that currently exist with the country of Venezuela. The lack of a criminal record in the United States does not indicate they pose a limited threat. In fact, based upon their association with TdA, the lack of specific information about each individual actually highlights the risk they pose. It demonstrates that they are potential terrorists for whom we lack a complete profile.

23.     However, even though many of these TdA members have been in the United States only a short time, some have still managed to commit extremely serious crimes. A review

of ICE databases reveals that numerous individuals subject to the AEA have arrests and convictions in the United States for dangerous offenses.

24.    Additionally, a review of ICE databases reveals that numerous individuals removed have arrests, pending charges, and convictions outside of the United States, including an individual who is under investigation by Venezuelan authorities for the crimes of aggravated homicide, qualified kidnapping, and illegal carrying of weapons of war and short arms with ammunition for organized gang in concealment and trafficking; an individual who is the subject of an active INTERPOL Blue Notice issued on or about January 2, 2025, and a Red Notice issued February 5, 2025, for the crime of kidnapping and rape in Chile; an individual who is the subject of an INTERPOL Red Notice issued by Chile for kidnapping for ransom and criminal conspiracy involving TdA; an individual who admitted he sold marijuana and crystal methamphetamine for the Colombian gang Las Paisas, assaulted someone with a knife for a cellphone while living in Venezuela, and has twice robbed people for money while living in Colombia; an individual who is the subject of an INTERPOL Red Notice for child abduction; an individual identified as a "high-ranking" member of the TdA by the Mobile Tactical Interdiction Unit in Guatemala City, Guatemala; an individual who is the subject of an INTERPOL Red Notice based on obstruction of justice, criminal conspiracy, and aggravated corruption based on the individual's role as a police officer in modifying evidence to cover up a murder; an individual who, according to Peruvian Newspapers, is associated with high-ranking TdA members and who fled Peru while under investigation for illegal possession of firearm and distributing narcotics; and an individual who is the subject of an INTERPOL Blue Notice stating that he is under investigation in Venezuela for murder with aggravating circumstances against a victim whose corpse was found inside a suitcase on a dirt road.

25.    According to a review of ICE databases, numerous individuals removed were arrested together as part of federal gang operations, including two individuals who were in a vehicle during a Federal Bureau of Investigations gun bust with known TdA members; four individuals who were arrested during the execution of an HSI New York City operation; and four individuals who were encountered during the execution of an arrest warrant targeting a TdA gang member, all of whom were in a residence with a firearm and attempted to flee out the back of the residence.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of April 2025.

SELWYN J SMITH
Digitally signed by SELWYN J SMITH
Date: 2025.04.01 21:51:03 -04'00'

Selwyn Smith
Deputy Assistant Director
Homeland Security Investigations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

Exhibit B

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| J.G.G.*, et al.*, | |
| Petitioner, | |
| v. | No. 1:25-cv-766 (JEB) |
| DONALD J. TRUMP, *et al.*, | |
| Respondents. | Declaration Of Acting Assistant Director Marcos D. Charles |

**DECLARATION OF MARCOS D. CHARLES**

I, Marcos D. Charles, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

      1.     I am an Acting Assistant Director for Field Operations at Enforcement and Removal Operations ("ERO") at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS").

      2.     As the (A) Assistant Director, I am responsible for providing guidance and counsel to the twenty-five ERO Field Office Directors, ensuring all field operations are working to efficiently execute the agency mission.  I began my career with the U.S. Government as a border patrol agent for the former Immigration and Naturalization Service in Hebbronville, TX. Over time I was promoted to Senior Border Patrol Agent, Supervisory Border Patrol Agent, and Field Operations Supervisor. I joined ICE in 2008 as the Assistant Officer in Charge. Overtime I was promoted to Supervisory Detention and Deportation Officer, Assistant Field Office Director,

Chief of Staff, Deputy Field Office Director, and Field Office Director before becoming the

Acting Assistant Director.

  3.  I am aware that the instant lawsuit has been filed regarding the removal of

Venezuelan members of Tren de Aragua ("TdA") pursuant to the Alien Enemies Act ("AEA").

  4.  I provide this declaration based on my personal knowledge, reasonable inquiry,

and information obtained from various records, systems, databases, other DHS employees, and

information portals maintained and relied upon by DHS in the regular course of business.

