# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

A.A.R.P.,* W.M.M.,* and F.G.M.* on their own
behalf and on behalf of others similarly-situated,

*Petitioners–Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States; PAMELA BONDI,
Attorney General of the United States, in her
official capacity; KRISTI NOEM, Secretary of the
U.S. Department of Homeland Security, in her
official capacity; U.S. DEPARTMENT OF
HOMELAND SECURITY; TODD LYONS,
Acting Director of the Director of U.S.
Immigration and Customs Enforcement, in his
official capacity; U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT; MARCO RUBIO,
Secretary of State, in his official capacity; U.S.
STATE DEPARTMENT; JOSH JOHNSON, in his
official capacity as acting Dallas Field Office
Director for U.S. Immigration and Customs
Enforcement; MARCELLO VILLEGAS, in his
official capacity as the Facility Administrator of
the Bluebonnet Detention Center; PHILLIP
VALDEZ, in his official capacity as Facility
Administrator of the Eden Detention Center;
JIMMY JOHNSON, in his/her official capacity as
Facility Administrator of the Prairieland Detention
Center; and JUDITH BENNETT, in her official
capacity as Warden of the Rolling Plains Detention
Center;

*Respondents–Defendants*.

Case No. _____

**COMPLAINT-CLASS
ACTION: CLASS PETITION
FOR WRIT OF HABEAS
CORPUS AND COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF**

* Motion for the Petitioners to proceed under pseudonyms has been concurrently filed with this
class petition and complaint.

## INTRODUCTION

1.      Petitioners-Plaintiffs ("Petitioners") are Venezuelan men in immigration custody at risk of imminent removal under the President's Proclamation invoking the Alien Enemies Act ("AEA").

2.      By its terms, the AEA applies only where the United States is in a "declared war" with a "foreign nation or government," or a "foreign nation or government" has engaged in, or is threatening to engage in, an "invasion" or "predatory incursion" against the "territory of the United States." 50 U.S.C. § 21.

3.      The Proclamation at issue here invoking the AEA is entitled: "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua.[1] It authorizes the "immediate" removal, without notice or judicial review, of noncitizens over the age of fourteen who the government claims are members of the Venezuelan criminal gang Tren de Aragua ("TdA"), excluding lawful permanent residents. It also overrides all the procedural and substantive protection afforded by Congress for noncitizens in immigration proceedings, including protection against the removal to a place where they will face torture.

4.      Although the AEA requires that its invocation be made "public," the Proclamation is dated March 14, 2015, but was not made public until March 15. The government, however, attempted to remove individuals under the Proclamation before it was made public.

5.      The AEA, enacted in 1798, provides the President with wartime authority and has been used only three times in our Nation's history: the War of 1812, World War I and World War II.

6.      It may not be used against a criminal gang or during peacetime.

_____

[1] *Available at* https://perma.cc/ZS8M-ZQHJ.

7.      Nonetheless, on March 15, the government removed at least 137 Venezuelan noncitizens under the Proclamation to one of the world's most notorious prisons in El Salvador, where they may remain incommunicado for the rest of their lives according to the Salvadoran President.

8.      These individuals were sent to this brutal prison without any court having had an opportunity to review the threshold questions of whether a criminal gang can be deemed a "foreign government or nation" within the meaning of the AEA, or whether criminal activity and migration can constitute a military "invasion or predatory incursion" of the "territory of the United States;" under the Act.

9.      These individuals were also given no opportunity to contest their designation as members of the TdA gang and therefore did not even fall with the Proclamation. And more and more evidence is emerging that many (perhaps most) of these individuals lacked any ties to the gang and were mistakenly placed under the Proclamation.

10.     That more individuals are not languishing in a Salvadoran prison is the result of a nationwide class Temporary Restraining Order issued by Judge Boasberg in the District of Columbia. *J.G.G. v. Trump*, No. 1:25-cv-766-JEB, 2025 WL 825115, at *1 (D.D.C. Mar. 15, 2025). The D.C. Circuit declined to stay the TRO, *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *1 (D.C. Cir. Mar. 26, 2025), but the Supreme Court vacated the TRO, *Trump v. J.G.G.*, No. 24A931, 2025 WL 1024097, at *1 (U.S. Apr. 7, 2025). However, the Supreme Court made clear that review was available by habeas, that individuals subjected to the Proclamation are entitled to "due process" and must be given "notice . . . within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *Id*. at *2.

