# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
August 13, 2026
Lyle W. Cayce
Clerk

---

No. 25-10534

---

W.M.M., *on their own behalf and on behalf of others similarly situated*; F.G.M., *on their own behalf and on behalf of others similarly situated*; A.R.P., *on their own behalf and on behalf of others similarly situated*,

*Petitioners—Appellants*,

*versus*

Donald J. Trump, *in his official capacity as President of the United States*; Todd Wallace Blanche, *Acting Attorney General of the United States, in his official capacity*; Markwayne Mullin, *Secretary of the United States Department of Homeland Security, in his official capacity*; United States Department of Homeland Security; Todd Lyons, *Acting Director of the Director of United States Immigration and Customs Enforcement, in his official capacity*; United States Immigration and Customs Enforcement; Marco Rubio, *Secretary of State, in his official capacity*; United States State Department; Josh Johnson, *in his official capacity as acting Dallas Field Office Director for United States Immigration and Customs Enforcement*; Marcello Villegas, *in his official capacity as the Facility Administrator of* the Bluebonnet Detention Center; Phillip Valdez, *in his official capacity as Facility Administrator of* the Eden Detention Center; Jimmy Johnson, *in his/her official capacity as Facility Administrator of* the Prairieland Detention Center; Judith Bennett, *in her official capacity as Warden of the Rolling Plains Detention Center*,

*Respondents—Appellees*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 1:25-CV-59

Before ELROD, *Chief Judge*, and JONES, SMITH, STEWART, RICHMAN, SOUTHWICK, HAYNES, GRAVES, HIGGINSON, WILLETT, HO, DUNCAN, ENGELHARDT, OLDHAM, WILSON, DOUGLAS, and RAMIREZ, *Circuit Judges*.

JENNIFER WALKER ELROD, *Chief Judge*, joined by JONES, SMITH, STEWART, RICHMAN, SOUTHWICK, GRAVES, HIGGINSON, WILLETT, HO, DUNCAN, ENGELHARDT, WILSON, DOUGLAS, and RAMIREZ, *Circuit Judges*:[*]

Over a year ago, the President of the United States proclaimed Venezuelan citizens in this country "immediate[ly]" removable "[a]lien [e]nemies" if they were members of a certain gang and "not actually naturalized or lawful permanent residents." That Proclamation has generated litigation around the country in federal courts at all levels. Here, three "Venezuelan national[s]" sued the President and other federal-government defendants, on petitioners' own behalf and that of a putative class, claiming that the Proclamation violates, as relevant here, the Alien Enemies Act of 1798 and due-process guarantees. Petitioners unsuccessfully sought preliminary injunctive relief against summary removal under the AEA in the district court and our court before the Supreme Court returned the case to us.

Now, on remand, the Supreme Court has specifically asked us to answer two questions: (1) whether the named petitioners' claims that the President violated the AEA warrant a preliminary injunction and (2) whether the President's Proclamation violates due process as to a putative class. But

[*] JUDGE HAYNES and JUDGE OLDHAM concur in the judgment.

after oral argument before the *en banc* court, we learned that the government has removed all three named petitioners under the Immigration and Nationality Act—that is, *not* the AEA. This development is unobjectionable: The Supreme Court expressly said that the government could remove the named petitioners and putative class under other laws. And petitioners point out no infirmities in their removal.

We DISMISS the appeal for lack of jurisdiction.

## I

### A

On March 14, 2025, the President issued a proclamation invoking the AEA against "all" citizens of Venezuela fourteen years of age or older within the United States who "are not actually naturalized or lawful permanent residents of the United States" and "are members of" Tren de Aragua. *Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua*, 90 Fed. Reg. 13033, 13034 (Mar. 14, 2025). Tren de Aragua, a designated foreign terrorist organization, *id.* at 13033; *Foreign Terrorist Organizations*, U.S. Dep't of State, https://www.state.gov/foreign-terrorist-organizations (last visited Aug. 11, 2026), began as a Venezuelan prison gang and has since "bec[o]me Venezuela's most powerful criminal enterprise," a "feared criminal organization focused on sex trafficking, human smuggling[,] and the drug trade," Luis Ferré-Sadurní & Chelsia Rose Marcius, *Venezuelan Gang's Path to U.S. Stokes Fear, Crime and Border Politics*, N.Y. Times (Sep. 22, 2024), https://perma.cc/QM86-NGAG. According to the Proclamation, Venezuelan authorities have gradually "ceded ever-greater control over their territories" to this group, resulting in "a hybrid criminal state that is perpetrating an invasion of and predatory incursion into the United States, and which poses a substantial danger to the United States." 90 Fed. Reg. at 13033. The President said that "TdA has

engaged in and continues to engage in mass illegal migration to the United States"; has "invaded the United States and continues to invade, attempt to invade, and threaten to invade the country; [has] perpetrated irregular warfare within the country; and [has] used drug trafficking as a weapon against our citizens." *Id.*

