**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

W.M.M., *et al.*, on their own behalf and on behalf of all others similarly situated,

*Petitioners–Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

*Respondents–Defendants*.

Case No. 1:25-cv-59-H

**INDEX OF EXHIBITS**
MOTION TO ADD PROPOSED CLASS REPRESENTATIVES
& MOTION TO PROCEED UNDER PSEUDONYMS

1. Declaration of Kymberly Renaud, Attorney for D.A.A.
2. Declaration of Travis John Collins, Attorney for T.I.A.
3. Declaration of E.A.A.
4. Declaration of Oscar Sarabia Roman, Attorney for A.C.L.U.
5. Exhibit A – Supplementary Declaration of Andres Antillano (D.D.C. 2025)

# EXHIBIT 1

**DECLARATION OF KYMBERLY RENAUD, ATTORNEY FOR D.A.A.**

I, Kymberly Renaud, declare under penalty of perjury the following:

1. I am an immigration attorney in Austin, Texas. My practice focuses on removal defense. I represent D.A.A. in his immigration proceedings.

2. D.A.A. was born in Maracaibo, Venezuela, in 1987. Prior to his detention, D.A.A. was living in El Paso, Texas. He is currently detained at Bluebonnet Detention Facility, where he has been detained since April 15, 2025.

3. D.A.A.'s only entry into the United States occurred on May 11, 2023 through the CBP One Application and granted parole. While living in El Paso, he met and married his U.S.-citizen wife and then submitted a family-based petition to adjust D.A.A.'s status to lawful permanent resident. But since D.A.A. has been detained, the U.S. Citizenship and Immigration Services has repeatedly postponed their required appointments.

4. The U.S. government has falsely accused D.A.A. of being a member of Tren de Aragua. He is not and has never been a member of, or associated with, Tren de Aragua or any other criminal organization. D.A.A. has never been arrested or convicted of any crime anywhere in the world. The sole basis for this accusation appears to be his tattoos. D.A.A. has approximately 40 tattoos, including images of lighthouses, feathers, forests, family members' names and initials, and two stars (one commemorating his graduation as an architect and one marking his daughter's birth). None of these tattoos have any connection to Tren de Aragua or to criminal activity.

5. In March 2024, D.A.A. was first detained by immigration officers while returning home from the gym in El Paso. D.A.A. was then taken to an El Paso ICE office and questioned about whether he was a member of Tren de Aragua. D.A.A. voluntarily provided the officers with his phone and passcode so that they could review its contents. D.A.A. was then transferred to a detention facility in Montana, where he remained detained for approximately three months. In Montana, ICE officers accused him of being part of Tren de Aragua. But since the government could not provide any evidence at the bond hearing, D.A.A. was released on bond and required to carry a cell phone to facilitate remote check-ins. He returned home to El Paso with his wife.

6. In February 2025, an ICE officer informed D.A.A. that he needed to come into the El Paso ICE office because the cell phone assigned for his check ins was malfunctioning. When D.A.A. arrived, an officer told him that he had a removal order—which was not true—and they detained him. Officers photographed D.A.A.'s tattoos, and then he was transferred to a detention facility in Montana the same day. While in Montana, four officers questioned D.A.A. about his tattoos and their meanings, which he explained were related to his family, life experiences, and interest in travel. On April 15, 2025, D.A.A. was transferred to Bluebonnet Detention Facility. He was never told of the reason for this transfer.

7. On April 18, 2025, while detained at Bluebonnet, an officer D.A.A. could identify only by last name, Figueroa, instructed him to sign a Notice of Removal under the Alien Enemies Act. He refused. Although D.A.A. cannot read English, he recognized the term "Tren de Aragua" on the form. The officers did not translate or explain the document to D.A.A. After he refused to sign, officers placed D.A.A. on a bus with other Venezuelan men and transported them toward an airport. Later that same day, they were returned to Bluebonnet. Since he refused to sign the Alien Enemies Act form, D.A.A. has remained detained at Bluebonnet.