  5.  On March 15, 2025, President Trump announced the Proclamation *Invocation of*

*the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua* stating

that, "Evidence irrefutably demonstrates that TdA has invaded the United States and continues to

invade, attempt to invade, and threaten to invade the country; perpetrated irregular warfare

within the country; and used drug trafficking as a weapon against our citizens" (the

Proclamation) (https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-

alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/). In the same

Proclamation, President Trump announced that, pursuant to 50 U.S.C. § 21, "all Venezuelan

citizens 14 years of age or older who are members of TdA, are within the United States, and are

not actually naturalized or lawful permanent residents of the United States are liable to be

apprehended, restrained, secured, and removed as Alien Enemies."

  6.  Gangs remain one of the more formidable issues that corrections officials face in

the management of prisons and civil detention facilities. Gangs are responsible for a

disproportionate amount of prison misconduct and violence. Their continued presence challenges

ongoing efforts to maintain control, order, and safety in the facilities. While all gangs disrupt the

orderly administration of detention facilities, TdA represents a heightened challenge beyond what prisons in the United States face, given TdA's formation and history in penal institutions.

7.    TdA is not just a normal gang. Open-source information documents the gang's history and growth over the last decade. As reported in National Public Radio's article titled, *Tren de Aragua, a criminal organization with roots in Venezuela, has roots in Venezuela, has rapidly expanded across Latin America*, TdA was founded in 2014 in the Tocorón prison, in the central Venezuelan state of Aragua, led by Héctor Rusthenford Guerrero Flores, alias "Niño Guerrero." The gang largely controlled the Tocorón prison and eventually branched out overseas. The gang's leaders fled the prison in 2023 when it was taken over by security forces. While leadership splintered after fleeing the prison, TdA recruited new gang members from among the eight million Venezuelans who had fled the country's economic crisis. Initially, it established criminal cells in neighboring Colombia, Peru, and Chile, where it smuggled drugs and people and operated extortion rackets and prostitution rings. TdA's most notorious alleged crime was the 2024 killing of Ronald Ojeda, a former Venezuelan army officer who conspired against Nicolás Maduro, the country's authoritarian leader, then fled to Chile. Suspected gang members dressed as Chilean police officers abducted Ojeda from his apartment. Days later, his body was found stuffed in a suitcase and buried in cement. The history reflects over a decade of savage criminal activity, vicious disregard for authority, and violent crimes which threaten the stability of order. TdA poses the same terrorizations in the United States as the origin countries from which they started – Venezuela, and now also to include Colombia, Peru and Chile.

8.    While in confinement in Venezuela, TdA was able to grow its numbers exponentially. Multiple examples of their savagery can be found in open-source news articles highlighting the numerous abhorrent activities they have conducted while in the United States

including but not limited to murder, rape, kidnapping, sex trafficking, drug trafficking, robbery, and assault. Further, TdA has been designated a Foreign Terrorist Organization. Their continued presence in ICE custody poses significant risks such as the ability to recruit new TdA members. Detention of hundreds of members of a designated Foreign Terrorist Organization, among other populations of aliens is an unnecessary danger to other detainees and facility staff.

9.      The designation of TdA as a terrorist organization has introduced new budgetary challenges for ICE/ERO. This classification necessitates a shift in resource allocation, directing limited funds and human capital towards the identification, arrest, detention, and removal of individuals within this newly prioritized organization. ICE is bound by statutory requirements to not release certain aliens from immigration detention based on criminal or threat designations. This shift in priorities hampers ICE's ability to properly detain those aliens who are not statutorily eligible for release or for whom an ICE officer determines is a public safety or flight risk during the custody determination process. Detaining this dangerous population of aliens detracts from our already limited bedspace capacities and diminishes our resources and obstructs ICE's ability to detain other criminal aliens, and make difficult decisions on which aliens are the most egregious, dangerous and/or removable all while also being bound by statutory requirements in the Immigration and Nationality Act (INA), which imposes limitations on release, such as aliens subject to expedited removal, or for whom there is a prohibition of release under the mandatory detention provision of INA § 236(c). ICE currently has roughly 41,500 beds available for detention. These beds cost the American public roughly $152 a bed daily. Because members of TdA pose a significant threat of danger at ICE detention facilities, their swift removal from the United States after entering ICE custody ensures the preservation of security and order for both detainees and facility personnel.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of April, 2025.