2

11.     Accordingly, given that Petitioners and the putative class are no longer protected by the TRO in D.C., they file this habeas action given the Supreme Court's ruling that habeas is the proper mechanism to challenge the Proclamation's application.

12.     As of April 18, 2025, officers at Bluebonnet have issued notices to many men, including F.G.M., and many others in the proposed class. The notice is in English, does not say that one can contest the designation under the AEA, and does not state a timeframe for when the removal will occur.

13.     The Proclamation is unlawful for three principal reasons: the Proclamation (1) fails to satisfy the statutory predicates of the AEA because the TdA is not a "foreign government or nation" not is it involved in a military "invasion or predatory incursions" of the "territory of the United States;" (2) sweeps away the procedural and substantive protections Congress enacted for the protection of noncitizens subject to removal; and (3) provides no notice or opportunity for judicial review to show that an individual is not in fact a member of the TdA and therefore falls wholly outside of the Proclamation.

14.     This Court's intervention is necessary so that Petitioners and the putative class are not unlawfully sent to a Salvadoran prison pursuant to the Proclamation, perhaps for the remainder of their lives.

15.     Petitioners in this action do not seek release from detention or contest any aspect of their ongoing immigration proceedings.

<u>**JURISDICTION AND VENUE**</u>

16.     This case arises under the Alien Enemies Act ("AEA"), 50 U.S.C. §§ 21-24; the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.* and its implementing regulations; the Convention Against Torture ("CAT"), *see* Foreign Affairs Reform and

Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112

Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231); the All Writs Act, 28 U.S.C.

§ 1651; and the Fifth Amendment to the U.S. Constitution.

17. This Court has subject matter jurisdiction under 28 U.S.C. § 2241 *et seq*. (habeas

corpus); art. I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause); 28 U.S.C. § 1346 (United

States as defendant); 28 U.S.C. § 1361 (mandamus); and 28 U.S.C. § 1651 (All Writs Act).

18. The Court may grant relief pursuant to 28 U.S.C. § 2241; 28 U.S.C. § 2243; the

Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.; the All Writs Act, 28 U.S.C. § 1651; and

the Court's inherent equitable powers.

19. Venue is proper in this District under 28 U.S.C. § 2241; 28 U.S.C. § 1391(b); and,

28 U.S.C. § 1391(e)(1) because at the time of filing the Petitioners were detained in the

Respondents' custody within the Northern District of Texas; a substantial part of the events and

omissions giving rise to the claim occurred in this district; and Respondents are agencies of the

United States or officers of the United States acting in their official capacity.

## PARTIES

### A. Petitioners-Plaintiffs ("Petitioners")

20. Petitioner A.A.R.P. is a Venezuelan national who is detained at Bluebonnet

Detention Center in Anson, Texas. A.A.R.P. fled Venezuela because he and his family were

persecuted there in the past for their political beliefs and for publicly protesting against the

current Venezuelan government. He came to the United States in 2023 with his wife and their

son. He is currently seeking asylum, withholding, and protection under the Convention Against

Torture. His next hearing is scheduled for April 28, 2025, at the Fort Snelling Minnesota

Immigration Court. A.A.R.P. was detained while carpooling to work with his wife on March 26,

4

2025. ICE has accused A.A.R.P. of having "tattoos and associates that indicate membership in the Tren de Aragua gang" in an I-213. A.A.R.P. has a number of tattoos including a clock that shows the date and time of his son's birth, a cross, and the Virgin Mary. None of these tattoos are related to TdA, and he denies any connection with TdA. Early on April 14, A.A.R.P. was suddenly transferred from the Sherburne County Jail in Minnesota to the Bluebonnet Detention Center despite his upcoming April 28 hearing in immigration court in Minnesota. A.A.R.P. is at grave risk of being classified as an alien enemy under the Aliens Enemy Act and summarily deported under the Proclamation to El Salvador.