Invoking "the full extent of [his] authority to conduct the Nation's foreign affairs under the Constitution," the President "f[ound] and declare[d] that TdA is perpetrating, attempting, and threatening an invasion or predatory incursion against the territory of the United States." *Id.* at 13034. TdA is accomplishing this, according to the Proclamation, by "undertaking hostile actions and conducting irregular warfare against the territory of the United States both directly and at the direction, clandestine or otherwise," of the then-current Venezuelan government. *Id.* The President thus "proclaim[ed] that all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as [a]lien [e]nemies" under the AEA. *Id.*

The President directed that all such individuals "are subject to immediate apprehension, detention, and removal, and further that they shall not be permitted residence in the United States." *Id.* Moreover, the Proclamation stated, "[t]he Secretary of Homeland Security retains discretion to apprehend and remove any [a]lien [e]nemy under any separate authority." *Id.*

B

W.M.M., F.G.M., and A.R.P.—three "Venezuelan national[s]" whom the government alleges are TdA members and who were then detained

in Anson, Texas—filed a habeas petition.[1] Specifically, they purported to file a habeas petition as a class action. Indeed, their habeas petition bears the title "Complaint-Class Action: Class Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief."[2] They claim, among other things, that the Proclamation does not satisfy the AEA and violates due process. They also moved to certify a class of "[a]ll noncitizens in custody in the Northern District of Texas who were, are, or will be subject to" the President's Proclamation "and/or its implementation."

Almost immediately, litigation in this case assumed a breakneck pace. On April 17, 2025, the day after petitioners filed their habeas petition, the district court denied their motion, on their own behalf and that of the putative class, for a temporary restraining order "against summary removal under the AEA." *A.A.R.P. v. Trump (A.A.R.P. III)*, 605 U.S. 91, 92 (2025). The next day, April 18, at 12:34 a.m. central time, petitioners moved for an emergency TRO—again on their own behalf and that of the putative class. *Id.* At 12:48 p.m., they asked for "a ruling on that motion or a status conference by 1:30 p.m." *Id.* At 3:02 p.m., they appealed the district court's "constructive denia[l]" of the emergency TRO to our court and sought a temporary administrative stay and an injunction pending appeal. *Id.* at 92–93 (alteration

---

[1] The district court granted the named petitioners' motion to proceed under pseudonyms. In district court, A.R.P. initially went by the initials "A.A.R.P.," but the district court granted a motion to change his pseudonym to "A.R.P."

[2] Generally, habeas proceedings involve only one petitioner against one respondent. *See, e.g.*, *Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004) ("[T]he proper respondent to a habeas petition is 'the person who has custody over [the petitioner].' The consistent use of the definite article in reference to the custodian indicates that there is generally only one proper respondent to a given prisoner's habeas petition." (second alteration in original) (citation omitted) (quoting 28 U.S.C. § 2242)). But W.M.M. and A.R.P. filed a single habeas petition together and also sought to represent a putative class. They later filed an amended habeas petition adding F.G.M. as a third petitioner.

in original). The same day, petitioners also submitted to the Supreme Court an emergency application for an emergency injunction or writ of mandamus and stay of removal, seeking to bar the government from removing them while the appeal was pending, as well as a class-wide temporary administrative injunction. *Id.* at 93. Petitioners posited that the Supreme Court could alternatively treat their application as a petition for *certiorari* before judgment.