8. D.A.A. is terrified of being deported to Venezuela, El Salvador, or any other country. He now faces serious danger because the U.S. government has falsely labeled him a member of Tren de Aragua. This false designation places D.A.A. at serious risk of torture in El Salvador and at serious risk in Venezuela, including retaliation, coercion, extortion, threatened prosecution, and violence from Tren de Aragua-associated groups, rival gangs, and others who may believe these false accusations. D.A.A. also fears an increased risk of arrest and persecution by the Venezuelan government as a result of this designation.

9. D.A.A. wants to contest his false designation as a member of Tren de Aragua and the application of the Alien Enemies Act to him. D.A.A. wants to be properly allowed to pursue his family-based petition to adjust his status to lawful permanent resident and remain in the United States with his U.S.-citizen wife.

I, Kymberly Renaud, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge and belief.

/s/Kymberly Renaud — 2/11/2026

Kymberly Renaud — Date

# EXHIBIT 2

**DECLARATION OF TRAVIS JOHN COLLINS, ATTORNEY FOR T.I.A.**

I, Travis John Collins, declare under penalty of perjury the following:

1. I am an immigration attorney in Arlington, Virginia. My practice focuses on removal defense. I represent T.I.A. in his immigration proceedings.

2. T.I.A. was born in Venezuela in 1992. He is currently detained at Diamondback Correctional Facility in Watonga, OK. He has been detained in immigration custody since March 2025.

3. T.I.A.'s only entry into the United States occurred on August 14, 2023, using the CBP One application. T.I.A. filed a timely asylum application on August 7, 2024. His application for asylum was approved on August 19, 2025.

4. The U.S. government has falsely accused T.I.A. of being a member of Tren de Aragua. He is not and has never been a member of, or associated with, Tren de Aragua or any other criminal organization.

5. On March 14, 2025, T.I.A. was detained by immigration agents while visiting a family member's house in Maryland. At the time, the agents stated that they were there for another person but that they were nonetheless also taking the other men who happened to be present to the station. At the station, the agents instructed T.I.A. to remove his shirt. The agents then observed T.I.A.'s tattoos and stated that because T.I.A. had tattoos he was therefore a member of Tren de Aragua. T.I.A.'s tattoos include his name and his son's name, religious quotes, a clock with a rose, a musical note, a soccer ball, and a flower. T.I.A. responded that he had no part in Tren de Aragua and that each tattoo represented his relationship with God and religion, and his family. The agents responded that all Venezuelans with tattoos were members of Tren de Aragua. T.I.A. again stated that he had no connection to Tren de Aragua and asked the agent to review his record, as he has no criminal record in any country and no record of any connection to any gang. The agents continued to repeat that because he was from Venezuela and had tattoos that meant that he was a member of Tren de Aragua. The agents took photographs and a video of T.I.A. and transferred him to Farmville Detention Facility in Virginia. While en route to Virginia, the agents continued to state that because T.I.A. had tattoos and is Venezuelan that meant that he was a member of Tren de Aragua.

6. At some point during his detention in Farmville, T.I.A. was instructed to go to the doctor; officials then took him to another room where he was met by government agents who pressured him to claim affiliation with Tren de Aragua. The agents instructed T.I.A. to remove his shirt and began questioning him about his tattoos. He explained the meaning behind each tattoo. The agents asked and if he had any criminal history; T.I.A. provided the same responses as previously and again asked the officials to review his record so that they could confirm that he had no record. The agents spoke among themselves then again asked T.I.A. to explain the meaning behind each tattoo. They informed him that they were recording everything. He continued to deny any connection to Tren de Aragua.