MARCOS D CHARLES
Digitally signed by
MARCOS D CHARLES
Date: 2025.04.01
22:48:40 -04'00'

Marcos D. Charles
Acting Assistant Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

Exhibit C

DECLARATION OF MICHAEL G. KOZAK

Pursuant to 28 U.S.C. § 1746, I, Michael G. Kozak, declare and state as follows:

1.  I, Michael G. Kozak, am the Senior Bureau Official within the Bureau of Western
    Hemisphere Affairs (WHA) of the United States Department of State, a position I have
    held since January 2025.  In that capacity, I lead and oversee WHA, including the country
    offices handling affairs regarding Central and South America and other countries in the
    Hemisphere.  I am a career member of the Senior Executive Service, and have served in a
    variety of senior positions in the Department of State, including previously as the Acting
    Assistant Secretary of WHA, in other positions within WHA, and leading other bureaus
    and offices of the Department of State.  WHA is responsible for diplomatic relations
    between the United States and countries in the Western Hemisphere, including El
    Salvador and Venezuela.  I make the following statements based upon my personal
    knowledge, including from my extensive experience since 1971 engaging in diplomatic
    and other work of the Department with respect to El Salvador, Venezuela, and other
    countries in the region and around the world, as well as upon information made available
    to me in the performance of my official duties.

2.  U.S. government officials from the White House and the Department of State, including
    special Presidential envoy Richard Grenell, Secretary of State Marco Rubio, and Special
    Envoy for Latin America Mauricio Claver-Carone, have negotiated at the highest levels
    with the Government of El Salvador and with Nicolas Maduro and his representatives in
    Venezuela in recent weeks for those countries to consent to the removal to Venezuela and
    El Salvador of some number of Venezuelan nationals detained in the United States who
    are associated with Tren de Aragua (TdA), a designated foreign terrorist organization.

3.  Arrangements were recently reached to this effect with these foreign interlocutors to accept the removal of some number of Venezuelan members of TdA. These arrangements were the result of intensive and delicate negotiations between the United States and El Salvador, and between the United States and representatives of the Maduro regime.

4.  The foreign policy of the United States would suffer harm if the removal of individuals associated with TdA were prevented, taking into account the significant time and energy expended over several weeks by high-level U.S. government officials and the possibility that foreign interlocutors might change their minds regarding their willingness to accept certain individuals associated with TdA removed or might otherwise seek to leverage this as an ongoing issue. These harms could arise even in the short term, as future conversations with foreign interlocutors seeking to resolve foreign policy matters would need to take this issue into account along with other issues, instead of allowing the discussions to fully move on to other issues.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on March 15, 2025, in Arlington, Virgina.

MICHAEL G. KOZAK

Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

G.F.F., *et al.,*

*Petitioners*,

*v.*

DONALD J. TRUMP, *et al.*,

*Respondents.*

No. 25-cv-02886 (AKH)

<u>Declaration of Deputy Assistant Director
Matthew L. Elliston</u>

**DECLARATION OF MATTHEW L. ELLISTON**

I, Matthew L. Elliston, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as
follows:

1.      I am the Deputy Assistant Director for Field Operations, Eastern Division, for
Enforcement and Removal Operations (ERO), within U.S. Immigration and Customs
Enforcement (ICE), U.S. Department of Homeland Security (DHS). In this position, I am the
first-line supervisor for twelve ERO Field Office Directors.

2.      I began my law enforcement career in 2008 as an Immigration Enforcement Agent
in the ERO Los Angeles Field Office and have served as a Deportation Officer, Detention and
Deportation Officer, Acting Supervisory Detention and Deportation Officer, Section Chief,
Deputy Chief of Staff to the ICE Deputy Director and Deputy Chief of Staff of ERO. In
particular, I have served as Section Chief of the National Fugitive Operations Program (NFOP),
where I managed the daily at-large operations and Special Response Team deployments
throughout the nation. Most recently I served as Deputy Field Office Director and Field Office
Director of Baltimore.

3.      I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, other DHS ICE employees, and information portals maintained and relied upon by DHS ICE in in the regular course of business.

4.      I am aware of the above-captioned petition for habeas corpus.

5.      On March 15, 2025, President Trump announced the Proclamation *Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua*, (the Proclamation), which states that "[e]vidence irrefutably demonstrates that [Tren De Aragua (TdA)] has invaded the United States and continues to invade, attempt to invade, and threaten to invade the country; perpetrated irregular warfare within the country; and used drug trafficking as a weapon against our citizens." 90 Fed. Reg. 13,033, 13,033 (Mar. 20, 2025). In the same Proclamation, President Trump announced that, pursuant to 50 U.S.C. § 21, "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." 90 Fed. Reg. at 13,034.