21.    W.M.M. is a Venezuelan national who is also detained at Bluebonnet Detention Center in Anson, Texas. W.M.M. fled Venezuela after the Venezuelan military harassed and assaulted him because they believed that he did not support the Maduro regime. W.M.M. arrived in the United States in 2023. He was released on his own recognizance, and he subsequently filed an asylum application. Several months later, federal authorities arrested W.M.M. on a misdemeanor warrant for alleged illegal entry into the United States. At his hearing on the warrant, the government alleged that W.M.M. is affiliated with TdA based on emojis used in W.M.M.'s social media feed, and a comment left by another individual on a social media post. The government also alleged that W.M.M. was arrested at a residence where an alleged TdA associate was present. *Id.* W.M.M. denies having any connection with TdA. The magistrate judge ordered W.M.M. released from federal criminal custody because the government had not met its threshold burden to show a serious risk that W.M.M. would flee. The judge noted that the illegal entry case was W.M.M.'s only interaction with a court. The U.S. Marshals released W.M.M. into ICE's custody and he was subsequently detained for about a month at the Winn Correctional Center in Louisiana. On April 14, W.M.M. was abruptly transferred along with

several other Venezuelans to the Bluebonnet Detention Center, where he is now currently detained with Venezuelans transferred from other facilities. Even though W.M.M. has an individual hearing scheduled for August 22, his phone access was abruptly cut off the afternoon of April 15 and he was told he would be imminently transferred again. W.M.M. is fearful that he will be classified as an alien enemy under the Aliens Enemy Act and summarily deported under the Proclamation to El Salvador.

22.    Petitioner F.G.M. is a Venezuelan national who is also detained at Bluebonnet Detention Center in Anson, Texas. F.G.M. has a pending asylum application and no final removal order. On the evening of April 17, 2025, F.G.M. called his attorney. F.G.M. said that ICE accused him of being a member of TdA and provided documentation labeling him as such, and as an alien enemy. ICE told F.G.M. to sign papers written in English but F.G.M., who speaks only Spanish, refused. ICE informed F.G.M. that these papers were coming from the President and that he would be deported even if he did not sign the papers.

**B. Respondents-Defendants ("Respondents")**

23.    Respondent Donald Trump is the President of the United States. He is sued in his official capacity. In that capacity, he issued the Proclamation under the Alien Enemies Act. Injunctive relief is not sought against the President.

24.    Respondent Pamela J. Bondi is the U.S. Attorney General at the U.S. Department of Justice, which is a cabinet-level department of the United States government. She is sued in her official capacity.

25.    Respondent Kristi Noem is the Secretary of the U.S. Department of Homeland Security, which is a cabinet-level department of the United States government. She is sued in her

official capacity. In that capacity, Respondent Noem is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103.

26.    Respondent U.S. Department of Homeland Security ("DHS") is a cabinet-level department of the United States federal government. Its components include Immigration and Customs Enforcement ("ICE"). Respondent DHS is a legal custodian of Petitioner.

27.    Respondent Todd Lyons is the Acting Director of ICE. Respondent Lyons is responsible for ICE's policies, practices, and procedures, including those relating to the detention of immigrants during their removal procedures. Respondent Lyons is a legal custodian of Petitioner. Respondent Lyons is sued in his official capacity.

28.    Respondent ICE is the subagency of DHS that is responsible for carrying out removal orders and overseeing immigration detention. Respondent ICE is a legal custodian of Petitioner.

29.    Respondent Marco Rubio is the Secretary of State at the U.S. Department of State. He is sued in his official capacity.

30.    Respondent U.S. Department of State, which is a cabinet-level department of the United States government.

31.    Respondent Josh Johnson is the acting director of ICE's Dallas's Field Office, which is responsible for ICE activities in Northern Texas and Oklahoma, including Bluebonnet Detention Center. Respondent Johnson is an immediate legal custodian responsible for the arrest and detention of Petitioners. He is sued in his official capacity.

32.    Respondent Marcello Villegas is the Facility Administrator of the Bluebonnet Detention Center, which detains individuals suspected of civil immigration violations pursuant to

a contract with ICE. Respondent Villegas is the immediate physical custodian responsible for the detention of Petitioners. He is sued in his official capacity.

33.     Respondent Phillip Valdez is the Facility Administrator of the Eden Detention Center, which detains individuals suspected of civil immigration violations pursuant to a contract with ICE. Respondent Valdez is the immediate physical custodian responsible for the detention of individuals in the Petitioner class. He is sued in his official capacity.