That night, our court dismissed petitioners' appeal for lack of jurisdiction under 28 U.S.C. § 1291(a)(1) and denied their motion for a temporary administrative stay and an injunction pending appeal as premature. *A.A.R.P. v. Trump (A.A.R.P. I)*, No. 25-10534, 2025 WL 1148141, at *1 (5th Cir. Apr. 18, 2025). At the time of that order, the panel was unaware that the Supreme Court would also issue a ruling the same night. At 12:52 a.m. on April 19—that is, 11:52 p.m. central time on April 18—the Supreme Court ordered the government "not to remove any member of the putative class of detainees." *A.A.R.P. III*, 605 U.S. at 93; *A.A.R.P. v. Trump (A.A.R.P. II)*, 145 S. Ct. 1034, 1034 (2025). It invited the government to respond to the stay application after our court had ruled. *A.A.R.P. II*, 145 S. Ct. at 1034. The case then returned to district court.

In the brief lull that followed, the district court denied class certification. But it stayed the effect of that denial "pending further action from the Supreme Court." And it declared that if the Supreme Court granted petitioners' then-pending "petition for a writ of certiorari" (by which it presumably meant their application for emergency relief), the district court's order denying certification would "[be] automatically vacated." That is indeed what happened when the Supreme Court treated petitioners' pending emergency-relief application as a petition for *certiorari* and granted it. *A.A.R.P. III*, 605 U.S. at 94, 97 n.1, 98. The putative class

currently remains uncertified. *Id.* at 97 n.1; *W.M.M. v. Trump*, 154 F.4th 207, 213 & n.2, *vacated on grant of en banc reh'g*, 154 F.4th 319 (5th Cir. 2025).

The Supreme Court vacated our judgment dismissing petitioners' appeal and remanded the case to us. *A.A.R.P. III*, 605 U.S. at 98. It concluded that we had incorrectly dismissed the appeal for lack of jurisdiction. *Id.* at 94. The Court then directed that "[i]n resolving the detainees' appeal," we "should address" two questions:

> (1) all the normal preliminary injunction factors, including likelihood of success on the merits, as to the named plaintiffs' underlying habeas claims that the AEA does not authorize their removal pursuant to the President's March 14, 2025, Proclamation, and (2) the issue of what notice is due, as to the putative class's due process claims against summary removal.

*Id.* at 98–99.

The Court enjoined the government "from removing the named plaintiffs or putative class members in this action under the AEA pending order by the Fifth Circuit and disposition of" a timely petition for a writ of *certiorari*. *Id.* at 99. But it expressly stated that the government "may remove the named plaintiffs or putative class members under other lawful authorities." *Id.*

On remand, a panel of our court granted preliminary injunctive relief to the three named petitioners and to the putative class. *W.M.M.*, 154 F.4th at 213. It also concluded that the government's notice procedure satisfied due process. *Id.* At the government's request, we granted *en banc* review.

At oral argument before the *en banc* court, we inquired as to the current immigration statuses of the three named petitioners. Neither petitioners' counsel nor the government's was able to provide a full answer. Specifically, counsel for petitioners told the court that while two of the named petitioners had been removed "under the immigration laws," he did

not know the status of his last remaining client. Oral Arg. at 22:54–25:48, 27:20–28:42. Counsel for the governmental defendants, which include the Department and Secretary of Homeland Security, was no wiser. Oral Arg. at 54:13–55:29. The named petitioners expressly declined to protest their removal.

Counsel have since provided some of the missing and desired information. At the court's request, counsel for petitioners and for the government jointly notified us, without further explanation, that "[t]he government has removed all three named [p]etitioners—W.M.M., []A.R.P., and F.G.M.—under the Immigration and Nationality Act." As a result, no petitioner remains in this country, and no class has been certified.

## II

The Supreme Court remanded this case to us when the three named petitioners were still in the country. But we have since learned that the government has removed them. Given this change, we conclude that the appeal is moot.

"[I]f in the course of litigation a court finds that it can no longer provide a plaintiff with any effectual relief, the case generally is moot." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 282 (2021); *accord, e.g.*, *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (explaining that a case "becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party" (quoting *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012))). And "if an event occurs while a case is pending on appeal that makes it impossible for the court to grant 'any effectual relief whatever' to a prevailing party, the appeal must be dismissed." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)). The government has removed all three named petitioners under the *INA*, so enjoining removal under the *AEA*

would not prevent their removal. *See Preczewski*, 592 U.S. at 282. And AEA removal of the three named petitioners now cannot occur, irrespective of any preliminary injunction in this case. The appeal has thus become moot. *See Church of Scientology*, 506 U.S. at 12.