7. T.I.A. was then transferred to Bluebonnet Detention Facility in Anson, Texas. On Thursday April 17, 2025, while detained at Bluebonnet, officers instructed T.I.A. to sign a Notice of Removal under the Alien Enemies Act. In the early morning of April 18, T.I.A. was taken to a soccer field with a group of over twenty uniformed and armed officials. The officials had a table to which they called each detainee one by one. When T.I.A. approached, they confirmed his name and said this is a document for your deportation. The document was in English and not read to T.I.A. in Spanish. T.I.A. did not understand what the document said. T.I.A. asked the officials what the document said and was told that it was his order of deportation. T.I.A. then stated that he would not sign the document and asked to speak to his attorney. T.I.A. asked again what the document said. The officials stated that the document was an order of deportation. The officials stated that whether he signed or not it was the same, as they would place a red stamp on his paper. They stamped the paper.

8. T.I.A. was then taken to a cell with other detainees. At some point later, officials came and distributed a stamped paper to each detainee. While in the cell, T.I.A. reviewed his paper, along with other detainees. T.I.A. recognized the words "Tren de Aragua" and the word "Alien Enemy." At no point did the officers translate or explain the document to T.I.A., despite questioning by T.I.A. and other detainees. After his continued refusal to sign, officers placed T.I.A. on a bus with other Venezuelan men and transported them toward an airport. Later that same day, they were returned to Bluebonnet. On May 4, 2025, T.I.A. was transferred to Prairieland Detention Facility in Alvarado, Texas. On January 1, 2026, T.I.A. was transferred to Diamondback Correctional Facility in Oklahoma.

9. T.I.A. is terrified of being deported to Venezuela, El Salvador, or any other country. He originally fled Venezuela due to government persecution and indeed has since been granted asylum in the United States. T.I.A. now faces additional danger because the U.S. government has falsely labeled him a member of Tren de Aragua. This false designation places T.I.A. at serious risk of torture in El Salvador and at serious risk in Venezuela, including retaliation, coercion, extortion, threatened prosecution, and violence from Tren de Aragua-associated groups, rival gangs, and others who may believe these false accusations. T.I.A. also fears an increased risk of arrest and persecution by the Venezuelan government as a result of this designation. If T.I.A. were returned to Venezuela, it would be extremely difficult for him to flee again.

10. T.I.A. wants to contest his false designation as a member of Tren de Aragua and the application of the Alien Enemies Act to him. T.I.A. was granted asylum and he wants to properly remain in the United States where he would be safe from harm.

I, Travis John Collins, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge and belief.

______________________________ 2/10/2026

Travis John Collins Date

# EXHIBIT 3

**DECLARATION OF E.A.A.**

I, [redacted], declare under penalty of perjury the following:

1. I was born in Caracas, Venezuela, in 1991. Prior to my detention, I was living in Atlanta, Georgia. I am currently detained at Prairieland Detention Facility, where I have been detained since May 4, 2025. Before that, I was detained at Bluebonnet Detention Facility.

2. My only entry into the United States occurred in September 2024. I fled Venezuela because I was persecuted for my political organizing against the Venezuelan government. In June 2023, government agents kidnapped me and tortured me at an undisclosed location. My understanding is that the government agents kidnapped me because of my political activities. They pulled out one of my teeth, broke my pinky finger, fractured my ribs, and beat me severely. They also threatened me and warned me to be careful about what I reported to the police. Despite those threats, I filed a police report documenting the torture. The following month, government agents again kidnapped me and beat me severely. Because of this persecution and fear of further harm, I fled to the United States and am pursuing asylum. Those proceedings remain ongoing.

3. The U.S. government has falsely accused me of being a member of Tren de Aragua. I am not and have never been a member of, or associated with, Tren de Aragua or any other criminal organization. I have never been arrested or convicted of any crime anywhere in the world. The sole basis for this accusation appears to be my tattoos. I have approximately 20 tattoos, including images of Michael Jordan's logo, Mario Brothers characters, religious proverbs, the names of family and friends, and musical notes. None of these tattoos have any connection to Tren de Aragua or to criminal activity. They reflect my faith, family, and cultural interests.

4. In February 2025, as I was leaving for work in front of my home, five vehicles surrounded my car and officers arrested me. They stated they were looking for my brother because the vehicle was registered in his name, but they never explained the basis for my arrest. After my arrest, I was transferred to a detention facility in Georgia and later moved to Bluebonnet Detention Facility in March 2025. I was never informed why I was transferred.