6.      I am aware that , in the case of *Trump, et al. v. J.G.G., et al*., --- S.Ct. ----, 2025 WL 1024097 (U.S. Apr. 7, 2025), the Supreme Court of the United States stated that "detainees [held for removal under the Alien Enemies Act (AEA)] are entitled to notice and opportunity to be heard 'appropriate to the nature of the case.'"

7.      The government has adopted procedures for aliens subject to the Proclamation.

8.      These procedures require that each such alien be provided individual notice, in a language the alien understands, of the government's determination that the alien is subject to

removal as an alien enemy under the Proclamation. The notice will allow the alien a reasonable time to file a petition for a writ of habeas corpus.

I declare, under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief, as of the time of signature.

Executed this 15th day of April 2025.



MATTHEW L ELLISTON
Digitally signed by MATTHEW L ELLISTON
DN: cn=MATTHEW L ELLISTON, o=U.S. Government, ou=People, email=Matthew.Elliston@ice.dhs.g ov, c=US
Date: 2025-04-15T22:02:17-0400

Matthew L. Elliston
Deputy Assistant Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

3

Exhibit E

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

G.F.F., *et al.*,

                              Petitioners,

                    v.                                          Case No. 1:25-cv-02886 (AKH)

DONALD J. TRUMP, *et al.*,

                              Respondents.

**DECLARATION OF ACTING ASSISTANT FIELD OFFICE DIRECTOR**
**KHRISTOPHER DAWSON**

I, KHRISTOPHER DAWSON, pursuant to 28 U.S.C. § 1746, declare under penalty of

perjury as follows:

1.    I am currently employed by the U.S. Department of Homeland Security (DHS),

U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO),

as the Acting Assistant Field Office Director, Detained Case Management Unit, for the New York

City ERO Field Office, which is responsible for ERO operations in the five boroughs of New York

City, as well as the counties of Dutchess, Nassau, Putnam, Suffolk, Sullivan, Orange, Rockland,

Ulster, and Westchester in New York State.

2.    As the Acting Assistant Field Office Director, I am responsible for, among other

things, oversight of the detention of noncitizens in the New York City area. In my role as the

Acting Assistant Field Office Director, I have access to records maintained in the ordinary

course of business by ICE, including documentary records concerning the New York City ERO

Field Office and the noncitizen detainees who fall within the responsibility of that field office.

3.    I base this declaration on my personal knowledge, and on information contained

in ICE's electronic records and databases.

1

**<u>G.F.F.</u>**

4.      G.F.F. is a native and citizen of Venezuela. He unlawfully entered the United

States on or about May 15, 2024, without inspection.

5.      On June 4, 2024, G.F.F. was served in person with a Notice to Appear charging

him with inadmissibility under section 212(a)(6)(A)(i) of the Immigration and Nationality Act

(INA).

6.      On November 20, 2024, G.F.F. failed to appear for his initial master calendar

hearing before the Chicago Immigration Court.

7.      On December 5, 2024, during the course of executing a federal arrest warrant,

Homeland Security Investigations (HSI) agents encountered G.F.F. and several alleged members

of Tren de Aragua (TdA) living together inside an apartment. On the same day, G.F.F. was

arrested and detained by ICE pursuant to INA § 236(a).

8.      On January 20, 2025, a custody redetermination hearing was held before an

immigration judge, who denied G.F.F.'s request for a change in custody status by written order

dated February 18, 2025.

9.      On January 24, 2025, G.F.F. filed an asylum application as his sole form of relief.

10.     On March 8, 2025, G.F.F. was transferred to Moshannon Valley Processing

Center ("MVPC").

11.     On March 9, 2025, G.F.F. was transferred to El Valle Detention Facility

("EVDF").

12.     On March 17, 2025, an individual merits hearing in removal proceedings for

G.F.F. was held before an immigration judge, and the case was adjourned to March 25, 2025, for

additional testimony.

13.     On March 25, 2025, a continued individual merits hearing for G.F.F. was held before an immigration judge, and the case was adjourned to April 2, 2025, for additional testimony.

14.     On April 2, 2025, a continued individual merits hearing for G.F.F. was held before an immigration judge, and the court set a briefing schedule for closing statements and adjourned the case to April 23, 2025.

15.     On April 4, 2025, G.F.F. was transferred to Alexandria Staging Facility.

16.     On April 5, 2025, G.F.F. was transferred to Orange County Jail, where he continues to be detained.

## J.G.O.

17.     J.G.O. is a thirty-two-year-old native and citizen of Venezuela. He unlawfully entered the United States on or about September 29, 2022, without inspection.