34.     Respondent Jimmy Johnson is the Facility Administrator of the Prairieland Detention Facility, which detains individuals suspected of civil immigration violations pursuant to a contract with ICE. Respondent Johnson is the immediate physical custodian responsible for the detention of individuals in the Petitioner class. He is sued in his official capacity.

35.     Respondent Judith Bennett is the Warden of the Rolling Plains Detention Center, which detains individuals suspected of civil immigration violations pursuant to a contract with ICE. Respondent Bennett is the immediate physical custodian responsible for the detention of individuals in the Petitioner class. She is sued in her official capacity.

## BACKGROUND

**The Alien Enemies Act**

36.     The AEA is a wartime authority enacted in 1798 that grants the President specific powers with respect to the regulation, detention, and deportation of enemy aliens.

37.     The AEA, as codified today, provides that "[w]henever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized,

shall be liable to be apprehended, restrained, secured, and removed as alien enemies." 50 U.S.C. § 21.

38.     The AEA can thus be triggered in only two situations. The first is when a formal declared war exists with a foreign nation or government. The second is when a foreign nation or government perpetrates, attempts, or threatens an invasion or predatory incursion against the territory of the United States.

39.     To trigger the AEA, the President must make a public proclamation of the declared war, or of the attempted or threatened invasion or predatory incursion. *Id.*

40.     The AEA also provides that noncitizens must be permitted the full time to depart as stipulated by any treaty between the United States and the enemy nation, unless the noncitizen has engaged in "actual hostility" against the United States. If no such treaty exists, the President may declare a "reasonable time" for departure, "according to the dictates of humanity and national hospitality." *Id.* § 22.

41.     Under the AEA, noncitizens who "refuse or neglect to depart" are subject to removal. *Id.* § 21.

42.     The Act has been used only three times in American history, all during actual or imminent wartime.

43.     The AEA was first invoked several months into the War of 1812, but President Madison did not use the AEA to remove anyone from the United States during the war.

44.     The AEA was invoked a second time during World War I by President Wilson. Upon information and belief, there were no removals effectuated pursuant to the AEA during World War I.

45.     The AEA was used again during World War II, though it was never used as a widespread method of removal.

46.     On December 7, 1941, after the Japanese invaded Hawaii in the attack on Pearl Harbor, President Roosevelt proclaimed that Japan had perpetrated an invasion upon the territory of the United States. The president issued regulations applicable to Japanese nationals living in the United States. The next day Congress declared war on Japan.

47.     On the same day, President Roosevelt issued two separate proclamations stating that an invasion or predatory incursion was threatened upon the territory of the United States by Germany and Italy. The president incorporated the same regulations that were already in effect as to Japanese people for German and Italian people. Three days later Congress voted unanimously to declare war against Germany and Italy.

48.     Congress declared war against Hungary, Romania, and Bulgaria on June 5, 1942. Just over a month later, President Roosevelt issued a proclamation recognizing that declaration of war and invoking the AEA against citizens of those countries.

49.     Under these proclamations, the United States infamously interned noncitizens from Japan, Germany, Italy, Hungary, Romania, and Bulgaria (with U.S. citizens of Japanese descent subject to a separate order that did not rely on the AEA).

50.     It was not until the end of hostilities that the President provided for the removal of alien enemies from the United States under the AEA.  On July 14, 1945, President Truman issued a proclamation providing that alien enemies detained as a danger to public peace and safety "shall be subject upon the order of the Attorney General to removal from the United States." The Department of Justice subsequently issued regulations laying out the removal process. *See* 10 Fed. Reg. 12,189 (Sept. 28, 1945). The regulations required, *inter alia*, notice of

the removal order to be served on the designated alien enemy and that the alien enemy had thirty

(30) days thereafter to depart—during which time they could seek judicial review of the removal

order. *Id*.

**Systemic Overhaul of Immigration Law in 1952**

51.     Following the end of World War II, Congress consolidated U.S. immigration laws

into a single text under the Immigration and Nationality Act of 1952 ("INA").