We note that petitioners—to the extent that any party can now properly receive that appellation—have asked us to substitute five new class representatives on appeal in place of the three that no longer remain in this country and as to whom the appeal is now moot. We decline to do so for the reasons that the separate order on that motion expresses. While an exception to the mootness doctrine exists for properly certified class actions, no class exists or ever has existed in this case. *See Sosna v. Iowa*, 419 U.S. 393, 399 (1975) ("*When the [d]istrict [c]ourt certified the propriety of the class action*, the class of unnamed persons described in the certification acquired a legal status separate from the interest asserted by appellant." (emphasis added)); *id.* at 399 n.8; *see also Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975). Nor has the district court—which is in a much better position than we are to make factual determinations—had an opportunity to find any facts with respect to whether those five proposed representatives should indeed represent the putative class. *See, e.g.*, *Oscar Priv. Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 268 (5th Cir. 2007) (explaining that "a district court must 'resolve[] factual disputes relevant to each Rule 23 requirement and find [] that whatever underlying facts are relevant to a particular Rule 23 requirement have been established'" (alterations in original) (quoting *In re Initial Pub. Offerings Secs. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006)); *cf. Vizena v. Union Pac. R.R. Co.*, 360 F.3d 496, 502–03 (5th Cir. 2004) (recognizing the "essentially factual basis of the certification inquiry," including the determination that the Rule 23 requirements "are met," and "of the district court's inherent power to manage and control pending" litigation (quoting *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 408 (5th Cir. 1998))). But, as

the court's separate order explains, the denial of the motion to add class representatives on appeal is without prejudice to any future determination by the district court respecting whether to certify a class, to permit the petitioners to add or substitute new class representatives, or to allow an amendment of the petition.[3]

Given the lack of any named petitioners to whom we could grant relief in this appeal, and given that this case has never and does not now feature any class, we conclude that the appeal is moot. We therefore DISMISS the appeal for lack of jurisdiction.

---

[3] The "general rule of mootness . . . is that a class action becomes moot when the putative representative plaintiff's claim has been rendered moot before a class is certified." *Fontenot v. McCraw*, 777 F.3d 741, 748 (5th Cir. 2015); *accord, e.g.*, *Slayman v. FedEx Ground Package Sys.*, 765 F.3d 1033, 1048 (9th Cir. 2014) ("[W]here, as here, the plaintiff's claim becomes moot *before* the district court certifies the class, the class action normally also becomes moot." (citations omitted)). Obviously, exceptions exist to that general rule. *See generally, e.g.*, 13C Wright & Miller's Federal Practice & Procedure § 3533.9.1 (3d ed. Apr. 2026 update). But no one in this case argues that any exception to mootness applies.

JAMES C. HO, *Circuit Judge*, concurring:

I agree that this case is moot. But I also agree with the United States that we should address the merits questions directed to us by the Supreme Court—and affirm the President's actions under the Alien Enemies Act and the Due Process Clause. *See A.A.R.P. v. Trump*, 605 U.S. 91, 98–99 (2025).

Mootness is, of course, jurisdictional—and ordinarily, we must find jurisdiction first, before reaching the merits. But when it comes to appeals at the preliminary injunction stage, there is no order of operations. We can deny relief based on the merits, instead of jurisdiction—as our en banc court did in *United States v. Abbott*, 110 F.4th 700, 722 (5th Cir. 2024). In fact, the Supreme Court has instructed that reaching the merits in cases like this is not just permissible, but "most appropriate." *Munaf v. Geren*, 553 U.S. 674, 691 (2008). After all, "the injunction rests on a question of law and it is plain that the plaintiff cannot prevail." *Id.* If "the Government is entitled to judgment as a matter of law, it is appropriate for us to *terminate the litigation now*." *Id.* at 692 (emphasis added). *See also Roake v. Brumley*, 170 F.4th 292, 300–01 (5th Cir. 2026) (Ho, J., concurring) (discussing *Abbott* and *Munaf*).

And that's what the Government is asking us to do here—terminate the litigation now, by ruling on the merits as a matter of law.