5. On April 18, 2025, while detained at Bluebonnet, officers instructed me to sign a Notice of Removal under the Alien Enemies Act. I refused. Although I cannot read English, I recognized the term "Alien Enemy" on the form and understood it to relate to the Alien Enemies Act. The officers did not translate or explain the document to me. After I refused to sign, officers placed me on a bus with other Venezuelan men and transported us toward an airport. Later that same day, we were returned to Bluebonnet. Following my refusal to sign the form, I was transferred to Prairieland Detention Facility on May 4, 2025, where I remain detained.

6. I am terrified of being deported to Venezuela, El Salvador, or any other country. I originally fled Venezuela because of persecution related to my political activity. I now face additional danger because the U.S. government has falsely labeled me a member of Tren de Aragua.

This false designation places me at serious risk of torture in El Salvador and at serious risk in Venezuela, including retaliation, coercion, extortion, threatened prosecution, and violence from Tren de Aragua-associated groups, rival gangs, and others who may believe the false accusations. I also fear increased risk of arrest by the Venezuelan government because of this designation. If I am returned to Venezuela, it would be extremely difficult for me to flee again.

7. I want to contest my false designation as a member of Tren de Aragua and the application of the Alien Enemies Act to me. I want to be properly allowed to pursue my asylum application for protection in the United States where I would be safe from harm.

I, [redacted], swear under penalty of perjury that the foregoing declaration was read back to me in Spanish, and that it is true and correct to the best of my knowledge and recollection.

[redacted]

[redacted]

02/05/26
Date

I, Oscar Sarabia Roman, swear under penalty of perjury that I am fluent in the English and Spanish languages, that I read the foregoing declaration to [redacted] in Spanish, and that he agrees with its contents.

Oscar Sarabia Roman

2/5/2026
Date

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

W.M.M., *et al.*, on their own behalf and on behalf of all others similarly situated,

*Petitioners–Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

*Respondents–Defendants*.

Case No. 1:25-cv-59-H

**DECLARATION OF OSCAR SARABIA ROMAN**

I, Oscar Sarabia Roman, declare as follows:

1. I am over eighteen years of age and am competent to make this declaration.
2. I am an attorney at the American Civil Liberties Union Immigrants' Rights Project. I represent the Petitioners in this case.
3. On August 24, 2026, at 8:51 a.m., I checked the ICE online detainee locator system for the locations of D.A.A., T.I.A., and E.A.A. The locator showed D.A.A. detained at Bluebonnet Detention Facility in Texas and both T.I.A. and E.A.A. detained at Diamondback Correctional Facility in Oklahoma.
4. I spoke with Travis John Collins, immigration counsel for proposed Petitioner T.I.A., regarding the declaration he previously executed regarding T.I.A. Mr. Collins confirmed that T.I.A. remains detained at Diamondback Correctional Facility and subject to an AEA designation.
5. Counsel was unable to schedule a confidential attorney meeting before the time of this filing but can provide an updated declaration on T.I.A.'s behalf, if warranted.

6. I also spoke with Orlando Mondragon, immigration counsel for proposed Petitioner D.A.A., regarding the information in the prior declaration regarding D.A.A. Mr. Mondragon confirmed that D.A.A. remains detained at Bluebonnet Detention Facility and subject to an AEA designation.
7. Counsel was unable to schedule a confidential attorney meeting before the time of this filing but can provide an updated declaration on D.A.A.'s behalf, if warranted.
8. Counsel has attempted to schedule a confidential attorney meeting with proposed Petitioner E.A.A., who is unrepresented in his immigration proceedings. According to the instructions provided by Diamondback Correctional Facility, I attempted to schedule a meeting through their online system, but no appointments were available before the time of this filing. I then emailed diamondbacklegal@corecivic.com and called (580) 614-2100, extension 42225, to request a virtual attorney-client meeting with E.A.A. Despite those efforts, I was unable to schedule such a meeting with E.A.A. before the time of this filing.
9. Counsel will continue efforts to obtain any updated declaration on E.A.A.'s behalf, if warranted.