18.     He was issued a Notice to Appear charging him with inadmissibility under INA § 212(a)(6)(A)(i).

19.     On January 18, 2024, J.G.O. was arrested by the New York City Police Department for Criminal Possession of Weapon in the 4th degree in violation of N.Y. Penal Law § 265.01(01). The arrest was eventually sealed.

20.     On January 30, 2025, HSI agents encountered J.G.O. while executing a criminal arrest warrant against an alleged member of TdA. On the same day, J.G.O. was arrested and detained by ICE pursuant to INA § 236(a) at Orange County Jail.

21.     On March 8, 2025, J.G.O. was transferred to MVPC.

22.     On March 9, 2025, J.G.O. was transferred to EVDF.

23.     On April 4, 2025, J.G.O. was transferred to Alexandria Staging Facility.

24.     On April 5, 2025, J.G.O. was transferred to Orange County Jail, where he continues to be detained.

25.     His individual hearing on his asylum application is scheduled for May 2, 2025, in the Varick Immigration Court.

## ORANGE COUNTY JAIL

26.     Orange County Jail, located in Goshen, New York, is the only ICE detention facility located in the Southern District of New York aside from short-term arrest processing facilities at 26 Federal Plaza. ICE does not have any detention facilities located on Rikers' Island.

27.     Orange County Jail has bed-space capacity for 56 low/medium-risk detainees. As of today, it is at capacity for detainees at this classification.

28.     Orange County Jail has bed-space capacity for 112 medium/high-risk detainees. As of today, 86 detainees at this classification are detained there.

29.     Low-risk classification detainees cannot be detained in medium/high risk bed-space capacity.

30.     There are currently 8 Venezuelan citizens with alleged membership in TdA detained at Orange County Jail, including the named Petitioners in this lawsuit.

31.     Due to the above-described space limitations at Orange County Jail for aliens of certain classifications and to comply with the Temporary Restraining Order issued by this court, ICE is unable to detain and remove certain Venezuelan citizens with alleged membership in TdA in the Southern District of New York when they are subject to removal under both Title 8 and Title 50 of the U.S. Code.

32.    Due to the above-described space limitations at Orange County Jail for aliens of certain classifications and to comply with the Temporary Restraining Order issued by this court, ICE is unable to transfer Venezuelan citizens with alleged membership in TdA to facilities with sufficient bed space.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
          April___, 2025

KHRISTOPHER J DAWSON
Digitally signed by KHRISTOPHER J DAWSON
Date: 2025.04.15 19:12:33 -04'00'

KHRISTOPHER DAWSON

Exhibit F

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION**

| | | |
|---|---|---|
| A.A.R.P., on his own behalf and on behalf of all others similarly situated, et al., | § § § § | |
| Petitioners-Plaintiffs, | § § | No. 1:25-CV-059-H |
| v. | § § | |
| DONALD J. TRUMP, et al. | § § | |
| Respondents-Defendants. | § | |

<u>DECLARATION OF YOUSUF KHAN</u>

In accordance with the provisions of Section 1746 of Title 28, United States Code, I, the undersigned, Yousuf Khan, do hereby make the following declaration, under penalty of perjury in the above-styled and numbered cause:

1.  I, Yousuf Khan, am presently employed by the United States Department of Homeland Security ("DHS" or the "Department"), Immigration and Customs Enforcement ("ICE"), in the position of Assistant Field Office Director.

2.  As the AFOD, I am responsible for the detained and detention portfolios, meaning I am responsible for the officers that process incoming detainees, manage the immigration cases of detainees, and oversee the detention facilities in the field office to ensure compliance with relevant standards.

3.  I base this declaration on my personal knowledge, and on information contained in ICE's electronic records and databases.

4.  I am familiar with the cases of A.A.R.P. and W.M.M.

5.   Both A.A.R.P. and W.M.M. are currently detained in ICE custody at the Bluebonnet Detention Center in Anson, Texas.

6.   As of April 16, 2025, neither A.A.R.P. nor W.M.M. have been issued paperwork advising them that ICE intends to remove them under the Alien Enemies Act ("AEA").

7.   ICE is aware that A.A.R.P. and W.M.M. are plaintiffs in the instant habeas petition.

8.   ICE does not intend to remove A.A.R.P. or W.M.M. under the AEA while their habeas petitions are pending.


Sworn to and subscribed this 16th day of April, 2025.


_____
Yousuf Khan
Assistant Field Office Director
Department of Homeland Security
Immigration and Customs Enforcement