52.     The INA, and its subsequent amendments, provide for a comprehensive system of

procedures that the government must follow before removing a noncitizen from the United

States. The INA now provides the exclusive procedure by which the government may determine

whether to remove an individual. 8 U.S.C. § 1229a(a)(3).

53.     In addition to laying out the process by which the government determines whether

to remove an individual, the INA also enshrines certain forms of humanitarian protection.

54.     First, the INA provides that "[a]ny alien who is physically present in the United

States or who arrives in the United States (whether or not at a designated port of arrival . . . ),

irrespective of such alien's status," may apply for asylum. 8 U.S.C. § 1158(a)(1). To qualify for

asylum, a noncitizen must show a "well-founded fear of persecution" on account of a protected

ground, such as race, nationality, political opinion, or religion. 8 U.S.C. § 1101(a)(42)(A).

55.     Second, save for certain limited exceptions, Congress has barred the removal of

an individual to a country where it is more likely than not that he would face persecution on one

of these protected grounds. 8 U.S.C. § 1231(b)(3). That protection implements this country's

obligations under the 1951 Refugee Convention and the 1967 Protocol relating to the Status of

Refugees. The relevant form of relief, known as "withholding of removal," requires the applicant

11

to satisfy a higher standard with respect to the likelihood of harm than asylum, but this form of relief is mandatory if the standard is met.

56.    Third, the Convention Against Torture ("CAT") prohibits the government from returning a noncitizen to a country where it is more likely than not that he would face torture. *See* 8 U.S.C. § 1231 note. That protection implements the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242. As with withholding of removal, CAT relief also requires the applicant to satisfy a higher standard with respect to the likelihood of harm than asylum and relief is mandatory if that standard is met. There is no exception to CAT relief.

**President Trump's Proclamation Invoking the AEA**

57.    On March 14, the President signed the AEA Proclamation at issue here. It provides that "all Venezuelan citizens 14 years of age or older who are members of TdA [Tren de Aragua], are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." *See* Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua (Mar. 15, 2025).[2]

58.    Although the AEA calls for a "public proclamation," 50 U.S.C. § 21, the administration did not make the invocation public until around 3:53 p.m. EDT on March 15, despite making extensive preparations and attempts to remove class members under the Act.

59.    The Proclamation claims that the TdA gang is engaged in an invasion and predatory incursion into the United States, and that the gang should be considered a "foreign government."

---

[2] *Available at*: https://perma.cc/ZS8M-ZQHJ.

60.     The Proclamation thus states that all Venezuelan citizens ages fourteen or older alleged to be members of TdA who are not U.S. citizens or lawful permanent residents are alien enemies.

61.     The Proclamation provides no means or process for individuals to contest that they are members of the TdA and do not therefore fall within the terms of the Proclamation. Nor does it provide individuals with the statutory grace period in which they can both seek judicial review or arrange their affairs and leave voluntarily.

62.     Instead, the Proclamation invokes the statutory exception to the "reasonable notice" requirement by claiming that the individuals subject to the Proclamation are "chargeable with actual hostility," and pose "a public safety risk," making them subject to immediate apprehension, restraint, and removal.

63.     The government employs a standardized check list, the "Alien Enemy Validation Guide," to determine who is an "alien enemy" subject to the Proclamation. An ICE officer completes the form, tallying points for different categories of alleged TdA membership characteristics.

64.     The checklist's methodology relies on several dubious criteria, including physical attributes like tattoos, hand gestures, symbols, logos, graffiti, and manner of dress. Experts who study the TdA have explained how none of these physical attributes are reliable ways of identifying members of the TdA.

65.     Noncitizens subject to the Proclamation are not afforded the procedural or substantive protection under the INA, including under Convention Against Torture.

66.     Multiple judges have already found that the Proclamation is likely unlawful. *See J.G.G.*, 2025 WL 914682, at *5–10 (Henderson, J., concurring) (AEA predicates of "invasion"

or "predatory incursion" not met); *id*. at *13 (Millett, J., concurring) ("The Constitution's demand of due process cannot be so easily thrown aside."); *J.G.G. v. Trump*, No. CV 25-766 (JEB), 2025 WL 890401, at *2 (D.D.C. Mar. 24, 2025) (Boasberg, J.) ("before plaintiffs may be deported, they are entitled to individualized hearings to determine whether the Act applies to them at all").