* * *

As I've explained, foreign governments have used illegal immigration as a weapon to invade and weaken other countries, as Administrations of both parties have warned for decades. *See United States v. Texas*, 173 F.4th 659, 668–72 (5th Cir. 2026) (Ho, J., concurring); *Abbott*, 110 F.4th at 734 (Ho, J., concurring in the judgment in part and dissenting in part). As I've also noted, judges are supposed to defer to a President's declaration of a state of invasion—including the ones issued on January 20, 2025. *See Texas*, 173 F.4th at 671 (Ho, J., concurring); *Abbott*, 110 F.4th at 728–29 (Ho, J.,

concurring in the judgment in part and dissenting in part); *see also* Proclamation No. 10888, *Guaranteeing the States Protection Against Invasion*, 90 Fed. Reg. 8333, 8334 (Jan. 20, 2025) ("I have determined that the current state of the southern border reveals that the Federal Government has failed in fulfilling this obligation to the States and hereby declare that an invasion is ongoing at the southern border."); Exec. Order No. 14159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443 (Jan. 20, 2025).

And if courts must defer when the President treats illegal immigration as an invasion, *see id.*, then *a fortiori* we must defer when it comes to the narrower question of an invasion by Tren de Aragua. *See* Proclamation No. 10903, *Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren de Aragua*, 90 Fed. Reg. 13033 (Mar. 14, 2025).

So I would answer the Court's questions and affirm Proclamation 10903 and the President's actions under the Alien Enemies Act and the Due Process Clause. That would not just "terminate the litigation now." *Munaf*, 553 U.S. at 692 (emphasis added). It would also terminate future AEA cases, such as those involving the putative class members—as well as any number of other cases and controversies that likewise turn on a state of invasion.[1]

---

[1] *See, e.g.*, *Abbott*, 110 F.4th at 725 (Ho, J., concurring in the judgment in part and dissenting in part) (discussing the power of the states to engage in war in response to invasion under Article I, section 10 of the Constitution); *see also Texas*, 173 F.4th at 674 n.2 (Ho, J., concurring) (declaration of state of invasion is sufficient to support Executive Order 14160 in full); Jim Banks, *To fix birthright citizenship, declare a foreign invasion*, THE HILL (July 29, 2026); Ashley Brasfield, *GOP Rep. Brandon Gill Unveils Legislation Ending Birthright Citizenship For Children Of Illegal Aliens During Declared 'Invasion'*, DAILY CALLER (July 22, 2026); Eric Wessan, *How Congress Can Fix SCOTUS's Disastrous Birthplace Citizenship Error*, THE FEDERALIST (July 22, 2026); Josh Blackman, *Four Questions and Few Answers About the Invasion Clause*, CIVITAS (Feb. 13, 2025); Daniel Whitehead, *Securitization: A Solution to the Migration Crisis in the United States*, THE NEW DIGEST (Nov. 28, 2024).

## I.

I'll begin with a basic principle: Determining the existence of a state of invasion is a quintessentially executive prerogative—not a judicial one.

As Justice Story observed: "The command and application of the public force . . . to resist foreign invasion, are powers so obviously of an executive nature, and require the exercise of qualities so peculiarly adapted to this department, that a well-organized government can scarcely exist, when they are taken away from it." Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1485 (1833). *See also* Montesquieu, THE SPIRIT OF THE LAWS 151 (Thomas Nugent transl. 1899) (1748) (noting that the executive "provides against invasions"). So "[i]f a war be made by invasion of a foreign nation, the President is not only authorized but bound to resist force by force . . . without waiting for any special legislative authority." *The Prize Cases*, 67 U.S. (2 Black) 635, 668 (1862).

And the power to resist invasion necessarily includes the power to find an invasion. The duty to "resist force," *id.*, naturally requires that "the executive possesses the power authoritatively to find the facts when an emergency, such as an invasion or an insurrection, arises." *Atlee v. Laird*, 347 F. Supp. 689, 705 (E.D. Pa. 1972) (three-judge panel), *sum. aff'd sub nom. Atlee v. Richardson*, 411 U.S. 911 (1973). "The status of . . . foreign invasion of our own country, and insurrection at home, are political questions determined by the executive branch of our government." *The Tropic Wind*, 28 F. Cas. 218, 220 (C.C.D.D.C. 1861).

The judiciary, by contrast, is poorly suited to second-guess such matters. "Under Article II of the Constitution, the President of the United States, not any federal judge, is the Commander in Chief of the Armed Forces." *Austin v. U.S. Navy Seals 1-26*, 142 S. Ct. 1301, 1302 (2022)

(Kavanaugh, J., concurring). So judges may not review the President's determination of an invasion.