I hereby declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Executed on the 24th of August, 2026, in San Francisco, California.

*/s/ Oscar Sarabia Roman*
Oscar Sarabia Roman

# EXHIBIT 5

# EXHIBIT A

**DECLARACION SUPLEMENTARIA DE ANDRES ANTILLANO**

Yo, Andrés Antillano, declaro lo siguiente de conformidad con 28 U.S.C. § 1746, y declaro bajo pena de perjurio que lo siguiente es verdadero y correcto según mi leal saber y entender:

1. Para un resumen de mis calificaciones profesionales, sírvase consultar mi declaración anterior, presentada como ECF No. 102-3. Con base en mi experiencia, se me ha pedido que describa la situación en Venezuela para los hombres enviados por los Estados Unidos a CECOT en marzo de 2025 y luego enviados a Venezuela en julio.

2. Los detenidos del CECOT fueron rápidamente politizados tanto por el régimen de Maduro como por la oposición en Venezuela.

3. El régimen de Maduro se ha usado a estos hombres como herramientas de propaganda para demostrar las deficiencias de Estados Unidos y la benevolencia del estado venezolano. Por ello, los ha presentado de forma destacada en propaganda, incluyendo la divulgación de detalles personales sobre ellos y su tiempo en CECOT.

4. Esta atención extrema pone a los hombres en peligro por varias razones.

5. En primer lugar, los detenidos de CECOT que se nieguen a participar en la propaganda gubernamental o que se expresen en contra del régimen se enfrentarán a amenazas (o algo peor) por parte del régimen de Maduro. En el pasado, el régimen de Maduro no ha dudado en arrestar y detener a solicitantes de asilo que regresan y se manifiestan en contra del gobierno venezolano para enviar un mensaje. Esto es especialmente cierto cuando se manifiestan personalidades prominentes, y por la propia naturaleza de su campaña de propaganda, el gobierno venezolano ha dado a muchos de los detenidos de CECOT un lugar destacado.

6. En segundo lugar, los detenidos del CECOT se enfrentan a violencia política de ambos bandos. Venezuela sigue experimentando una violencia política persistente. El régimen colabora con grupos paramilitares que amenazan, intimidan y atacan regularmente a personas consideradas simpatizantes de la oposición. Si el régimen de Maduro percibe a alguno de los detenidos como miembro o simpatizante de la oposición porque expresa su oposición al régimen (o simplemente se niega a participar en la propaganda), es probable que sea objeto de violencia física por parte de los grupos paramilitares afines al régimen.

7. Así como los grupos paramilitares afines al régimen atacan a simpatizantes de la oposición, los grupos afines de la oposición a veces atacan físicamente a los simpatizantes del régimen de Maduro. Dado que estos hombres aparecen ampliamente en la propaganda gubernamental y, por lo tanto, tienen vínculos públicos con el régimen, es probable que sean objetos de la violencia de los grupos de la oposición. Por consiguiente, se enfrentan a una situación peligrosa: o participan en la propaganda y se enfrentan a la violencia de los grupos de la oposición, o se niegan a participar en la propaganda y se enfrentan a la violencia de los grupos afines al gobierno.

8. A diferencia del régimen de Maduro, los líderes de la oposición derechista en Venezuela han insistido en que los hombres son criminales peligrosos y miembros del Tren de Aragua. La oposición sostiene que la Administración Trump no cometió ningún error al designarlos como miembros del TdA.

9. Ser etiquetados prominentemente como miembros de TdA por líderes políticos de alto perfil, tanto de los Estados Unidos como de Venezuela, conlleva graves consecuencias, a pesar de la falsedad de las acusaciones en la gran mayoría de los casos. Pandillas rivales que creen erróneamente en las declaraciones públicas de que estos hombres son miembros de TdA

pueden amenazarlos o atacarlos como lo harían con cualquier otro miembro de una pandilla rival. TdA, u otras pandillas relacionadas con TdA, pueden someter a los detenidos de CECOT a retaliaciones, ya que perciben que los hombres fingieron pertenecer a TdA. Estas amenazas simultáneas pueden hacer que la vida cotidiana de estos hombres sea muy peligrosa.