67.    As a result of the Proclamation, countless Venezuelans—including Petitioners in this District—are at imminent risk of removal pursuant to the Proclamation without any hearing or meaningful review, regardless of the absence of any ties to TdA or the availability of claims for relief from and defenses to removal.

## CLASS ACTION ALLEGATIONS

68.    Petitioners bring this action under both Federal Rules of Civil Procedure 23(a) and 23(b)(2) and principles of habeas and equity on behalf of himself and a class of all other persons similarly situated.

69.    Petitioners seek to represent the following Proposed Class: All noncitizens in custody in the Northern District of Texas who were, are, or will be subject to the March 2025 Presidential Proclamation entitled 'Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren De Aragua' and/or its implementation.

70.    The proposed class satisfies the requirements of Rule 23(a)(1) because the class is so numerous that joinder of all members is impracticable. Hundreds of Venezuelans living in Texas and the greater southern U.S. region will potentially be subjected to summary removal under the Proclamation and its implementation by Respondents. Several weeks ago, the government identified nationwide 86 people in detention subject to the Proclamation and 172 more who are at liberty. *See supra*, Cerna Decl. ¶ 6. Based on the former number alone,

Petitioners clear the bar, but there are likely to be more individuals entering the class as more of the 172 individuals are taken into ICE custody. Upon information and belief, the government has in the last 24 to 48 hours suddenly transferred Venezuelan men, including Named Petitioners, from detention centers all over the country to northern Texas, despite their pending removal proceedings in immigration court. Upon information and belief, people have been transferred in groups of Venezuelan men, and been told that they appear to be on a list with other Venezuelans. Upon information and belief, many have now received notices under the AEA designating them as alien enemies. The Notice is in English, does not say that one can contest the designation under the AEA, and does not state a timeframe for when the removal will occur. Proposed class members are being told that they will be imminently removed under the AEA, as soon as tonight. Thus, many individuals in this District are at imminent risk of summary removal pursuant to the Proclamation. The proposed class also includes numerous future noncitizens who will be subjected to the Proclamation, as the government has repeatedly stated that it intends to continue using the Proclamation absent court intervention. Because ICE continues to "track[] the TdA members who are amenable to removal proceedings," *see supra*, Cerna Decl. ¶ 6, and more individuals will be designated under the Proclamation, "the class includes unknown, unnamed future members." *Pederson v. La. State Univ.*, 213 F.3d 858, 868 n.11 (5th Cir. 2000); *see also Jack v. Am. Linen Supply Co.*, 498 F.2d 122, 124 (5th Cir. 1974) (discussing impracticability of joinder of unknown persons); *Phillips v. Joint Legislative Comm.*, 637 F.2d 1014, 1022 (5th Cir. 1981) ("joinder of unknown individuals is certainly impracticable").

71.     The class satisfies the commonality requirements of Rule 23(a)(2). The members of the class are subject to a common practice: summary removal under the Proclamation contrary to the AEA, the INA, and due process. The suit also raises threshold questions of law common to

members of the proposed class, including whether the Proclamation and its implementation satisfy the statutory requirements of the AEA; whether the Proclamation may lawfully override the protections afforded noncitizens under the INA; and whether the lack of due process violates the Fifth Amendment.

72.    The proposed class satisfies the typicality requirements of Rule 23(a)(3), because the claims of the representative Petitioners are typical of the claims of the class. Each proposed class member, including the proposed class representatives, has experienced or faces the same principal injury (unlawful removal), based on the same government practice (the Proclamation and its implementation), which is unlawful as to the entire class because it violates the AEA, the INA, and due process.

73.    The proposed class satisfies the adequacy requirements of Rule 23(a)(4). The representative Petitioners seek the same relief as the other members of the class—among other things, an order declaring the Proclamation unlawful and an injunction preventing enforcement of the Proclamation. In defending their rights, Petitioners will defend the rights of all proposed class members fairly and adequately.

74.    The proposed class is represented by experienced attorneys from the American Civil Liberties Union and the American Civil Liberties Union of Texas. Proposed Class Counsel have extensive experience litigating class action lawsuits and other complex systemic cases in federal court on behalf of noncitizens.