**II.**

These principles readily apply to the Alien Enemies Act, and inform the statutory interpretation issues presented in this case.

The Act authorizes the President to detain and remove enemy aliens when there is either "a *declared war* between the United States and any foreign nation or government," or "any *invasion or predatory incursion* is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government," and "the President makes public proclamation of the event." 50 U.S.C. § 21 (emphases added).

It's undisputed that courts have no power to question a Congressional declaration of war. Courts may ask if Congress has declared war—but we do not look behind the declaration and ask whether we agree that there is a legitimate war at hand. *See*, *e.g.*, John C. Yoo, *The Continuation of Politics by Other Means: The Original Understanding of War Powers*, 84 CALIF. L. REV. 167, 295 (1996) ("Congress' power to declare war . . . deprives the courts of the ability to second-guess Congress' determination of whether a formal state of war exists.").

Counsel for Petitioner admitted as much during oral argument. He acknowledged that courts must defer to Congressional declarations of war under *Ludecke v. Watkins*, 335 U.S. 160 (1948). *See* Oral Arg. at 8:09–11:00. But he theorized that a Presidential proclamation of invasion doesn't warrant the judicial respect that a Congressional declaration of war deserves. *Id.*

That curious (if not counterintuitive) hierarchy conflicts with the text of the Alien Enemies Act. It also turns the war powers of the United States on its head. As a matter of statutory interpretation as well as separation of

powers, there's no basis for requiring courts to defer to a Congressional declaration of war, but not a Presidential proclamation of invasion.

**A.**

When statutory terms appear together, we typically construe them together, unless the text indicates otherwise. Under the *noscitur a sociis* canon, when words "are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 195 (2012). That's clearly the case here, where all three statutory triggers empower the President to respond to a potential national security threat. Likewise, we interpret related statutory terms *in pari materia*—that is, we treat "laws dealing with the same subject . . . harmoniously." *Id.* at 252. When a "phrase that comes before a court for interpretation is part of the whole statute," its meaning is "affected by other provisions of the same statute." *Id.* "Our task is to give all of it . . . the most harmonious, comprehensive meaning possible." *Clark v. Uebersee Finanz-Korporation, A.G.*, 332 U.S. 480, 488 (1947).

So it would defy the text and structure of the AEA to defer to Congress declaring the need for offensive military actions—but not to the President engaging in defensive military actions to protect the homeland. "We generally 'resist attributing to Congress an intention to render a statute so internally inconsistent.'" *Jones v. Hendrix*, 599 U.S. 465, 479 (2023) (citation omitted).

Moreover, the AEA doesn't even mention Congress—it mentions only the President. Under the Presidential avoidance canon, courts presume that statutes do not apply to the President absent express reference. *See*, *e.g.*, *Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992) ("Out of respect for

the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of [an act]."); *Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27 (1982) (requiring an explicit statement from Congress before applying generally applicable statutes to the President). By that same logic, when a statute explicitly authorizes the President (and *only* the President) to take certain action, that too warrants "respect for the separation of powers and the unique constitutional position of the President." *Franklin*, 505 U.S. at 800–01.

**B.**

This understanding of the AEA is further bolstered by the Constitution and its allocation of war powers across the separate branches of government.

Under the Constitution, the President is the Commander in Chief. He alone is vested with the executive power, and entrusted with taking care that the laws be faithfully executed. Numerous Presidents have asserted this authority to take independent military action on countless occasions. *See*, *e.g.*, Barbara Salazar Torreon & Sofia Plagakis, *Instances of Use of United States Armed Forces Abroad, 1798-2023*, CONG. RESEARCH SERV. (2023). As President John Quincy Adams observed in the early years of our Republic: "However startled we may be at the idea that the Executive Chief Magistrate has the power of involving the nation in war, even without consulting Congress, an experience of fifty years has proved that in numberless cases he has and must have exercised the power." John Quincy Adams, AN EULOGY ON THE LIFE AND CHARACTER OF JAMES MADISON 47 (1836). *See also*, *e.g.*, THE FEDERALIST NO. 74 (Alexander Hamilton) ("Of all the cares or concerns of government, the direction of war most

peculiarly demands those qualities which distinguish the exercise of power by a single hand.").