10. En resumen, los detenidos del CECOT se enfrentan a una red de amenazas compleja en Venezuela. Dado que tanto el régimen de Maduro como la oposición han buscado agresivamente utilizarlos para sus fines políticos, las amenazas suelen ser inevitables.

Fecha: 10 08 2025________________

Andres Antillano

**SUPPLEMENTAL DECLARATION OF ANDRÉS ANTILLANO**

I, Andrés Antillano, declare the following pursuant to 28 U.S.C. § 1746, and declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

1. For a summary of my professional qualifications, please refer to my previous declaration, filed as ECF No. 102-3. Based on my experience, I have been asked to describe the situation in Venezuela for the men sent by the United States to CECOT in March 2025 and then sent to Venezuela in July.

2. The CECOT detainees were quickly politicized by both the Maduro regime and the opposition in Venezuela.

3. The Maduro regime has used these men as propaganda tools to demonstrate the shortcomings of the United States and the benevolence of the Venezuelan state. Therefore, it has prominently featured them in its propaganda, including disclosing personal details about them and their time at CECOT.

4. This extreme attention puts men in danger for several reasons.

5. First, CECOT detainees who refuse to participate in government propaganda or speak out against the regime will face threats (or worse) from the Maduro regime. In the past, the Maduro regime has not hesitated to arrest and detain returning asylum seekers who demonstrate against the Venezuelan government in order to send a message. This is especially true when prominent figures speak out, and by the very nature of its propaganda campaign, the Venezuelan government has given many CECOT detainees a prominent position.

6. Second, CECOT detainees face political violence from both sides. Venezuela continues to experience persistent political violence. The regime collaborates with paramilitary groups that regularly threaten, intimidate, and attack individuals perceived as opposition

sympathizers. If the Maduro regime perceives any of the detainees as members or sympathizers of the opposition because they express opposition to the regime (or simply refuse to participate in propaganda), they are likely to be subjected to physical violence by pro-regime paramilitary groups.

7. Just as pro-regime paramilitary groups attack opposition supporters, pro-opposition groups sometimes physically attack supporters of the Maduro regime. Because these men feature heavily in government propaganda and therefore have public ties to the regime, they are likely targets of opposition groups' violence. Consequently, they face a dangerous situation: either participate in propaganda and face violence from opposition groups, or refuse to participate in propaganda and face violence from pro-government groups.

8. Unlike the Maduro regime, right-wing opposition leaders in Venezuela have insisted that the men are dangerous criminals and members of the Tren de Aragua. The opposition maintains that the Trump administration made no mistake in designating them as members of the TdA.

9. Being prominently labeled as TdA members by high-profile political leaders in both the United States and Venezuela carries serious consequences, despite the falsity of the accusations in the vast majority of cases. Rival gangs that mistakenly believe public statements that these men are TdA members may threaten or attack them as they would any other rival gang member. TdA, or other TdA-related gangs, may subject CECOT detainees to retaliation, as they perceive the men to have pretended to belong to TdA. These simultaneous threats can make daily life for these men very dangerous.

10. In short, CECOT detainees face a complex web of threats in Venezuela. Given that both the Maduro regime and the opposition have aggressively sought to use them for their political ends, threats are often unavoidable.

Date: 10 08 2025________________

Andres Antillano

**CERTIFICATE OF TRANSLATION**

I, Jennifer Reyes, certify that I am fluent in both English and Spanish and that I have translated the foregoing declaration from Andres Antillano, faithfully and accurately, from Spanish into English. I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

______________________________

Jennifer Reyes
Paralegal
American Civil Liberties Union Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2635
jreyes@aclu.org