75.    The proposed class also satisfies Rule 23(b)(2). Respondents have acted (or will act) on grounds generally applicable to the class by subjecting them to summary removal under the Proclamation rather than affording them the protection of immigration laws. Injunctive and declaratory relief is therefore appropriate with respect to the class as a whole.

16

76.     The proposed class also satisfies the requirements for a class guided by Rule 23 but certified under equity habeas principles.

## CAUSES OF ACTION[3]

### FIRST CLAIM FOR RELIEF

*Ultra Vires*, **Violation of 50 U.S.C. § 21, *et seq.***
**(All Respondents)**

77.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

78.     The AEA does not authorize the removal of noncitizens from the United States absent a "declared war" or a "perpetrated, attempted, or threatened" "invasion or predatory incursion" against the "territory of the United States" into the United States by a "foreign nation or government." *See* 50 U.S.C. § 21.

79.     The Proclamation and its implementation do not satisfy these statutory preconditions.

80.     Additionally, the AEA permits removal only where noncitizens alleged to be "alien enemies" "refuse or neglect to depart" from the United States. 50 U.S.C. § 21. The AEA also requires the government to afford noncitizens alleged to be "alien enemies" sufficient time to settle their affairs and to depart the United States. *See* 50 U.S.C. § 22.

81.     However, Petitioners and the class are being subject to forced removal without being afforded the privilege of voluntary departure, let alone any notice or an opportunity to respond to the designation of alien enemy.

---

[3] Insofar as a cause of action seeks to enjoin Respondents, Petitioners do not seek such relief against the President.

82.     The application of the AEA Process to Petitioners and the class is therefore *ultra vires*.

## SECOND CLAIM FOR RELIEF

### Violation of 8 U.S.C. § 1101, *et seq.*
### (All Respondents)

83.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

84.     The INA provides that a removal proceeding before an immigration judge under 8 U.S.C. § 1229a is "the sole and exclusive procedure" by which the government may determine whether to remove an individual, "[u]nless otherwise specified" in the INA. 8 U.S.C. § 1229a(a)(3).

85.     The INA's "exclusive procedure" and statutory protections apply to any removal of a noncitizen from the United States, including removals authorized by the AEA.

86.     The AEA Process creates an alternative removal mechanism outside of the immigration laws set forth by Congress in Title 8.

87.     Because the AEA Process provides for the removal of Petitioners and the class without the procedures specified in the INA, it violates the INA.

## THIRD CLAIM FOR RELIEF

### Violation of 8 U.S.C. § 1158, Asylum
### (All Respondents)

88.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

89.     The INA provides, with certain exceptions, that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated

port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title." 8 U.S.C. § 1158(a)(1).

90.    Respondents' application of the AEA Process to Petitioners and the class prevents them from applying for asylum in accordance with 8 U.S.C. § 1158(a)(1) and is therefore contrary to law.

## FOURTH CLAIM FOR RELIEF

### Violation of 8 U.S.C. § 1231(b)(3), Withholding of Removal
### (All Respondents)

91.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

92.    With certain limited exceptions, the "withholding of removal" statute, INA § 241(b)(3), *codified at* 8 U.S.C. § 1231(b)(3), bars the removal of noncitizens to a country where it is more likely than not that they would face persecution.

93.    Respondents' AEA Process violates the withholding of removal statute because it does not provide adequate safeguards to ensure that Petitioners and the class are not returned to a country where it is more likely than not that they would face persecution. As a result, Respondents' actions against Petitioners and the class are contrary to law.

## FIFTH CLAIM FOR RELIEF

### Violation of the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"),
### codified at 8 U.S.C. § 1231 note
### (All Respondents)

94.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

19

95.     FARRA prohibits the government from returning a noncitizen to a country where it is more likely than not that he would face torture.

96.     Respondents' AEA Process violates FARRA because it does not provide adequate safeguards to ensure that Petitioners and the class are not returned to a country where it is more likely than not that they would face torture. As a result, Respondents' actions against Petitioners and the class are contrary to law.