Congress has the power to declare war. So Congress can "define the legal state of our relations with another country under international law." Robert J. Delahunty & John Yoo, *Making War*, 93 CORNELL L. REV. 123, 127 (2007). The Founders also "granted Congress an ultimate check on executive actions . . . by exercising its powers over funding and impeachment." Yoo, *The Continuation of Politics by Other Means*, at 174. But "the Commander in Chief Clause is a grant of power that makes clear that the Executive still retains the bulk of the war power, minus whatever Article I, Section 8 conveys to Congress." Delahunty & Yoo, *Making War*, at 129.

This broad understanding of the President's powers as Commander in Chief is further bolstered by other provisions of the Constitution. For example, "Article I, Section 10, Clause 3, expressly prohibits states from 'engag[ing] in War, unless actually invaded, or in such imminent Danger as will not admit of delay' unless they have obtained the 'Consent of Congress.'" James C. Ho and John C. Yoo, *The Sword and the Purse (Part 2); The President as Commander in Chief*, HERITAGE FOUNDATION (June 20, 2011). "By contrast, no such limitation on engagement in war by the President can be found in Article II." *Id.* "Article II expressly authorizes the President to engage in other foreign relations powers (such as the making of treaties and the appointment of ambassadors) only with the consent of Congress"—yet "it imposes no such check with respect to the use of military force." *Id.*

## C.

Moreover, it's precisely because the Constitution vests such broad war powers in the President that the Founders were uniquely concerned about foreign influence over the Presidency.

The Constitution limits the office of President to natural born citizens. *See* U.S. CONST. art. II, § 1, cl. 5 ("No Person except a natural born Citizen . . . shall be eligible to the Office of President"). No other federal office is limited in this matter. The Constitution only "requires that a President be a citizen from birth." *Trump v. Barbara*, 609 U.S. _, _ (2026) (Alito, J., dissenting). And the reason is the enormity of the President's powers as our Commander in Chief.

In a letter to George Washington during the Constitutional Convention, John Jay argued that it would be "wise & seasonable to provide a strong check to the admission of Foreigners into the administration of our national Government; and to declare expresly that the Command in chief of the american army shall not be given to, nor devolved on, any but a natural *born* Citizen." Letter from John Jay to George Washington (July 25, 1787), 3 Max Farrand, THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 61 (1911) (emphasis in original). Washington thanked Jay for his recommendation in a September 2, 1787 letter. *Id.* at 76. And two days later, the Committee on Detail "reported its version of the presidential eligibility provision with 'natural born Citizen' to the Convention at large." Thomas H. Lee, *Natural Born Citizen*, 67 AM. U. L. REV. 327, 353 (2017).

Notably, Jay's letter "specifically addressed the President's role as military commander, not as head of state or chief executive of the domestic political order." *Id.* at 355. Because Jay was chiefly concerned that a foreigner might be elected "with strong sympathies with the republican cause in Europe who would then seek to deploy American armies in aid of revolutionary war there." *Id.* at 357. "[T]wo fundamental, inter-related concerns animat[ed]" the Natural Born Citizens Clause: "preventing European intervention in American domestic politics," and "preventing American military intervention in European domestic politics." *Id.*

That's why the Founders deemed it "indispensable" that "the president should be a natural born citizen of the United States." Story, COMMENTARIES § 1473. *See also Barbara*, 609 U.S. at _ (Alito, J., dissenting) (noting that the Founders sought to "prevent a person with possible foreign loyalties from becoming President").

**D.**

So "if ever there was a place for deference to the Executive when it comes to interpreting legal texts, it would be here, in the immigration and border security context." *Rodriguez v. Garland*, 31 F.4th 935, 945 (5th Cir. 2022) (Ho, J., dissenting from denial of rehearing en banc).

The Supreme Court has repeatedly instructed the judiciary to respect the determinations of Congress and the President in the military context. *See*, *e.g.*, *Rostker v. Goldberg*, 453 U.S. 57, 64–65 (1981) ("perhaps in no other area has the Court accorded Congress greater deference"). But "great deference" is due "even when the President acts alone in this area." *Boumediene v. Bush*, 553 U.S. 723, 832 (2008) (Scalia, J., dissenting). "The President, after all, is the 'Commander in Chief of the Army and Navy of the United States.'" *Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988). That authority over our national security "flows primarily from this constitutional investment of power in the President and exists quite apart from any explicit congressional grant." *Id.* "The Constitution entrusts the President with responsibilities that are essential to the country's safety and wellbeing." *Trump v. Vance*, 591 U.S. 786, 826 (2020) (Alito, J., dissenting). As Commander in Chief, the President "is responsible for the defense of the country from the moment he enters office until the moment he leaves." *Id.*