## SIXTH CLAIM FOR RELIEF

### *Ultra Vires*, Violation of 50 U.S.C. § 22
### (All Respondents)

97.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

98.     The AEA requires that noncitizens whose removal is authorized by the AEA, unless "chargeable with actual hostility, or other crime against the public safety," be allowed the full time stipulated by treaty to depart or a reasonable time in which to settle their affairs before departing. *See* 50 U.S.C. § 22. The Proclamation on its face denies Petitioners and the class any time under Section 22 to settle their affairs, because it declares everyone subject to the Proclamation to be "chargeable with actual hostility" and to be a "danger to public safety."

99.     The government cannot invoke that exception categorically, without individualized assessments. Each noncitizen must specifically be "chargeable with actual hostility" or a crime against public safety to lose eligibility for voluntary departure.

100.    The AEA Process thus contravenes 50 U.S.C. § 22 and is *ultra vires.*

101.    The application of the AEA Process to Petitioners and the class is contrary to law.

## SEVENTH CLAIM FOR RELIEF

## Violation of Due Process Under the Fifth Amendment

20

**(All Respondents)**

102.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

103.    The Due Process Clause of the Fifth Amendment provides in relevant part that: "No person shall be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

104.    In denying Petitioners and the class meaningful procedural protections to challenge their removal, the Proclamation violates due process.

### EIGHTH CLAIM FOR RELIEF

**Violation of Habeas Corpus**
**(All Respondents)**

105.    Detainees have the right to file petitions for habeas corpus to challenge the legality of their removal under the Proclamation.

106.    The summary removal of Petitioners and the class under the Proclamation violates their right to habeas corpus. *See* 28 U.S.C. § 2241; U.S. Const. art. I, § 9, cl. 2 (Suspension Clause).

### PRAYER FOR RELIEF

WHEREFORE, Petitioners respectfully pray this Court to:

a.   Assume jurisdiction over this matter;

b.   Certify this action on behalf of the proposed Petitioner Class, appoint the Petitioners as class representatives, and appoint the undersigned counsel as class counsel;

c.   Grant a temporary restraining order to preserve the status quo pending further proceedings;

21

d.  Enjoin Respondents from transferring Petitioners and the Petitioner Class out of this district during the pendency of this litigation without advance notice to counsel;

e.  Grant a writ of habeas corpus to Petitioners and the Petitioner Class that enjoins Respondents removing them pursuant to the Proclamation;

f.  Enjoin Respondents from removing Petitioners and the Petitioner Class pursuant to the Proclamation.

g.  Declare unlawful the Proclamation;

h.  Enjoin Respondents from applying the Proclamation to Petitioners and the Petitioner Class without providing 30-day notice and an opportunity to respond to the designation prior to the removal date;

i.  Award Petitioners' counsel reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and

j.  Grant such further relief as the Court deems just, equitable, and appropriate.

Dated: April 16, 2025

Respectfully submitted,

/s/Brian Klosterboer
Brian Klosterboer
Tx Bar No.  24107833

Lee Gelernt*
Daniel Galindo*
Ashley Gorski*
Patrick Toomey*
Sidra Mahfooz*
Omar Jadwat*
Hina Shamsi*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
E: lgelernt@aclu.org
E: dgalindo@aclu.org
E: agorski@aclu.org
E: ptoomey@aclu.org
E: smahfooz@aclu.org
E: ojadwat@aclu.org
E: hshamsi@aclu.org

Noelle Smith*
Oscar Sarabia Roman*
My Khanh Ngo*
Cody Wofsy*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
T: (415) 343-0770
E: nsmith@aclu.org
E: osarabia@aclu.org
E: mngo@aclu.org
E: cwofsy@aclu.org

Thomas Buser-Clancy*
TX Bar No. 24078344
Savannah Kumar*
TX Bar No. 24120098
Charelle Lett*
TX Bar No. 24138899
Ashley Harris*
TX Bar No. 24123238
Adriana Piñon*
TX Bar No. 24089768
Adriana Piñon*
TX Bar No. 24089768
ACLU FOUNDATION OF TEXAS,
INC.
1018 Preston St.
Houston, TX 77002
(713) 942-8146
bklosterboer@aclutx.org
tbuser-clancy@aclutx.org
skumar@aclutx.org
clett@aclutx.org
aharris@aclutx.org
apinon@aclutx.org

Attorneys for Petitioners-Plaintiffs
*Pro hac vice applications
forthcoming

23