The power to defend national security necessarily includes the power to identify threats to national security. So the Court recognized early on that "the evidence upon which the President might decide that there is imminent

danger of invasion, might be of a nature not constituting strict technical proof, or the disclosure of the evidence might reveal important secrets of state, which the public interest, and even safety, might imperiously demand to be kept in concealment." *Martin v. Mott*, 25 U.S. 19, 31 (1827). *See also*, *e.g.*, *Padavan v. United States*, 82 F.3d 23, 28 (2nd Cir. 1996) ("The protection of the states from 'invasion' involves matters of foreign policy and defense, which are issues that the courts have been reluctant to consider."); *Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention.").

So "unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Egan*, 484 U.S. at 530. *See also*, *e.g.*, *Luftig v. McNamara*, 373 F.2d 664, 665–66 (D.C. Cir. 1967) ("The fundamental division of authority and power established by the Constitution precludes judges from overseeing the conduct of foreign policy or the use and disposition of military power.").

Nothing in the AEA indicates that the judiciary should question Presidential determinations regarding the war power. To the contrary, the Act expressly authorizes its use on a "public proclamation" by the President. Deference to the invasion determination is also especially appropriate given that the AEA empowers the President, not only where there is an ongoing invasion, but even if the invasion is only "attempted or threatened." Judges are ill-suited to question such national security assessments by the President.

The Supreme Court confirmed this approach in *Ludecke*. The President had invoked the AEA against enemy aliens from Germany during World War II—a "declared war." But active hostilities had already ended three years earlier. Germany had unconditionally surrendered. The Court

nevertheless refused to second guess the President. After all, "[t]hese are matters of political judgment for which judges have neither technical competence nor official responsibility." 335 U.S. at 170. It was not for the judiciary to "question a belief by the President that enemy aliens" had not "los[t] their potency for mischief." *Id.* "Such great war powers may be abused," but "that is a bad reason for having judges supervise their exercise." *Id.* at 172. "The Founders in their wisdom made him not only the Commander-in-Chief but also the guiding organ in the conduct of our foreign affairs." *Id.* at 173. So "full responsibility for the just exercise of this great power may validly be left where the Congress has constitutionally placed it—on the President of the United States." *Id.*

## III.

The Supreme Court has also directed us to address whether the notice provided by the Executive satisfies due process. It does. As I've explained, the power to engage in war obviously includes the power to detain. *See Texas*, 173 F.4th at 673 (Ho, J., concurring) ("[D]etention . . . is a fundamental incident of waging war.") (quoting *Hamdi v. Rumsfeld*, 542 U.S. 507, 519 (2004) (plurality opinion of O'Connor, J.)). I am aware of no authority indicating that due process applies in the war context to require more than the notice already being voluntarily provided by the Executive. The Government has confirmed that AEA detainees receive seven days of notice in "a language they understand, information about how to challenge their removal, [and] the option to request a list of available attorneys." That's more than enough to satisfy due process.

* * *

This case is moot. But we can answer the Court's questions and affirm the President's actions under the Alien Enemies Act and the Due Process Clause.

ANDREW S. OLDHAM, *Circuit Judge*, concurring in the judgment:

I will be brief because I have said all of this before. The plaintiffs are not entitled to injunctive relief. *See W.M.M. v. Trump*, 154 F.4th 207, 240–312 (5th Cir.) (OLDHAM, J., dissenting), *reh'g en banc granted, opinion vacated*, 154 F.4th 319 (5th Cir. 2025). "[T]o *issue or affirm* an injunction, we must find the plaintiff is likely to succeed in establishing both jurisdiction and the merits of its claim. But to [*deny or*] *reverse* an injunction, there is no order of operations." *United States v. Abbott*, 110 F.4th 700, 722–23 (5th Cir. 2024) (OLDHAM, J., concurring) (citation omitted); *see also Mullin v. Doe*, 146 S. Ct. 2121, 2137 (2026) (same). I have explained at length why the ACLU's claims fail on the merits. *See W.M.M.*, 154 F.4th at 240–312 (OLDHAM, J., dissenting). For those reasons—or because the ACLU no longer represents a party to this case—the request for injunctive relief must be denied.