**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

W.M.M., *et al.*, on their own behalf and on behalf of all others similarly situated,

*Petitioners–Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

*Respondents–Defendants*.

Case No. 1:25-cv-59-H

# PETITIONERS-PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

INTRODUCTION ........ 1

LEGAL AND FACTUAL BACKGROUND ........ 2

I. STATUTORY FRAMEWORK AND PROCLAMATION ........ 2

II. THIS LITIGATION ........ 4

LEGAL STANDARD ........ 6

ARGUMENT ........ 6

I. THE PROCLAMATION IS REVIEWABLE. ........ 6

II. THE PROCLAMATION IS NOT AUTHORIZED BY THE AEA. ........ 9

A. The AEA's Statutory Predicates of "Invasion" and "Predatory Incursion" Require Military Attacks. ........ 9

B. The Proclamation Fails to Establish an Attack by a "Foreign Nation or Government." ........ 21

III. DUE PROCESS REQUIRES RELEVANT INFORMATION AND AT LEAST 30 DAYS TO FIND A LAWYER AND SEEK RELIEF. ........ 29

IV. THE PROCLAMATION VIOLATES MULTIPLE PROCEDURAL PROTECTIONS. ........ 40

A. The Government Cannot Bypass the INA's Removal Procedures or Jettison Mandatory Humanitarian Protections. ........ 41

B. The Proclamation Violates the AEA's Right to Voluntary Departure. ........ 43

V. PERMANENT INJUNCTIVE RELIEF IS WARRANTED.

CONCLUSION ........ 45

CERTIFICATE OF SERVICE ........ 47

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*A.A.R.P. v. Trump*,
605 U.S. 91 (2025) ........ *passim*

*A.S.R. v. Trump*,
782 F. Supp. 3d 224 (W.D. Pa. 2025) ........ 7

*Alford v. United States*,
709 F.2d 418 (5th Cir. 1983) ........ 38

*Augustin v. Sava*,
735 F.2d 32 (2d Cir. 1984) ........ 39

*Bas v. Tingy*,
4 U.S. 37 (1800) ........ 16

*Boumediene v. Bush*,
553 U.S. 723 (2008) ........ 29, 40

*California v. United States*,
104 F.3d 1086 (9th Cir. 1997) ........ 11, 19

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........ 6

*Citizens Protective League v. Clark*,
155 F.2d 290 (D.C. Cir. 1946) ........ 8

*City of W. Covina v. Perkins*,
525 U.S. 234 (1999) ........ 40

*Covey v. Town of Somers*,
351 U.S. 141 (1956) ........ 39

*Cruz Rendon v. Holder*,
603 F.3d 1104 (9th Cir. 2010) ........ 38

*D.B.U. v. Trump*,
781 F. Supp. 3d 1158 (D. Colo. 2025) ........ 7, 10

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) ........ 41

*Ex parte Bollman*,
8 U.S. 75 (1807) ........ 16

*Freza v. Att'y Gen.*,
49 F.4th 293 (3d Cir. 2022) ....................................................................................38

*G.F.F. v. Trump*,
781 F. Supp. 3d 195 (S.D.N.Y. 2025)................................................................7, 10, 18

*George v. McDonough*,
596 U.S. 740 (2022)....................................................................................................13

*Greene v. McElroy*,
360 U.S. 474 (1959)....................................................................................................40

*Hamdan v. Rumsfeld*,
548 U.S. 557 (2006)....................................................................................................19

*Hamdi v. Rumsfeld*,
542 U.S. 507 (2004) ...........................................................................................10, 40

*Hemphill v. State Farm Mut. Auto. Ins. Co.*,
805 F.3d 535 (5th Cir. 2015) .........................................................................................6

*Hernandez Lara v. Barr*,
962 F.3d 45 (1st Cir. 2020)..........................................................................................38

*Huisha-Huisha v. Mayorkas*,
27 F.4th 718 (D.C. Cir. 2022).......................................................................................42

*In re Terrorist Attacks*,
538 F.3d 71 (2d Cir. 2008)...........................................................................................27

*J.A.V. v. Trump*,
781 F. Supp. 3d 535 (S.D. Tex. 2025) ..............................................................7, 10, 12, 16

*J.G.G. v. Trump*,
786 F. Supp. 3d 37 (D.D.C. 2025) ...............................................................................30

*J.G.G. v. Trump*,
No. 25-5067, 2025 WL 914682 (D.C. Cir. 2025)............................................... *passim*

*Johnson v. Eisentrager*,
339 U.S. 763 (1950).......................................................................................13, 17, 23

*Kelly v. Syria Shell Petroleum Dev. B.V.*,
213 F.3d 841 (5th Cir. 2000) .......................................................................................27

*Ludecke v. Watkins*,
335 U.S. 160 (1948)........................................................................................7, 8, 9, 10

*M.A.P.S. v. Garite*,
786 F. Supp. 3d 1026 (W.D. Tex. 2025)....................7, 10

*Mathews v. Eldridge*,
424 U.S. 319 (1976)....................30

*Memphis Light, Gas & Water Div. v. Craft*,
436 U.S. 1 (1978)....................30, 39, 40

*Mullane v. Cent. Hanover Bank & Trust Co.*,
339 U.S. 306 (1950)....................39

*Nasrallah v. Barr*,
590 U.S. 573 (2020)....................43

*New Jersey v. United States*,
91 F.3d 463 (3d Cir. 1996)....................11, 19

*Nken v. Holder*,
556 U.S. 418 (2009)....................45

*Padavan v. United States*,
82 F.3d 23 (2d Cir. 1996) ....................11, 19

*Quintero v. Garland*,
998 F.3d 612 (4th Cir. 2021) ....................35

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012)....................42

*Sessions v. Dimaya*,
584 U.S. 148 (2018) ....................17

*The Benito Estenger*, 176 U.S. 568 (1900) ....................14

*The Mary*, 12 U.S. 388 (1814) ....................27

*The Palmyra*, 25 U.S. 1 (1827) ....................27

*The Rapid*, 12 U.S. (8 Cranch) 155 (1814) ....................13, 16

*The Resolution*, 2 U.S. 1 (1781)....................28

*Truck Ins. Exch. v. Kaiser Gypsum Co., Inc.*,
602 U.S. 268 (2024)....................16

*Trump v. J.G.G.*,
604 U.S. 670 (2025).................... *passim*

*United States v. Lopez-Collazo*,
824 F.3d 453 (4th Cir. 2016) ....................................................................................39

*United States v. Oklahoma*,
No. 24-6144 (10th Cir. Nov. 20, 2024)...........................................................................11

*United States v. Rafiekian*,
991 F.3d 529 (4th Cir. 2021) ....................................................................................26

*United States v. Smith*,
18 U.S. 153 (1820)..........................................................................................................28

*United States v. Smith*,
27 F. Cas. 1192 (C.C.D.N.Y. 1806)..............................................................................16

*United States v. Trejo-Galvan*,
304 F.3d 406 (5th Cir. 2002) ....................................................................................16

*Usubakunov v. Garland*,
16 F.4th 1299 (9th Cir. 2021) ....................................................................................38

*U.S. ex rel. D'Esquiva v. Uhl*,
137 F.2d 903 (2d Cir. 1943)...........................................................................................8

*U.S. ex rel. Dorfler v. Watkins*,
171 F.2d 431 (2d Cir. 1948)...........................................................................................43

*U.S. ex rel. Gregoire v. Watkins*,
164 F.2d 137 (2d Cir. 1947)...........................................................................................8

*U.S. ex rel. Hoehn v. Shaughnessy*,
175 F.2d 116 (2d Cir. 1949)...........................................................................................8

*U.S. ex rel. Jaegeler v. Carusi*,
342 U.S. 347 (1952)...................................................................................................8, 43

*U.S. ex rel. Kessler v. Watkins*,
163 F.2d 140 (2d Cir. 1947)...........................................................................................8

*U.S. ex rel. Ludwig v. Watkins*,
164 F.2d 456 (2d Cir. 1947).......................................................................................8, 43

*U.S. ex rel. Von Heymann v. Watkins*,
159 F.2d 650 (2d Cir. 1947).......................................................................................8, 43

*U.S. ex rel. Zdunic v. Uhl*,
137 F.2d 858 (2d Cir. 1943)...........................................................................................8

*W.J.C.C. v. Trump*,
2025 WL 1703682 (W.D. Pa. June 18, 2025) ........................................ 35

*W.M.M. v. Trump*,
--- F.4th ---, 2026 WL 2349473 (5th Cir. Aug. 13, 2026) ........................................ 6

*W.M.M. v. Trump*,
154 F.4th 207 (5th Cir. 2025) ........................................ *passim*

*W.M.M. v. Trump*,
154 F.4th 319 (5th Cir. 2026) ........................................ *passim*

*Ware v. Hylton*,
3 U.S. (3 Dall.) 199 (1796) ........................................ 13

*White v. Burnley*,
61 U.S. 235 (1857) ........................................ 14

*Worcester v. Georgia*,
31 U.S. 515 (1832) ........................................ 15

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ........................................ 18

*Zivotofsky v. Clinton*,
566 U.S. 189 (2012) ........................................ 9

**Constitution**

U.S. Const. art. I, § 8, cl. 15 ........................................ 10

U.S. Const. art. I, § 9, cl. 2 ........................................ 10

U.S. Const. art. I, § 10, cl. 3 ........................................ 10

U.S. Const. art. IV, § 4 ........................................ 11

**Statutes**

8 U.S.C. § 1182(a)(2) ........................................ 20

8 U.S.C. § 1182(a)(3) ........................................ 20

8 U.S.C. § 1182(a)(3)(B)(i)(V) ........................................ 20

8 U.S.C. § 1182(a)(3)(B)(vi) ........................................ 20

8 U.S.C. § 1189(a)(1)(A) ........................................ 19

8 U.S.C. § 1189(a)(1)(B) ....................19

8 U.S.C. § 1225 ....................20

8 U.S.C. § 1225(b) ....................41

8 U.S.C. § 1226(c) ....................20

8 U.S.C. § 1226a ....................20, 41

8 U.S.C. § 1227(a)(2) ....................20

8 U.S.C. § 1227(a)(4) ....................20

8 U.S.C. § 1227(a)(4)(B) ....................20

8 U.S.C. § 1228 ....................41

8 U.S.C. § 1229(b)(2) ....................39

8 U.S.C. § 1229a(a)(3) ....................41

8 U.S.C. § 1231 ....................41, 42

8 U.S.C. § 1231(a)(6) ....................20

8 U.S.C. § 1231(b)(3)(A) ....................41, 42

8 U.S.C. § 1231(b)(3)(B) ....................42

8 U.S.C. § 1531 ....................20, 41

8 U.S.C. § 1536 ....................20

8 U.S.C. § 1537 ....................20

18 U.S.C. § 2441 ....................19, 24

28 U.S.C. § 1603(b)(2) ....................27

28 U.S.C. § 2242 ....................36

50 U.S.C. § 21 .................... *passim*

50 U.S.C. § 22 ....................8, 43, 44

Foreign Affairs Reform and Restructuring Act of 1998 § 2242(a), Pub. L. No. 105-277, Div. G. Title XXI, 112 Stat. 2681 (1998) ....................41

1 Stat. 96 (1789) ....................12

1 Stat. 264 (1792)....................10

1 Stat. 329 (1793)....................16

1 Stat. 384 (1794)....................16

1 Stat. 424 (1795)....................10

1 Stat. 558 (1798)....................10, 16

1 Stat. 571 (1798)....................17

1 Stat. 725 (1799)....................10

2 Stat. 759 (1812)....................27

2 Stat. 763 (1812)....................27

2 Stat. 764 (1812)....................27

**Rules**

Fed. R. Civ. P. 56(a) ....................6

**Regulatatory Authority**

8 C.F.R. § 208.16 ....................41

8 C.F.R. § 208.17 ....................41

8 C.F.R. § 208.18 ....................41

8 C.F.R. § 1208.16 ....................41

8 C.F.R. § 1208.17 ....................41

8 C.F.R. § 1208.18 ....................41

8 C.F.R. § 1240.10(f) ....................43

8 C.F.R. § 1240.11(c)(1)....................43

10 Fed. Reg. 12189 ....................43

90 Fed. Reg. 13033 ....................17, 18, 22, 26

90 Fed. Reg. 13034 .................... *passim*

**Other Authorities**


3 Parliamentary Register 275 § 1 (1802) ....................28

3 Parliamentary Register 34 § 1 (1802) ....................28

3 Parliamentary Register 46 § 1 (1802) ....................28

8 Annals of Cong. 1573 (1798) ....................16

8 Annals of Cong. 1575 (1798) ....................15

8 Annals of Cong. 1577 (1798) ....................14

8 Annals of Cong. 1790 (1798) ....................14, 15

8 Annals of Cong. 1979 (1798) ....................14

8 Annals of Cong. 1980 (1798) ....................14

Antonin Scalia & Bryan Garner, Reading Law (2012) ....................12

Christian Wolff, Jus Gentium Methodo Scientifica Pertractatum (1764 ed., pub. 1934) ....................15

Cornelius Van Bynkershoek, Treatise on the Law of War (Peter Stephen du Ponceau trans., Farrand & Nicholas 1810) (1737) ....................13, 15, 27, 28

D.A. Azuni, Maritime Law of Europe (1806) ....................27

*Direction*, Black's Law Dictionary (2024) ....................26

Emer de Vattel, The Law of Nations (Charles G. Fenwick trans., Carnegie Inst. 1916) ....................28, 29

Emer de Vattel, The Law of Nations (Joseph Chitty ed., T. & J.W. Johnson & Co. 1863) ....................13, 14, 27, 44

Geneva Conventions Common Art. 3 ....................19

Gov't Stay Appl., *D.V.D. v. DHS*, No. 24A1153 (U.S. May 27, 2025) ....................29

Hamilton, The Examination No. 1 (Dec. 17, 1801) ....................15

*Hostile*, Ash's New and Complete Dictionary of the English Language (1795) ....................15

*Hostilities*, Duane's Military Dictionary (1810) ....................15

*Hostilities*, James's New and Enlarged Military Dictionary (1805) ....................15

*Hostility*, Dyche's New General English Dictionary (1771) ....................15

*Hostility*, Johnson's Dictionary (1773) ....................15

Hugo Grotius, De Jure Belli Ac Pacis [On the Law of War and Peace] (Francis W. Kelsey trans., Clarendon Press 1925) (1625)....................23

*Incursion*, Bailey's Universal Etymological English Dictionary (1770)....................12

*Incursion*, Webster's American Dictionary of the English Language (1828) ....................12

*Invasion*, Bouvier's Law Dictionary (1839)....................11

*Invasion*, Dyche's New General English Dictionary (1771) ....................11

Jean Jacques Burlamaqui, Principles of Natural and Politic Law (Thomas Nugent trans., 4th ed. 1792)....................14, 15, 23

John Adams, Special Session Message (May 16, 1797)....................12

John Wood, The Suppressed History of the Administration of John Adams (1846) ....................12

Letter from George Washington to Thomas Jefferson (Feb. 6, 1781)....................12

Life and Speeches of Henry Clay (1854)....................12

*Matter of C-B-*,
25 I. & N. Dec. 888 (BIA 2012) ....................38

Rodney Atwood, The Hessians (1980) ....................28

S. Rep. No. 82-1137 (1952) ....................41

Samuel Pufendorf, De Jure Naturae Et Gentium: Libri Octo [The Law of Nature and Nations] (C.H. Oldfather & W.A. Oldfather trans., Clarendon Press 1934) (1688)....................11, 28

Thomas Jefferson, Notes on the State of Virginia (1794) ....................13

U.N. Art. on Responsibility of States 8 ....................22

U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988)....................41

William Blackstone, 1 Commentaries on the Laws of England (1765) ....................13

William Rawle, A View of the Constitution of the United States of America (2nd ed. 1829) ....................23

## INTRODUCTION

The Alien Enemies Act ("AEA") is a wartime authority that requires a declared war or military attack by a foreign nation. Presidents have adhered to those statutory limits for over two hundred years. But now, for the first time, the government claims it can use this war power against individuals it claims are members of a private criminal organization, due to alleged crimes and migration, even though Congress has enacted extensive laws to regulate those same acts. Indeed, government officials have made clear that the whole point of the Proclamation is to evade the procedures and protections that Congress and the Constitution normally require for prosecution and deportation.

The government has argued that the Proclamation is effectively unreviewable, because courts must defer to the President's bare assertion that the AEA is satisfied. The Supreme Court specifically held otherwise in parallel litigation. *Trump v. J.G.G.*, 604 U.S. 670, 672-73 (2025). And the government's focus on eliminating review underscores the weakness of its case on the merits. Indeed, the Proclamation is void under the AEA. It is predicated on migration and crimes committed by a gang. But careful review of the statute's text, context, and the historical record, shows that the AEA's extraordinary powers are only available when there is a military attack on U.S. soil—something the Proclamation does not assert. *See W.M.M. v. Trump*, 154 F.4th 207, 220-29 (5th Cir. 2025), *vacated on reh'g en banc*, 154 F.4th 319 (5th Cir. 2026). Courts around the country have recognized the same. As Judge Henderson noted: "invasion is a military affair" and an "incursion is a lesser form of invasion." *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, *9-10 (D.C. Cir. 2025) (Henderson, J., concurring).

The Proclamation also fails the AEA's requirement of an attack by a "foreign nation or government." The President has made a formal determination that Tren de Aragua ("TdA"), the criminal organization that is the subject of the Proclamation, is a *non*-state actor whose alleged

drug trafficking triggers a *non*-international armed conflict—meaning it is not attributable to Venezuela. That directly contradicts the Proclamation's attempts to tie TdA to the Venezuelan government as a way to satisfy the AEA's requirement of an attack by a "nation or government." Thus, any deference previously accorded by courts to the Proclamation's assertion that former Venezuelan President Maduro "directed" some of TdA's activities, that deference is no longer justified. That is especially true given that 17 of 18 U.S. national security agencies have concluded that Maduro probably did *not* direct TdA.

Finally, the government's removal procedures violate due process and the INA. Strong protections are critical here, especially because there are extensive and disturbing indications that, using the Proclamation, the government has already removed countless people who have no connection to TdA, and sent them all to a notorious Salvadoran prison where they suffered horrific abuse. Given the barriers to filing new habeas litigation from detention—especially if hundreds need to do so all at once—detainees must be given at least 30 days' notice to ensure that the government cannot again remove people without judicial review.

## LEGAL AND FACTUAL BACKGROUND

### I. STATUTORY FRAMEWORK AND PROCLAMATION

Passed in 1798, the Alien Enemies Act provides:

> Whenever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government . . . shall be liable to be apprehended, restrained, secured, and removed as alien enemies.

50 U.S.C. § 21. And the Act allows "for the removal of" noncitizens only if they "refuse or neglect to depart" after being designated alien enemies. *Id.*

On March 14, the President signed a Proclamation under the AEA declaring that TdA, a Venezuelan criminal gang, is "perpetrating, attempting, and threatening an invasion or predatory incursion against the territory of the United States." 90 Fed. Reg. 13034. The Proclamation does not lay out any process for those accused of TdA membership to challenge that designation.

The administration issued a worksheet to identify TdA members, called an "Alien Enemy Validation Guide." The Guide assigns points based on alleged indicators of gang affiliation, such as tattoos, hand gestures, and social media activity. App.209-11 (Alien Enemy Validation Guide). Evidence in the record shows that these criteria have little connection to TdA. The group does not use consistent symbols or tattoos, and the ones the government relied on are common in Venezuelan culture and do not reliably indicate gang affiliation. App.6-7 (Hanson Decl.) ¶¶ 22-24; App.15 (Antillano Decl.) ¶ 14; App.25 (Dudley Decl.) ¶ 25.

The Guide also assigns points for a TdA membership certificate, but even the government's own experts agree that TdA is a fragmented and decentralized group with no clear leadership structure and certainly no membership certificates. *Compare* App.2, 5, 8 (Hanson Decl.) ¶¶ 1, 16, 27; App.14-15 (Antillano Decl.) ¶¶ 10-11, 14; App.24 (Dudley Decl.) ¶ 22, *with* Appellate Record at 825 (Smith Decl.) ¶¶ 9-10, *W.M.M. v. Trump*, No. 25-10534 (5th Cir. June 3, 2025), Dkt. 82-3; *id.* at 836 (Charles Decl.) ¶ 7. A disturbing number of designees appear to have no connection to TdA at all. Reporting indicates that approximately 75% of individuals sent to El Salvador had no criminal record in the United States or abroad, and that several of those who were sent to El Salvador entered as highly vetted refugees. App.389-92 (CBS investigation); App.395-98 (CATO report); App.262-69 (AEA designee removed to CECOT after being granted refugee status); App.311 (same); *Agelviz-Sanguino v. Noem*, No. 4:25-cv-2116, Dkt. 1 ¶ 1 (S.D. Tex. 2025). And scores of people appear to have been designated based on innocuous tattoos or social media posts.

App.248-387; *see also, e.g.*, App.94-95 (Tobin Decl.) ¶¶ 7-9; App.99 (April 17 Collins Decl.) ¶ 5; App.102 (April 18 Collins Decl.) ¶ 9. For one detainee, the only evidence the government ever adduced to establish his membership in TdA was two crown tattoos, which accompany the words "Mom" and "Dad" and celebrate his participation in his hometown's Epiphany festival. App.53 (Reyes Decl.) ¶¶ 22-24. Another man had a tattoo of the autism awareness ribbon, along with the name of his brother, who has autism. App.318-21.

These individuals nonetheless ended up in what is essentially a Salvadoran gulag, never having had an opportunity to contest their designation as TdA. App.413, 419-20 (routine severe beatings and acts of humiliation); App.427-30 (sexual abuse, beatings, denial of food); App.509-44 (describing "serious physical and psychological abuse on a virtually daily basis"); SUF.69; *see also* App.39, 42-44 (Bishop Decl.) ¶¶ 21, 33, 37, 39, 41 (beatings, forced labor, torture, indefinite detention without trial typical for Salvadoran prisons); App.28, 30-34 (Goebertus Decl.) ¶¶ 3, 8, 10, 17 (similar); SUF.70.

## II. THIS LITIGATION

Petitioners filed this habeas class action in this Court on behalf of themselves and a proposed class after learning that the government was moving Venezuelan noncitizens from around the country to the Bluebonnet Detention Facility. ECF No. 3-1 at 1-2.

After the government sought to quickly remove Petitioners on April 17-18, 2025, the Supreme Court issued an administrative stay just prior to midnight on April 18, ordering the government "not to remove any member of the putative class of detainees." *A.A.R.P. v. Trump*, 605 U.S. 91, 93, 96 (2025). After briefing, the Supreme Court construed Petitioners' stay application as a petition for a writ of certiorari, granted the petition and the application for an injunction pending further proceedings, vacated the Fifth Circuit's judgment, and remanded for further proceedings. *Id.* at 94. On remand, the Supreme Court instructed the Fifth Circuit to

expeditiously address "(1) all the normal preliminary injunction factors, including likelihood of success on the merits, as to the named plaintiffs' underlying habeas claims that the AEA does not authorize their removal pursuant to the President's March 14, 2025, Proclamation, and (2) the issue of what notice is due, as to the putative class's due process claims against summary removal." *Id.* at 98-99. The Supreme Court's injunction remains in place through the "disposition of the petition for a writ of certiorari, if such writ is timely sought." *Id.* at 99.

A panel of the Fifth Circuit granted a preliminary injunction and remanded for further proceedings. Judge Southwick, writing for the majority, held that the Court could review whether the AEA authorized the Proclamation, *W.M.M.*, 154 F.4th at 214-20, and that, on the merits, the Proclamation did not satisfy the AEA. The panel accepted the Proclamation's findings but held that those "findings do not support that an invasion or predatory incursion has occurred." *Id.* at 220-29. Judge Oldham dissented on the ground that courts could not review the President's assertion that an "invasion" or "predatory incursion" has occurred. *Id.* at 240-312. A separate majority, in an opinion from which Judge Ramirez dissented, *id.* at 237-39, noted that the government had altered its procedures to "give AEA detainees notice of their detention in a language they understand, information about how to challenge detention including how to contact counsel, and seven days in which to file a habeas petition before being removed." *Id.* at 236. The Court declined to invalidate the government's 7-day notice procedures on the current record but acknowledged the need for further fact-finding by the district court regarding the sufficiency of those procedures. *Id.* at 235-37.

The government petitioned the Fifth Circuit for rehearing en banc. *W.M.M. v. Trump*, No. 25-10534 (5th Cir. Sept. 22, 2025), Dkt. 206. The Fifth Circuit granted the petition. *W.M.M. v. Trump*, No. 25-10534 (5th Cir. Sept. 30, 2025), Dkt. 219.

At oral argument, the en banc panel inquired about the status of the named petitioners. The parties subsequently submitted a joint letter explaining that all three named petitioners had been removed under the Immigration and Nationality Act ("INA"). *W.M.M. v. Trump*, No. 25-10534 (5th Cir. Feb. 4, 2026), Dkt. 332. Both parties agreed that Petitioners could substitute additional AEA detainees as named class representatives, by filing a motion in the Fifth Circuit. *Id.* at 1. Petitioners then filed an unopposed motion to add class representatives, seeking to add the same proposed class representatives who are now before this court. *W.M.M. v. Trump*, No. 25-10534 (5th Cir. Feb. 17, 2026), Dkt. 336. The Fifth Circuit denied that motion, "without prejudice to any future determination by the district court respecting whether . . . to permit the petitioners to add or substitute new class representatives." *W.M.M. v. Trump*, --- F.4th ---, 2026 WL 2349473, at *4 (5th Cir. Aug. 13, 2026). It then dismissed the appeal "[g]iven the lack of any named petitioners to whom we could grant relief in this appeal" and the lack of a certified class. *Id.* at *5.

Petitioners subsequently filed an unopposed motion to add named petitioners in this Court. ECF No. 88. That motion remains pending before this Court.

## LEGAL STANDARD

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment "may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015).

## ARGUMENT

### I. THE PROCLAMATION IS REVIEWABLE.

All of Petitioners' claims can be resolved by this Court. As to the procedural claims, the Supreme Court has already twice ruled on the issue of what protections must be afforded to AEA

detainees, and it instructed the lower courts to address the merits of those issues on remand. *See A.A.R.P.*, 605 U.S. at 94-96; *J.G.G.*, 604 U.S. at 672-73. This Court can similarly review Petitioners' claims that the Proclamation does not satisfy the AEA's statutory requirements of an ongoing or threatened "invasion or predatory incursion" perpetrated by a "nation or government." The Supreme Court recently reaffirmed that courts can review not only whether an individual "is in fact an alien enemy" under the AEA, but also "'questions of interpretation and constitutionality' of the Act." *J.G.G.*, 604 U.S. at 672-73 (quoting *Ludecke v. Watkins*, 335 U.S. 160, 163, 172 n.17 (1948)). That is precisely what Petitioners seek here: a construction of the terms of the statute.

In light of the Supreme Court's ruling, every court to consider a threshold challenge to the Proclamation on the merits has agreed such claims are reviewable. *See, e.g.*, *J.A.V. v. Trump*, 781 F. Supp. 3d 535, 549-53 (S.D. Tex. 2025) (granting summary judgment on ground that there is no invasion or predatory incursion within the meaning of the AEA); *M.A.P.S. v. Garite*, 786 F. Supp. 3d 1026, 1046-48 (W.D. Tex. 2025); *D.B.U. v. Trump*, 781 F. Supp. 3d 1158, 1165 (D. Colo. 2025); *G.F.F. v. Trump*, 781 F. Supp. 3d 195, 205 (S.D.N.Y. 2025); *A.S.R. v. Trump*, 782 F. Supp. 3d 224, 238 (W.D. Pa. 2025); *see also J.G.G.*, 2025 WL 914682, at *8-10 (Henderson, J., concurring) (rejecting government's invasion and predatory incursion arguments); *id.* at *23-26 (Millett, J., concurring) (explaining why plaintiffs' AEA claims were reviewable).

In *Ludecke* itself, the Supreme Court reviewed whether the AEA's predicates were satisfied: whether a "declared war" existed within the meaning of the Act when "actual hostilities" had ceased and the "shooting war" had ended. 335 U.S. at 161, 166-70. The Supreme Court concluded, on the merits, that the statutory term "declared war" did not mean "actual hostilities," and that once Congress declares war, the war continues for purposes of the AEA until the political branches declare it over. *Id.* at 170 & n.15. *Ludecke* did not evaluate the "political judgment" of

Congress and the President about when to rescind the formal declaration of war. *Id.* at 169-70. But it did interpret the meaning of the statute to determine whether its requirements were satisfied. And applying that interpretation, four years later, the Court *reversed* an AEA removal order because "[t]he statutory power of the Attorney General to remove petitioner as an enemy alien ended when Congress terminated the war." *U.S. ex rel. Jaegeler v. Carusi*, 342 U.S. 347, 348 (1952).

Consistent with *J.G.G.*'s and *Ludecke*'s recognition that questions about the "construction," "interpretation," and "validity" of the AEA are justiciable, courts during World War II reviewed a range of issues concerning the meaning and application of the AEA's terms. *See, e.g.*, *U.S. ex rel. Kessler v. Watkins*, 163 F.2d 140, 143 (2d Cir. 1947) (interpreting "foreign nation or government"); *U.S. ex rel. Zdunic v. Uhl*, 137 F.2d 858, 860-61 (2d Cir. 1943) ("[t]he meaning of [native, citizen, denizen, or subject] as used in the statute . . . presents a question of law"); *U.S. ex rel. Gregoire v. Watkins*, 164 F.2d 137, 138 (2d Cir. 1947) (interpreting "native"); *U.S. ex rel. D'Esquiva v. Uhl*, 137 F.2d 903, 905-07 (2d Cir. 1943) (same and reviewing legal status of Austria); *Citizens Protective League v. Clark*, 155 F.2d 290, 292, 295 (D.C. Cir. 1946) (reviewing whether Proclamation fell within "the precise terms" of the AEA); *U.S. ex rel. Von Heymann v. Watkins*, 159 F.2d 650, 653 (2d Cir. 1947) (interpreting "within the United States"); *U.S. ex rel. Ludwig v. Watkins*, 164 F.2d 456, 457 (2d Cir. 1947) (interpreting "refuse or neglect to depart"); *U.S. ex rel. Hoehn v. Shaughnessy*, 175 F.2d 116, 117-18 (2d Cir. 1949) (interpreting "reasonable time" to depart under Section 22).

Nor does the political question doctrine pose any barrier to reviewing Petitioners' claims. The Supreme Court foreclosed that possibility in *J.G.G.* and *Ludecke*, by instructing courts to resolve questions of the AEA's "construction and validity" and "interpretation and

constitutionality." *Ludecke*, 335 U.S. at 163, 171; *J.G.G.*, 604 U.S. at 672-73; *see also A.A.R.P.*, 605 U.S. at 98-99 (instructing this Court to address named plaintiffs' statutory claims); *J.G.G.*, 2025 WL 914682, *6-8 (Henderson, J., concurring) (rejecting government's political-question arguments).

At bottom, interpreting statutes and applying those interpretations to facts is the essence of what courts do. *Zivotofsky v. Clinton*, 566 U.S. 189, 201 (2012); *W.M.M.*, 154 F.4th at 217 ("interpretation . . . implies the application of law to facts"). When Congress authorizes executive action, judicial review is essential to ensure that the executive stays within Congress's limits. Eliminating review would eviscerate the textual limits that Congress wrote into the AEA. Despite Congress's careful efforts to cabin this extraordinary war power to specific narrow circumstances, the President could use it any time he wanted for any reason at all. There is no support for this blank-check view of the AEA.

## II. THE PROCLAMATION IS NOT AUTHORIZED BY THE AEA.

### A. The AEA's Statutory Predicates of "Invasion" and "Predatory Incursion" Require Military Attacks.

1. For over two centuries, the AEA has been understood as a wartime authority that requires (1) a "declared war," or an ongoing or threatened "invasion or predatory incursion" (2) by a "foreign government or nation." 50 U.S.C. § 21. The Proclamation fails both of those requirements, even assuming its factual assertions are true, because it does not assert any declared war or military attack, only domestic law enforcement issues like irregular migration, drug trafficking, and other crimes.

Judges across the country have recognized that the statute requires military attack. Judge Southwick concluded that the statutory terms "invasion" and "predatory incursion" refer to military attacks—"sending an armed, organized force to occupy, to disrupt, or to otherwise harm

the United States." *W.M.M.*, 154 F.4th at 223-25, 228 (invasion is "an act of war involving the entry into this country by a military force" and predatory incursion is a smaller-scale attack by "a military force"). Judge Henderson likewise stressed in construing the AEA that "invasion is a military affair" and an "incursion is a lesser form of invasion." *J.G.G.*, 2025 WL 914682, at *8-10. Other judges have agreed. *See, e.g.*, *J.A.V.*, 781 F. Supp. 3d at 561; *G.F.F.*, 781 F. Supp. 3d at 210; *D.B.U.*, 781 F. Supp. 3d at 1175; *M.A.P.S.*, 786 F. Supp. 3d at 1049; *see also Ludecke*, 335 U.S. at 166, 171 (AEA is a "war power"); *W.M.M.*, 154 F.4th at 261 (Oldham, J.) (AEA applies in "military context"); *id.* at 125 (AEA "contemplates . . . military activity"); *id.* at 256 (AEA "implicat[es] the war power").

The text and context make clear that the AEA requires a declared war or military attack, not the "crimes" or "mass migration" asserted by the Proclamation.

Start with the text. The Act requires one of three events—a "declared war," "invasion," or "predatory incursion," 50 U.S.C. § 21—all of which refer to military conflict. A "declared war" is plainly military. An "invasion" is too: Every time Congress used that word in the late eighteenth century, it referred to military conflict. 1 Stat. 264 (1792) (authorizing summoning militia "whenever the United States shall be invaded"); 1 Stat. 424 (1795) (same); 1 Stat. 558 (1798) (authorizing raising army "in the event of a declaration of war against the United States, or of actual invasion of their territory, by a foreign power"); 1 Stat. 725 (1799) (similar). The same is true in the Constitution, written and ratified just a decade prior to the AEA. *See* U.S. Const. art. I, § 10, cl. 3 (states can "engage in War" if they are "actually invaded"); *id.* art. I, § 8, cl. 15 (Congress can "provide for calling forth the Militia to . . . repel Invasions"); *Id.* art. I, § 9, cl. 2 (Congress can suspend habeas corpus in certain "Cases of Rebellion or Invasion"); *see Hamdi v. Rumsfeld*, 542 U.S. 507, 554, 558 (2004) (Scalia, J., dissenting) (suspension available in "the exigencies of war");

*see also W.M.M.*, 154 F.4th at 222 ("Congress's use of the word in the AEA is consistent with the use in the Constitution, that 'invasion' is a term about war in the traditional sense and requires military action by a foreign nation."); *J.G.G.*, 2025 WL 914682, at *9 (Henderson, J., concurring). Indeed, the Second Circuit has explained that the Invasion Clause, *see* U.S. Const. art. IV, § 4, refers to "armed hostility from another political entity, such as another state or foreign country that is intending to overthrow the state's government"—not "illegal immigration" or crimes committed by immigrants. *Padavan v. United States*, 82 F.3d 23, 25, 28 (2d Cir. 1996); *see California v. United States*, 104 F.3d 1086, 1090-91 (9th Cir. 1997) (same); *New Jersey v. United States*, 91 F.3d 463, 469-70 (3d Cir. 1996) (same). In fact, the government has agreed in other briefing. *See* Br. for the United States at 38, *United States v. Oklahoma*, No. 24-6144 (10th Cir. Nov. 20, 2024) (explaining that "common usage of the term in the late Eighteenth Century predominantly referred to 'invasion' as a hostile and organized military force"—not "irregular migration or criminal cartels' smuggling activities").

Contemporaneous dictionaries and other sources confirm the term's military meaning. *See W.M.M.*, 154 F.4th at 221-23 (collecting contemporaneous uses of "invasion"); *see also Invasion*, Dyche's New General English Dictionary (1771) ("entering of an army into another's country"); *Invasion*, Bouvier's Law Dictionary (1839) ("the entry of a country by a public enemy, making war"); James Madison, Report of 1800 ("Invasion is an operation of war."); Samuel Pufendorf, De Jure Naturae Et Gentium: Libri Octo [The Law of Nature and Nations] 1126 (C.H. Oldfather & W.A. Oldfather trans., Clarendon Press 1934) (1688) (hereinafter "Pufendorf") ("forts, arms, and troops" are "required to repel invasion").

Like the two preceding terms, "predatory incursion" also referred to military attacks. Congress's only contemporaneous mention of "incursion" came in a statute that authorized the

President to summon the militia in response to attacks by Native American tribes. 1 Stat. 96 (1789) (addressing "hostile incursion"); *infra* at 23-24 ("hostile" referred to military action). A litany of other sources reflect a similar understanding. *W.M.M.*, 154 F.4th at 223-25 (reviewing contemporaneous uses of "predatory incursion" and concluding that examples "all involved a military force of some meaningful size, organized in a manner related to the kind of enemy involved"); *J.A.V.*, 781 F. Supp. 3d at 560 (similar); *see also Incursion*, Webster's American Dictionary of the English Language (1828) ("detachments of an enemy's army, entering a territory for attack"); *Incursion*, Bailey's Universal Etymological English Dictionary (1770) ("An Inroad of Soldiers into an Enemy's Country"); John Adams, Special Session Message (May 16, 1797) (calling for standing army "to guard against sudden and predatory incursions"); Life and Speeches of Henry Clay 16 (1854) (reproducing 1811 speech calling for troops to guard against "invasions and predatory incursions"); Letter from George Washington to Thomas Jefferson (Feb. 6, 1781) ("incursions" by British troops during Revolutionary War); *cf.* John Wood, The Suppressed History of the Administration of John Adams 290-91 (1846) (describing same incident as "predatory incursion").

"There of course can be far less warlike meanings" when the terms "invasion" or "predatory incursion" are "used colloquially." *W.M.M.*, 154 F.4th at 222; *J.G.G.*, 2025 WL 914682, at *8 n.5; *J.A.V.*, 781 F. Supp. 3d at 561. Ants may invade a kitchen; a person may invade someone's privacy; a business may complain of incursions from a competitor. But in the AEA, all surrounding text and context confirm that Congress used these terms in the military sense. *See* Antonin Scalia & Bryan Garner, Reading Law 70 (2012) (when words have multiple meanings, "context disambiguates").

Critically, the Act's title and operative text refer to "alien enemies," a well-established term of art in the law of nations that required military conflict. *See W.M.M.*, 154 F.4th at 245 (Oldham, J.) (alien enemies was "familiar concept" that referred to subjects of a foreign nation "when their home country and host country were at war"); *see also* Br. for Amicus Curiae Professor Andrew Kent, *W.M.M. v. Trump*, No. 25-10534 (5th Cir. Nov. 19, 2025), Dkt. 267-1. The evidence for this military term-of-art meaning is overwhelming. *Johnson v. Eisentrager*, 339 U.S. 763, 769 n.2 (1950) (collecting sources for the proposition that "an alien enemy is the subject of a foreign state at war with the United States" (quoting *Techt v. Hughes*, 128 N.E. 185, 186 (N.Y. 1920) (Cardozo, J.)); *id.* at 772 (alien enemy status "imposed temporarily as an incident of war"); *id.* ("in war 'every individual of the one nation must acknowledge every individual of the other nation as his own enemy'" (quoting *The Rapid*, 12 U.S. (8 Cranch) 155, 161 (1814)); *id.* at 775 (AEA requires "the existence of a state of war"); *Ware v. Hylton*, 3 U.S. (3 Dall.) 199, 228 (1796) (holding that people could not be "alien enemies" during peacetime); Emer de Vattel, The Law of Nations 321 (Joseph Chitty ed., T. & J.W. Johnson & Co. 1863) (hereinafter "Vattel, Chitty ed.") (alien enemy status arose when "a nation is at open war" against "another nation"); Cornelius Van Bynkershoek, Treatise on the Law of War 195 n.* (Peter Stephen du Ponceau trans., Farrand & Nicholas 1810) (1737) (hereinafter "Bynkershoek") (same); Thomas Jefferson, Notes on the State of Virginia 226 (1794) (same). In this situation, when "Congress employs a term of art obviously transplanted from another legal source, it brings the old soil with it." *George v. McDonough*, 596 U.S. 740, 746 (2022) (cleaned up).

By contrast, domestic crimes "committed by private citizens" such as "robbers" were handled "according to that rule of the civil law," and did not trigger the law of war or the status of alien enemies. William Blackstone, 1 Commentaries on the Laws of England 249 (1765). This

remains true today, as crime and migration are governed by ordinary domestic law, whereas warfare is governed by its own set of rules. Thus, by tying the AEA to this concept of "alien enemies," Congress used an established law-of-nations term which plainly excluded the kinds of TdA activities alleged in the Proclamation.

Other parts of the AEA's text perfectly match the law-of-nations concept of an "alien enemy." The Act authorizes detention and removal of "all natives, citizens, denizens, or subjects of the hostile nation or government," 50 U.S.C. § 21—exactly those whom the law of nations deemed enemies. *See The Benito Estenger*, 176 U.S. 568, 571 (1900) ("citizens or subjects" of an enemy nation are alien enemies based on their "political status"). And the Act requires an attack "against the territory of the United States," 50 U.S.C. § 21, in line with the law of nations' requirement of armed hostilities sufficient to mobilize "all the subjects or citizens of the one" against all the "subjects or citizens of the other." *White v. Burnley*, 61 U.S. 235, 249 (1857). Indeed, legislators consistently stated their intention to follow the law of nations in enacting the AEA. *See* 8 Annals of Cong. 1577 (1798); *id*. at 1790; *id*. at 1979-80.

The AEA's focus on both offensive and defensive wars provides further evidence that Congress intended to adopt the law of nations concept of alien enemies. *See* Jean Jacques Burlamaqui, Principles of Natural and Politic Law 348-49 (Thomas Nugent trans., 4th ed. 1792) (hereinafter "Burlamaqui") (under the law of nations, the aggressor "commences an offensive war and he who opposes him . . . begins a defensive war"). Offensive wars began with a written "declaration" of war. *Id.* at 362; Vattel, Chitty ed. at 315-16. Defensive wars did not require a declaration, because the hostile act—a military attack on another nation's territory—itself established a state of war. *See, e.g.*, Vattel, Chitty ed. at 316-17 ("He who is attacked and only wages defensive war, needs not to make any hostile declaration" because "open hostilities"

establish "the state of warfare"); Burlamaqui at 362 (same); Christian Wolff, Jus Gentium Methodo Scientifica Pertractatum 368 (1764 ed., pub. 1934) (same); Hamilton, The Examination No. 1 (Dec. 17, 1801) (same). Congress tracked this distinction in the AEA by providing for alien enemy status during both an *offensive* "declared War" and a *defensive* response to an "invasion" or "predatory incursion." 50 U.S.C. § 21; *Worcester v. Georgia*, 31 U.S. 515, 545 (1832) (discussing "defensive war" "to repel invasion" and "to repel [] incursions").

As a historical matter, applying alien enemy status outside of actual or imminent war would have been unheard of. There is no hint that Congress intended such a radical departure from the term's well established meaning. As Judge Henderson observed, all the statutory predicates "trigger a formal change in relations between the United States and the hostile power under the law of nations, and, in turn, the relationship of America to that nation's people." *J.G.G.*, 2025 WL 914682, at *8. And the debates show a universal understanding that "[i]n the event of a *war with France*, all her citizens here will become alien enemies[.]" 8 Annals of Cong. 1790 (1798) (emphasis added). In contrast, the Act's drafters were clear that, outside of war, "foreigners guilty of crimes against the United States" would be "apprehended and punished according to the existing laws: the present regulation was not pointed at them." *Id.* at 1575.

Other statutory text provides further support. The Act requires an attack by a "hostile" foreign nation, and "hostile" signified war during the founding era. *See Hostile*, Ash's New and Complete Dictionary of the English Language (1795) ("hostile" means "warlike"); *Hostility*, *id.* ("A state of war"); *Hostility*, Dyche's New General English Dictionary (1771) ("Open war"); *Hostility*, Johnson's Dictionary (1773) ("open war"); *Hostilities*, Duane's Military Dictionary (1810) ("act of hostility" tantamount to "declaration of war"); *Hostilities*, James's New and Enlarged Military Dictionary (1805) (same); Bynkershoek at 58 (equating "hostilities" with

"war"); *The Rapid*, 12 U.S. at 162 (referring to wartime enemy as "hostile country"); *United States v. Smith*, 27 F. Cas. 1192, 1230 (C.C.D.N.Y. 1806) ("invasive hostilities" create "war"); *Bas v. Tingy*, 4 U.S. 37, 45 (1800) ("hostile operations" permitted when Congress authorized "war").

The AEA also requires an attack "against the territory" of the United States—a phrase Congress used in contemporaneous statutes to refer to a "military expedition or enterprise" that undermined a nation's territorial control. 1 Stat. 384 (1794); *J.G.G.*, 2025 WL 914682, at *8 (Henderson, J., concurring) ("Undesired people do not arrive against the territory. But foreign armies can[.]"); *cf.* 1 Stat. 384 (1794) (criminalizing "any military expedition or enterprise . . . against the territory or dominions of any foreign prince or state" at peace with the U.S.); *Ex parte Bollman*, 8 U.S. 75, 131 (1807). In contrast, ordinary *crimes* were committed "against the person or property" of a private individual. *United States v. Trejo-Galvan*, 304 F.3d 406, 408 (5th Cir. 2002); 1 Stat. 329 (1793) (criminalizing "murder" and "other crime against the person or property of any friendly Indian"); *J.A.V.*, 781 F. Supp. 3d at 560 (emphasizing invasion and incursion as military entry into territory).

Historical context confirms the Act's military focus. *See Truck Ins. Exch. v. Kaiser Gypsum Co., Inc.*, 602 U.S. 268, 279 (2024) (looking to "historical context"). It was enacted in response to Congress's concern about potential war with France. *W.M.M.*, 154 F.4th at 220; *id.* at 244 (Oldham, J.). Congress's inclusion of defensive war—granting the President the power to respond to sudden military attack—makes particular sense given Congress's concern that France would engage in armed military conflict against U.S. territory while Congress was out of session. 1 Stat. 558 (1798) (authorizing President to respond to military attacks during congressional recess); 8 Annals of Cong. 1573 (1798) (rejecting limitation of AEA to times when Congress was in session and could declare war).

Finally, the AEA was enacted pursuant to Congress's power "to declare war." *Eisentrager*, 339 U.S. at 774 n.6. The Act faced little opposition on constitutional grounds because, "[w]ith respect to alien enemies, no doubt has been intimated as to the federal authority over them; the Constitution having expressly delegated to Congress the power to declare war." *Id.* That stands in stark contrast with the contemporaneously enacted Alien Friends Act ("AFA"), which permitted the removal of individuals "dangerous to the peace and safety of the United States" and individuals engaged in "secret machinations against the government"—with *or without* military conflict. 1 Stat. 571 (1798). Those terms align much more closely with the Proclamation, which asserts that "members of TdA are a danger to the public peace and safety of the United States," and that they are engaged in "clandestine" efforts to "undermine" and "destabiliz[e]" the United States. 90 Fed. Reg. 13033-34. In other words, the AFA applied to the same activity the government has elsewhere claimed the AEA covers: "any entry" that is "for a hostile and destructive purpose." Pet. for Reh'g En Banc at 12, *W.M.M. v. Trump*, No. 25-10534 (5th Cir. Sept. 22, 2025), Dkt. 206; *see also W.M.M.*, 154 F.4th at 227 (AFA "would more directly apply here"). But unlike the AEA, the AFA was "widely condemned as unconstitutional" precisely because it operated outside of wartime. *Sessions v. Dimaya*, 584 U.S. 148, 185 (2018) (Gorsuch, J., concurring). Congress would have been shocked to hear the government's position in this litigation that the AEA *also* applies outside wartime and encompasses the same things as the AFA.

2. The AEA's statutory terms thus require a military attack by a foreign nation or government against U.S. territory. But the Proclamation does not assert any sort of military activity, much less an attack on U.S. territory via a "method of conducting hostilities . . . in some manner comparable to an invasion or predatory incursion as understood in 1798." *W.M.M.*, 154 F.4th at 227. Instead, it alleges migration and criminal activity, particularly drug trafficking. Those are law

enforcement issues, extensively regulated by domestic law, including Title 8, Title 18, and the laws of every state. That is why the government has so strenuously resisted the statutory requirement of a military attack throughout this litigation.[1]

The Proclamation attempts to use "freestanding labels" to meet the AEA's statutory requirements. *See W.M.M.*, 154 F.4th at 228-29 (rejecting government's reliance on "freestanding labels"). The Proclamation *calls* drug sales a form of "irregular warfare." 90 Fed. Reg. 13033. It *says* that migration constitutes an "invasion" and "predatory incursion." *Id*. at 13033-34. But mere labels cannot be enough to satisfy the AEA—otherwise, the careful limits that Congress wrote into the statute would disappear. *Cf. W.M.M. v. Trump*, No. 25-10534 (5th Cir.), En Banc Oral Arg. at 51:03-53:45 (government counsel indicating that the court should defer if a proclamation claimed a "British invasion" based on the Beatles).

Beyond bare labels, the Proclamation's factual assertions are strikingly thin and do not match the AEA's requirements. The Proclamation contains one mention of crimes like "murders, kidnappings, [and] extortions," but it does not even claim that TdA is undertaking those activities in the United States. *Id.* at 13033. The only activities it claims within U.S. territory are "mass illegal migration" and "drug trafficking." *Id.* Even taking those assertions as true, those activities are "not within even an updated meaning of invasion or predatory incursion." *W.M.M.*, 154 F.4th at 229; *G.F.F.*, 781 F. Supp. 3d at 212 ("narcotics trafficking . . . is a criminal matter, not an

[1] The government's ongoing boat strikes, *infra* Part II.B, do not change this analysis, because they do not change the nature of the activities asserted in the Proclamation. There is still no "declared war," and drugs and migration still do not constitute an "invasion" or "predatory incursion" against U.S. territory as those terms were understood in 1798. Nor can the President use his military powers abroad to expand his domestic authority at home. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587-89 (1952).

invasion or predatory incursion"); *Padavan*, 82 F.3d at 28 (migration is not an "invasion" for constitutional purposes); *California*, 104 F.3d at 1091 (same); *New Jersey*, 91 F.3d at 468 (same).

Treating domestic drug crimes and immigration violations as military actions could have major implications. Military attacks on U.S. soil would trigger key elements of the Geneva Conventions, including the requirement that U.S. officials ensure alleged TdA members are "treated humanely" and are not subjected to "cruel treatment" or "outrages upon personal dignity." Geneva Conventions Common Art. 3; *Hamdan v. Rumsfeld*, 548 U.S. 557, 628, 630-31 (2006). There could be domestic criminal liability for war crimes if U.S. officials violated the Conventions. 18 U.S.C. § 2441. And such an attack could trigger law-of-war rules permitting the lethal targeting of combatants, including U.S. personnel. App.444-45 (Dep't of Def., Law of War Manual). The gravity of these consequences is one reason why Congress has never treated domestic drug sales and migration as military attacks. They are handled through a variety of other legal authorities, *see W.M.M.*, 154 F.4th at 231-32 (collecting authorities), not those pertaining to warfare.

Nor does the administration's labeling of TdA as a "foreign terrorist organization" mean TdA is engaged in military attacks. To be designated, an organization does not need to engage in anything close to military hostilities or be a sovereign nation or government. Instead, a "foreign organization" can be designated as an FTO if it commits any of a long list of crimes, like kidnapping or "[t]he use of any . . . firearm, or other weapon or dangerous device." 8 U.S.C. § 1189(a)(1)(A), (B) (referencing 8 U.S.C. § 1182(a)(3)(B)). Multiple criminal gangs have recently been designated. Designation as an FTO thus involves distinct statutory predicates from the AEA.

The FTO designation is further irrelevant to the AEA because Congress has provided a *different* set of tools for detaining and removing actual FTO members. The immigration laws

provide a range of authorities to detain and remove a "member" or "representative" of an FTO. Notably, Congress created a specialized court for the removal of non-citizen "terrorists." *Id.* §§ 1531 *et seq.* (Alien Terrorist Removal Court for FTO members among others); *see id.* §§ 1536-1537 (detention authority); *see also id.* § 1182(a)(3)(B)(i)(V), (vi) ("member of a terrorist organization" including designated FTO is removable); *id.* § 1227(a)(4)(B) (same); *id.* § 1226a (additional detention and removal scheme for FTO members and other "suspected terrorists"). Members of course can also be prosecuted and detained for any crime they commit. And if they engage in armed conflict against the United States, they can be subject to a range of detention and removal schemes designed for non-state actors. The AEA, by contrast, is designed for something else, which does not apply to TdA or other gangs: war between sovereign states. There are numerous authorities, with carefully chosen limits, for detaining and removing FTO members. *See W.M.M.*, 154 F.4th at 231-32; *see also* Br. of Amici Curiae Democracy Defenders Fund and Former Government Officials 6-11, *W.M.M. v. Trump*, No. 25-10534 (5th Cir. Nov. 19, 2025), Dkt. 269-1.

Congress has similarly provided detention and removal authorities for the specific activities the Proclamation identifies: "illegal migration," "drug trafficking," and other "crimes." The INA provides a host of detention and removal options for people who enter the country unlawfully and who commit crimes. *See, e.g.*, 8 U.S.C. §§ 1182(a)(2), (a)(3), 1225, 1227(a)(2), (a)(4), 1226(c), 1231(a)(6). And all the crimes identified in the Proclamation are of course subject to serious criminal penalties. These authorities belie the notion that the government needs to misappropriate a wartime power to address issues for which Congress has already provided extensive and specific tools.

Allowing the government to stretch the AEA here would open the door to a range of abuses. The government has already claimed extraordinary powers under the AEA—including to strip people of their legal status in this country; to send people to be held indefinitely without trial, incommunicado, in a horrific foreign prison; and to enter American homes without a warrant. *See supra* at 3-4; App.223-24. There are many troubling indications that the government is applying the Proclamation to scores of people with no TdA affiliation, using criteria that have almost nothing to do with TdA membership, even assuming TdA has formal "members." *See supra* at 3-4. So far, these efforts have primarily targeted Venezuelan men. But these efforts are likely to expand dramatically if courts rule that the government can use the AEA against non-state organizations that are not engaged in armed hostilities. Many nations have criminal gangs that have some presence in the United States. And if the Proclamation's thin assertions are enough, the President could easily claim that any gang or other non-state actor "coordinates" with a foreign government and aims to "destabiliz[e]" the United States.

In sum, the AEA can only be used in response to a declared war or military attack on U.S. territory. The Proclamation fails that requirement.

**B. The Proclamation Fails to Establish an Attack by a "Foreign Nation or Government."**

The Proclamation is not authorized by the AEA for a second, independent reason. The statute requires not just a military attack against U.S. territory, but one carried out by a "foreign nation or government." 50 U.S.C. § 21. The Proclamation fails this requirement in multiple ways. The Proclamation on its face fails to establish an attack by Venezuela, studiously avoiding that assertion and instead naming TdA. Moreover, the government has taken contradictory positions in this litigation—first asserting that Maduro was directing TdA, then flip-flopping and arguing that

TdA's actions are *not* attributable to Venezuela. That position, with which nearly the entire intelligence community agrees, fatally undermines the conclusory assertions in the Proclamation.

1. The Proclamation tries to satisfy the AEA's foreign-nation requirement by asserting that TdA is part of "a hybrid criminal state" or is acting "at the direction . . . of the Maduro regime." 90 Fed. Reg. 13033-34. But the government has directly contradicted these statements in other fora. On September 2, 2025, the government began military strikes against boats in the Caribbean on the allegation that they were "transporting illegal narcotics" for cartels, including TdA. SUF.6; App.435-36 (initial strike, against alleged TdA members). In a notification to Congress that became public in early October, the executive branch stated that "the President determined these cartels are *non*-state armed groups" and "that the United States is in a *non*-international armed conflict [NIAC] with these designated terrorist organizations." SUF.7 (emphasis added). The government reiterated that same position before the United Nations Security Council on October 10, stating that "President Trump has determined" TdA and Cártel de Los Soles "are *non*-state armed groups" with whom "the United States is in a *non*-international armed conflict." SUF.8 (emphasis added).

Those recent presidential determinations can only be true if the Proclamation's assertions are false. If TdA's actions create a "non-international armed" conflict, then it cannot be acting "at the direction" of the Maduro government. Such direction would transform the conflict into an "*international* armed conflict." App.442 (Department of Defense noting that an IAC is "between States"); U.N. Art. on Responsibility of States 8 (group's conduct is attributable to a government where the group is acting "under the direction or control" of the government). It is impossible for TdA's drug trafficking to be attributable to the Maduro government and simultaneously to form the basis of a non-international armed conflict in which TdA is engaged as a non-state actor.

App.450 ("Non-international armed conflicts are those armed conflicts that are *not* between States." (emphasis added)). Therefore, the President's own formal determinations make clear that TdA's actions are not those of a "nation or government." 50 U.S.C. § 21.

The government's shifting determinations concerning TdA mirror its shifting positions in this case. At the Fifth Circuit, it abandoned its former argument before this Court that TdA itself "is a foreign nation or government." ECF No. 19 at 21. And the new determinations contradict numerous statements in the government's briefing in the Fifth Circuit. *See, e.g.*, Br. for Respondents-Appellees at 44, *W.M.M. v. Trump*, No. 25-10534 (5th Cir. June 10, 2025) (while Petitioners argued "TdA is a 'non-state actor,'" "the President found otherwise").

The recent determinations also contradict the AEA's fundamental purpose. As explained, the concept of "alien enemies" only applies when "a foreign *state* [is] at war with the United States." *Eisentrager*, 339 U.S. at 769 n.2 (emphasis added); *supra* Part II.A. Such status is premised on the unique legal relationship between sovereigns and their subjects. *Eisentrager*, 339 U.S. at 772 (citing *The Rapid*, 12 U.S. at 161). But that requires war between two sovereigns. The drafters of the AEA would never have recognized the notion of alien enemies in a conflict between a nation and a "non-state" actor. *See* William Rawle, A View of the Constitution of the United States of America 100 (2nd ed. 1829) (describing "public war" between sovereigns, where alien enemy status applied); Hugo Grotius, De Jure Belli Ac Pacis [On the Law of War and Peace] 91 (Francis W. Kelsey trans., Clarendon Press 1925) (1625) (distinguishing public war from "mixed" war between nation and non-state group); Burlamaqui at 349-50 (similar).

In addition to contradicting the Proclamation and precluding the application of alien enemy status, the President's recent determinations also underscore a problem on the Proclamation's face: It never claims an invasion by Venezuela itself, only TdA. While it asserts various connections

between the two, the Proclamation repeatedly states that "TdA"—not Venezuela—"is perpetrating, attempting, and threatening an invasion or predatory incursion against the territory of the United States." 90 Fed. Reg. 13034.

That does not satisfy the AEA, which requires an attack by a "nation or government," not a non-state group. And it is no mere technicality. Declaring an invasion by the nation of Venezuela would mean that we are in an *international* armed conflict, which would trigger a host of serious consequences: Both Venezuela and the United States could lethally target each other's combatants under the laws of war. App.444-45 (Dep't of Def., Law of War Manual). The entirety of the Geneva Conventions would apply. TdA members would have to be treated as prisoners of war and could not be prosecuted for drug trafficking (as the alleged action constituting a military attack). *Id.* at 105, 539-40. And, again, U.S. officials could be subject to criminal liability for war crimes. 18 U.S.C. § 2441.

That should end the matter: According to the administration itself, TdA's actions are not attributable to the Venezuelan government, and the AEA cannot be invoked against a non-state actor.

If any doubt remained as to whether TdA's actions are attributable to the Venezuelan government, the facts on the ground have overtaken it. After en banc briefing was complete, the United States criminally indicted Venezuela's president, Nicolas Maduro. SUF.9. The United States then deposed and captured Mr. Maduro, in what the Administration described as a "law enforcement" operation, and transported him to the United States to stand trial for his alleged crimes. SUF.10. Mr. Maduro remains incarcerated in the United States. In the wake of Mr. Maduro's ouster, President Trump stated that the United States would "run the country until such time as we can do a safe, proper, and judicious transition." SUF.11. The next day he reiterated that

"we're in charge" of Venezuela. SUF.12. Subsequent reporting has shown that Secretary of State Rubio has indeed taken a substantial role in Venezuela's operation. SUF.13 ("Mr. Rubio now effectively controls Venezuela's finances, the distribution of its natural resources and its government."). Trump recently referred to Venezuela as "our new and great friends." SUF.14. It no longer makes any sense to argue that TdA's actions are attributable to the Venezuelan government that the United States is "run[ning]" and "in charge" of.

2. The government's contradictory statements undermine the basis for deferring to the Proclamation's factual assertions. When the government itself contradicts its previous assertion, courts no longer have a consistent set of claims to defer to. Meaningful review of the facts is necessary so that the President cannot baselessly assert that the AEA's predicates are met. Indeed, courts have repeatedly reviewed the government's factual assertions in AEA cases. *Supra* at 7.

Here, the President's recent boat-strike determinations match the view of nearly the entire intelligence community, which concluded that TdA's actions are not attributable to Venezuela. Seventeen out of eighteen national security agencies that make up the National Intelligence Council ("NIC") concluded that it is "highly unlikely" the Maduro regime and TdA "would cooperate in a strategic or consistent way." SUF.4. The NIC explained that TdA focuses on "low-skill criminal activities" and that its "decentralized structure make[s] it highly unlikely that TDA coordinates large volumes of human trafficking or migrant smuggling." SUF.5.

3. Even without looking beyond the face of the Proclamation, it does not satisfy the AEA's requirement of an attack by a "nation or government." The Proclamation states that TdA acts "both directly and at the direction, clandestine or otherwise, of the Maduro regime." 90 Fed. Reg. 13034. But like its assertion of "irregular warfare," its bare assertion of "direction" by Maduro is simply a label—a legal conclusion that cannot satisfy the AEA all by itself. *W.M.M.*, 154 F.4th at 228-29

(rejecting the sufficiency of "freestanding labels"). The Proclamation provides no information about the alleged direction: it says nothing about its extent, such as whether it allegedly involves mere encouragement, or general instructions, or direct operational control. The Proclamation does not even say *what* Maduro allegedly directed TdA to do, where, or against whom. If it were enough to simply write the word "direction" in a proclamation, the AEA's "nation or government" requirement would disappear.

Nor do the Proclamation's more specific factual assertions support this label. It states that TdA "operates in conjunction" and "coordinates" with Cártel de los Soles, and that it "support[s] the Maduro regime's goal[s]." 90 Fed. Reg. 13033. But those do not describe *direction*. Direction requires "[a]n order," "an instruction on how to proceed," or "an act of guidance." Black's Law Dictionary (2024). The Proclamation describes no such order or instruction. *Cf. United States v. Rafiekian*, 991 F.3d 529, 538 (4th Cir. 2021) (for "direction" or "control" under 18 U.S.C. § 951, agent "must do more than act in parallel with a foreign government's interests or pursue a mutual goal"). Moreover, the President has now determined that, like TdA, Cártel de los Soles is also a "non-state" group, strikes against which constitute a "non-international armed conflict." *Supra* at 21-22. So "coordination" with that group is even further afield from state direction.

The same problems apply to the Proclamation's assertion that TdA is part of a "hybrid criminal state." Again, the President has now taken the position that TdA is a "non-state" actor. *Id.* But regardless, "hybrid criminal state" is an unexplained label just like irregular warfare. And it finds no support in the Proclamation's more specific factual statements. The Proclamation makes contradictory assertions that TdA is "closely aligned" with the regime yet has "infiltrated" the regime. And it says authorities have "ceded" an unspecified amount and kind of "control over their territories." None of that comes close to establishing that TdA is an arm of Venezuela's "hybrid

criminal state." In another context, to determine whether an entity is "an organ of a foreign state" under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1603(b)(2), courts must consider "whether the foreign state created the entity," whether it "actively supervises the entity," and "whether the foreign state requires the hiring of public employees and pays their salaries." *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 846-47 (5th Cir. 2000). The Proclamation does not assert that TdA meets *any* of those factors. *Compare id.* at 848-49 (entity created, owned, and managed by government was state organ); *In re Terrorist Attacks*, 538 F.3d 71, 86 (2d Cir. 2008) (similar).

4. In 1798, none of the Proclamation's assertions would have transformed TdA's actions into those of a "foreign nation or government." The most prominent contemporaneous analog is privateers. But privateer activity was treated as state action only when privateers acted *openly* on behalf of the sovereign pursuant to a formal public commission. *See, e.g.*, Bynkershoek at 139-140 (privateers under "the sanction of public authority" with "commission"); 2 Stat. 759 (1812) (privateering required written application and posting of bond); *The Palmyra*, 25 U.S. 1, 8-18 (1827); Vattel, Chitty ed. at 450-51 (actions by "private individuals who commit acts of hostility without being able to produce a commission from their sovereign" cannot "be imputed to the sovereign"); *W.M.M.*, 154 F.4th at 279 (Oldham, J.) (privateers' relationship with sovereign "depended on issuance of a letter of marque").

Indeed, privateers were so formally and openly tied to their authorizing government that they formed "part of the armed forces of the nation." *The Mary*, 12 U.S. 388, 397 (1814); Bynkershoek at 140 (describing privateers acting as national navy); D.A. Azuni, Maritime Law of Europe 353-54, 360 (1806) (upon receipt of a commission, privateers "ha[d] the same power and jurisdiction as the general of an army"); 2 Stat. 759, 763-64 (1812) (privateers received state

disability pension). In contrast, sailors acting without any formal commission delegating sovereign authority were treated as private criminals—just like TdA. *See* Bynkershoek at 127-28 (those "who sail out for the purpose of making depredations on the enemy, without a commission" "are punished as pirates"); *United States v. Smith*, 18 U.S. 153, 162-63 (1820) (same). The Proclamation's conclusory assertions of "coordination," "clandestine or otherwise," would never have sufficed to turn private armed activities into the acts of a sovereign nation. *See The Resolution*, 2 U.S. 1, 3 (1781) ("The act of the subject can never be the act of the sovereign; unless the subject has been commissioned by the sovereign to do it.").

The same was true of other analogs that the panel dissent attempted to draw. *See W.M.M.*, 154 F.4th at 279 (citing mercenaries and Hessians). Mercenaries were private individuals who enlisted directly in foreign armies pursuant to formal contracts. Emer de Vattel, The Law of Nations 239 (Charles G. Fenwick trans., Carnegie Inst. 1916) (hereinafter "Vattel, Carnegie ed.") (mercenaries "enter into the service of the State"); *id.* at 319 (mercenaries "are in fact part of . . . the army in which they are fighting"). Mercenaries had the same duties as any other enlisted soldier. *Id.* at 241 ("All soldiers" had "same . . . obligation" "whether because of their character as subjects or because of their contract as mercenaries."); Pufendorf at 1013 (state can use citizen soldiers or "hire in their place as many mercenaries, as seem required for the common defence"). And Hessians were "auxiliary troops"—entire battalions of trained, professional soldiers sent to augment the British army pursuant to treaties between Britain and German principalities. Rodney Atwood, The Hessians 1 (1980); 3 Parliamentary Register 46 § 1 (1802) (February 5, 1776 treaty) (Hessian auxiliary troops "shall be at the entire disposition of the King of Great Britain"); *id.* at 34 § 1, 275 § 1 (same). Like mercenaries, foreign auxiliaries served the same essential functions as

their national peers. *See* Vattel, Carnegie ed. at 261. TdA members are plainly not hired soldiers fighting as regular troops in the Venezuelan military.

And when captured, privateers and mercenaries were treated as prisoners of war, not criminals—reflecting their formal status as functional members of the national military. *Id.* at 318 (privateer's commission ensured that "if taken, they will be treated as prisoners captured in regular warfare"); *id.* at 319 (mercenaries are "when captured, treated by the enemy as if they formed part of the army in which they are fighting"). That makes sense for hired members of a foreign military with the status of lawful combatants. But TdA lacks any formal, public authorization to fight under Venezuela's authority. Accordingly, TdA's actions would not have been attributable to Venezuela in 1798.

The Proclamation thus fails the AEA's "nation or government" requirement. And, at bottom, the President's recent determinations have fatally undermined the government's previous arguments.

## III. DUE PROCESS REQUIRES RELEVANT INFORMATION AND AT LEAST 30 DAYS TO FIND A LAWYER AND SEEK RELIEF.

The Supreme Court has been clear that "AEA detainees must receive notice . . . that they are subject to removal under the Act . . . afforded within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *J.G.G.*, 604 U.S. at 673. "In order to 'actually seek habeas relief,' a detainee must have sufficient time and information to *reasonably* be able to contact counsel, file a petition, and pursue appropriate relief." *A.A.R.P.*, 605 U.S. at 95 (emphasis added).[2]

[2] The requirement for sufficient notice and opportunity to bring habeas actions stems not only from due process, as the Supreme Court recognized in *J.G.G.* and *A.A.R.P.*, but also from habeas principles and the AEA itself. *Boumediene v. Bush*, 553 U.S. 723, 779 (2008); Gov't Stay Appl. 35 n.10, *D.V.D. v. DHS*, No. 24A1153 (U.S. May 27, 2025).

"The purpose of notice under the Due Process Clause is to apprise the affected individual of, *and permit adequate preparation for*, an impending hearing." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 14 (1978) (emphasis added). Notice must take into account the "education, experience, and resources" of recipients and ensure they are "informed clearly." *Id.* at 14 n.15; *see also Mathews v. Eldridge*, 424 U.S. 319, 348-49 (1976) ("a person in jeopardy of serious loss" must be "given a meaningful opportunity to present their case"). Here, sufficient notice requires (1) 30 days to find counsel and then prepare and file a habeas petition in federal court, with removal stayed during habeas proceedings; (2) information describing how to challenge AEA designation and removal; and (3) the factual basis for the government's accusation of TdA membership. The government's updated notice process remains deficient.

Such notice is essential due to the high "risk of an erroneous deprivation," and the enormous consequences of such error. *Mathews*, 424 U.S. at 335. There is "significant evidence" the government has targeted individuals who "have no connection to" TdA based "on flimsy, even frivolous, accusations." *J.G.G. v. Trump*, 786 F. Supp. 3d 37, 46 (D.D.C. 2025); *supra* 3-4. The government has sent all AEA detainees removed so far to severely abusive conditions at CECOT amounting to torture. *Supra* 4. And, after sending them there, it has claimed that it is powerless to remedy erroneous removals. *A.A.R.P.*, 605 U.S. at 95. With such "particularly weighty" interests at stake, "sufficient time and information" to "actually seek habeas relief" is critical. *Id.*

1. The current 7-day notice period is insufficient for AEA detainees "to reasonably be able to contact counsel, file a petition, and pursue appropriate relief." *Id.* At the outset, as the Supreme Court recognized, finding counsel is essential to challenge one's AEA designation. Petitioners are unaware of *any* AEA detainee who has been able to file a habeas petition pro se. That is no surprise given the barriers outlined below.

To file a habeas petition, AEA detainees must find and retain counsel if unrepresented or if their immigration attorney does not practice in federal court, as is often the case; they must meet with counsel, likely multiple times; and counsel must investigate, prepare pleadings, and file. There are immense barriers to rapidly accomplishing this.

The pool of pro bono attorneys with time and expertise to litigate federal habeas petitions within the Northern District of Texas is limited. Petitioners are aware of only one nonprofit organization, the Immigration Detention Project at Texas A&M School of Law, that regularly represents immigration habeas petitioners pro bono in the Northern District. SUF.15. The Immigration Detention Project has only one attorney who focuses exclusively on habeas petitions. SUF.16. Funding for this position at the Immigration Detention Project is not guaranteed past December 2026. SUF.17. The Immigration Detention Project has received overwhelming interest in its services—over 200 people have contacted the project for assistance with filing habeas petitions in Texas since it opened in December 2025. SUF.18. The Immigration Detention Project has only been able to represent about 10% of individuals who contact the project. SUF.19; *see also* App.136 (Babaie Supp. Decl.) ¶ 7. And the Immigration Detention Project has only been able to file 3 habeas petitions so far in the Northern District of Texas despite the fact that the project has over 30 people on its waitlist for the Northern District alone. SUF.20-21.

Other pro bono options are severely limited. App.123 (Fife Decl.) ¶ 22 ("nearly impossible to find a pro bono referral"); SUF.28. The Texas Immigration Law Council's ("TXILC") Texas Habeas Project is the primary organization that matches volunteer pro bono attorneys with prospective habeas petitioners in Texas. SUF.22. But the Texas Habeas Project would not take on AEA cases for several reasons: the cases' inaccessibility to first-time habeas litigators, who require straightforward cases; difficulty placing cases where the individual is accused of being a member

of a foreign terrorist organization; and the fact that the Project does not currently make pro bono placements in the Northern District due to resource allocation constraints. SUF.23-27. Other pro bono options are severely limited. *See* App.546-47 (Marouf Decl.) ¶ 6 (Immigration Detention Project has successfully placed less than 15 pro bono cases across the state since December 2025); App.115 (de la O Decl.) ¶ 6 (American Bar Association Commission on Immigration ("ABA COI") hotline had no successful referrals in the Northern District of Texas in the past year); SUF.28.

Even if a detainee were to successfully retain pro bono counsel, it can take a month or more for pro bono attorneys, who are not experienced in immigration habeas law, to file a habeas petition. App.118-19 (Etter Decl.) ¶¶ 10-17 (describing pro bono process); App.547 (Marouf Decl.) ¶ 7 ("It often takes weeks, or even months, for pro bono counsel to file a habeas petition. No pro bono attorney has ever filed a habeas petition in a week."); SUF.29.

Detainees who cannot find pro bono counsel must either pay for an attorney or file a petition pro se. Finding a paid referral is difficult. One attorney described the situation in the Northern District: "Based on my experience trying to refer cases for habeas representation, it is incredibly difficult to find an attorney who has sufficient knowledge and is willing to take on an immigration habeas case, let alone an attorney who would be willing to take the case on an expedited basis." App.123 (Fife Decl.) ¶ 22; App.133 (Justice Decl.) ¶ 10 ("It can take weeks for me to successfully refer my client to a habeas attorney."); SUF.28. Even apart from all the other obstacles, detainees searching on their own must have money in their accounts to make outgoing calls to seek consultation and representation. SUF.31. If a detainee can even find counsel available to be retained at the client's expense, it can take weeks or more to raise the money required to pay the attorney—particularly if the detainee's family has expended their already limited resources on

immigration counsel or if the detainee is the primary income-earner in the household. App.133 (Justice Decl.) ¶ 12; App.547 (Marouf Decl.) ¶ 9 ("Even $5,000 is often unaffordable."); *see also* App.133 (Justice Decl.) ¶ 11 (attorney fees between $5,000 and $7,500); App.547 (Marouf Decl.) ¶ 9 (private attorneys charging $10,000 to $20,000 to file a habeas petition); SUF.32-34.

If detainees are even able to find a lawyer, it is extremely difficult, if not impossible, for them to rapidly meet with counsel. Confidential legal video or phone visits must be scheduled in advance. SUF.35. It can take a week or more to even obtain an initial meeting with a client. *See* App.122 (Fife Decl.) ¶ 10 ("I have had to wait up to a week to get a meeting with a client" at Prairieland); App.110 (Smulian Decl.) ¶ 5 ("waited over a week for a scheduled video call" at Bluebonnet; 2-4 days at Eden); *see also* App.122 (Fife Decl.) ¶ 12 (for attorneys using online scheduling system for the first time, it takes 24-72 hours to review and approve account before online scheduling is available); SUF.36. Meetings are limited to one hour. App.126 (Briseno Decl.) ¶ 3; App.548 (Marouf Decl.) ¶ 17 (when the one-hour time slot ends, "facility staff end the meeting regardless of whether I need further time with my client"); App.122 (Fife Decl.) ¶ 14; SUF.37.

In-person visits are even more inaccessible. Bluebonnet and Eden are both located at least three hours from any urban center, where most attorneys able to take these cases are located. App.126 (Briseno Decl.) ¶ 5 (Bluebonnet is six hours from attorney's office in San Antonio); App.548 (Marouf Decl.) ¶ 13 (Bluebonnet is 3-4 hours from attorney in the Dallas-Fort Worth area); App.132 (Justice Decl.) ¶ 4 (same for Eden and Bluebonnet); SUF.38. Prairieland is located about 45 minutes from Dallas and further from other major cities. App.132 (Justice Decl.) ¶ 4; App.548 (Marouf Decl.) ¶ 13; App.121 (Fife Decl.) ¶ 4 (Prairieland is three-and-a-half hours from Houston and two-and-a-half hours from Austin); SUF.39. Sometimes in-person meetings are required if an attorney needs to get their client's signature, review a document with a client, or

have the client read through a declaration carefully and provide handwritten edits for incorporation. SUF.40.

Facilities have only a handful of attorney meeting rooms for hundreds of detainees. App.547-48 (Marouf Decl.) ¶ 12 (about four attorney rooms at Prairieland); App.132 (Justice Decl.) ¶ 7 (two attorney rooms at Bluebonnet); App.452-54 (average of about 1,000 detainees at Bluebonnet, 900 at Prairieland, and 500 at Eden in 2026); SUF.41. Attorneys can wait hours to use the meeting rooms if they are already occupied upon arrival. App.547-48 (Marouf Decl.) ¶ 12 (waited over four hours for attorney room at Prairieland and ultimately left); SUF.42. And attorneys are not permitted to bring their phones or laptops into the facilities, so there is no way to draft a petition or declaration while meeting with a client. SUF.43.

Scheduled meetings may be delayed or canceled for any number of reasons. App.547-48 (Marouf Decl.) ¶ 12 (attorney unable to meet with client because of six-hour count—a routine procedure during which facility staff verify the presence and location of every detained person—with no expected end); App.122 (Fife Decl.) ¶ 10 ("not unusual to wait multiple hours to see a client, or to have to return the next day to try again" due to lockdown); App.132 (Justice Decl.) ¶ 6 (2-3 hour wait at Bluebonnet during count); App.129-30 (Collins Decl.) ¶¶ 6-7 ("very common" that client fails to appear for video call due to technical issues, lunch, count, or the fact that staff were unaware of the scheduled call; sometimes staff "had no idea at all" why client was not on the call); App.126 (Briseno Decl.) ¶ 3 (25% success rate with scheduled calls at Bluebonnet); App.122 (Fife Decl.) ¶ 11 (client unavailable for meeting when receiving outside medical care); SUF.44. As one attorney described regarding representing clients at Prairieland, "if I needed to speak with my client about a sensitive or detailed matter while they were detained at Prairieland, while I hoped to speak with them within a week, I often planned on not being able to have that discussion for 7-

10 days . . . [a]nd if a discussion is more in depth, it would take even longer than 10 days." App.130 (Collins Decl.) ¶ 9.

Attorneys cannot schedule virtual meetings or request to meet with detainees in person unless they already know their name and A-number. App.548 (Marouf Decl.) ¶ 16; App.107 (Sarabia Roman Decl.) ¶ 3 (attorney "had to provide a list of names and A-numbers in advance in order to speak with individuals" and "w[as] not permitted to speak with individuals whose names or A-numbers [h]e did not have"); SUF.45. And detainees are frequently transferred between facilities, which can disrupt attorney-client communication for days at a time. App.133 (Justice Decl.) ¶ 9 ("at least two days to re-establish contact"); App.133 (Justice Decl.) ¶ 9 ("several days" to locate clients after transfer); App.136 (Babiae Decl.) ¶ 8 ("at least several days' delay" in setting up call when client is transferred); SUF.46; *see also W.M.M.*, 154 F.4th at 237-38 (Ramirez, J., dissenting in relevant part) ("transfers impeded detainees' ability to contact their attorneys"); *W.J.C.C. v. Trump*, 2025 WL 1703682, at *6-7 (W.D. Pa. June 18, 2025).

Once an attorney-client relationship is established, it "takes a lengthy time to gather the necessary facts and prepare the habeas petition." App.137 (Babaie Supp. Decl.) ¶ 10; App.123 (Fife Decl.) ¶ 18 (drafting a habeas petition "can take weeks" including "at minimum, eight hours meeting with the client"); SUF.47. Attorneys first conduct an initial intake to gather facts about the client's case. SUF.48. They then schedule follow-up meetings as needed to complete the fact gathering. SUF.49; *see also* App.123 (Fife Decl.) ¶ 19 (client can only have one attorney call per day); App.548 (Marouf Decl.) ¶ 17 (same). They must also gather supporting evidence. App.130 (Collins Decl.) ¶ 10 (week for Prairieland staff to respond regarding document exchange); SUF.50 *see also Quintero v. Garland*, 998 F.3d 612, 629 (4th Cir. 2021) (detainees "may have limited access to relevant documents"). And they must, of course, draft the actual petition. App.118 (Etter

Decl.) ¶ 13 (volunteer attorneys take one to three weeks to draft petition); App.546-47 (Marouf Decl.) ¶¶ 6-7 ("pro bono attorneys often require substantial assistance from [Immigration Detention Project attorneys], including with legal research and writing, to file a single habeas petition"); SUF.51. Finally, they must schedule a final meeting to verify the facts in the habeas petition before filing, as required by 28 U.S.C. § 2242. SUF.52.

In sum, it can take days to weeks to find an attorney (if the prospective petitioner can find an attorney at all); upwards of a week for that attorney to schedule a meeting and in fact meet with their client; additional time to collect outside evidence and prepare the habeas petition; and then upwards of a week to meet to verify the facts with the petitioner. All of this assumes no additional unforeseen delays such as the detainee being transferred or a medical event. These layers of barriers render it virtually impossible to file a habeas petition within seven days.

For those detainees who are unable to find or afford counsel, filing a successful pro se habeas petition is exceedingly difficult. Detainees have little knowledge of habeas law, and any knowledge they do have is often inaccurate. SUF.54. No organization provides "know your rights" presentations or other support for pro se petitioners in immigration detention facilities in the Northern District. SUF.56. The ABA COI detention and information hotline for individuals in detention facilities has limited hours and "often ha[s] unanswered calls." SUF.57.

Petitioners also lack basic knowledge about the Alien Enemies Act. SUF.55. The law libraries in Northern District of Texas facilities—if present at all, and if detainees are actually aware of them—are woefully inadequate. SUF.58; *see also W.M.M.*, 154 F.4th at 239 (Ramirez, J., dissenting in relevant part) ("Although each detention center is supposed to have a law library, not all do, and some of the law libraries have 'limited resources, including old computers that struggle to maintain internet connection and load websites, and there are no interpretation or

translation services available.'"). The detention facilities also lack sufficient computers or printers for detainees App.547 (Marouf Decl.) ¶ 11 (single computer for all of Prairieland); App.124 (Fife Decl.) ¶ 24; App.107 (Sarabia Roman Decl.) ¶ 4 ("The detainees we spoke with stated that they do not have access to computers."); SUF.59. Even if detainees had access to a law library for research or computers for drafting, some are not literate in their native language, let alone in English.[3] SUF.60.

The process of filing pro se presents another barrier. Electronic filing is not available for detainees. SUF.61. Mail processing at detention facilities is slow, so a habeas petition filed within seven days would not arrive to the courthouse for days or even weeks. SUF.62. Although the mailbox rule would apply, "[d]elays caused by mail service could result in the removal of detainees who timely 'filed' habeas petition." *W.M.M.*, 154 F.4th at 239 (Ramirez, J., dissenting in relevant part).

In sum, "[i]t is hard to imagine a pro se petitioner successfully petitioning for their release with an *unlimited* amount of time," much less in seven days. App.124 (Fife Decl.) ¶ 26; App.111 (Smulian Decl.) ¶ 7 (client "simply would not be able to draft a habeas petition on his own"); App.133 (Justice Decl.) ¶ 14 ("I'm not aware of anyone who has successfully petitioned for release pro se in the Northern District of Texas."); App.119 (Etter Decl.) ¶ 18 ("Without counsel, based on my experience, filing a successful habeas petition would not be feasible for individuals subject to AEA designations."); App.547 (Marouf Decl.) ¶ 10 (pro se habeas petitions "are often rejected for deficiencies or simply fail to raise the relevant legal issues properly"); *see also* App.137 (Babaie Supp. Decl.) ¶ 12 ("It is practically impossible for an unrepresented detained person to file a habeas petition on their own in a matter of days."); SUF.63.

---

[3] This also impedes detainees from locating and contacting attorneys.

If the Proclamation is upheld, numerous detainees may need to prepare and file lawsuits from the same detention center within the same short window. *Compare* Supp. App'x at 234, 261, 292-92, *W.M.M. v. Trump*, No. 25-10534 (5th Cir. June 3, 2025), Dkt. 82-3 (over 100 removals from a single facility to CECOT under AEA on a single day), *with* App.117 (Etter Decl.) ¶ 2, 8 (TXILC has placed approximately 133 cases across the entire state since its founding in April 2025). Pro bono practitioners would at best be able to handle no more than a few AEA habeas cases at the same time. App.127 (Briseno Decl.) ¶ 8; App.546 (Marouf Decl.) ¶ 4 ("we would have capacity to file no more than one habeas petition a week, on top of our preexisting caseload"); SUF.53. Dozens of detainees will not realistically be able to find their own lawyer, and prepare and file a new lawsuit, from the same detention facility in a single week.

Even 30 days is rapid under these circumstances. Based on similar barriers, courts have found longer timeframes necessary for detained immigrants to press their claims. *Freza v. Att'y Gen.*, 49 F.4th 293, 300-02 (3d Cir. 2022) (because courts cannot "ignore the realities of obtaining legal counsel while detained," denial of additional 30-day continuance violated due process); *Hernandez Lara v. Barr*, 962 F.3d 45, 55-56 (1st Cir. 2020) (five weeks insufficient); *Cruz Rendon v. Holder*, 603 F.3d 1104, 1110 (9th Cir. 2010) (two months insufficient); *Usubakunov v. Garland*, 16 F.4th 1299, 1306-07 (9th Cir. 2021) (seven weeks insufficient); *see also Alford v. United States*, 709 F.2d 418, 424 (5th Cir. 1983) (five weeks insufficient). The Board of Immigration Appeals has held that eight days is insufficient. *Matter of C-B-*, 25 I. & N. Dec. 888, 889-90 (BIA 2012).

At least 30 days' notice is necessary so that AEA detainees can "reasonably be able to contact counsel" and "actually seek habeas relief," in light of the significant barriers to doing so quickly and grave consequences of error. *A.A.R.P.*, 605 U.S. at 95.

2. Adequate notice must also provide basic information about the process. *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950) (notice must be "desirous of actually informing" a person of their rights); *Memphis Light*, 436 U.S. at 14 n.15 (notice required to explain "clearly" basic information—"where, during which hours of the day, and before whom" customers could dispute bills); *see also Covey v. Town of Somers*, 351 U.S. 141, 146-47 (1956) (where individual could not understand proceeding due to disability, notice did not comply with due process). Here, notice must be written plainly in a language the individual understands and read to the individual in that language. *See United States v. Lopez-Collazo*, 824 F.3d 453, 462 (4th Cir. 2016) (failure to provide Spanish translation abridged due process rights); *Augustin v. Sava*, 735 F.2d 32, 37 (2d Cir. 1984) (translation services required because otherwise an immigration "hearing is of no value"). It must inform them of their AEA designation, the country of removal, and the earliest possible date of removal. *J.G.G.*, 604 U.S. at 673 (notice must inform detainees "they are subject to removal under the Act"). It must state clearly that the person can challenge their removal by filing a lawsuit in federal court, and that they can contact lawyers to help do so. *A.A.R.P.*, 605 U.S. at 95 (notice must explain "how to exercise due process rights").

To facilitate representation, the government must additionally provide this notice to immigration counsel, if any, and class counsel in this case. The government must provide the list of free legal service providers it is already required to share; the list must include providers who may take on AEA habeas petitions, not merely immigration counsel. *Cf.* 8 U.S.C. § 1229(b)(2). And the government must provide regular telephone access.

The current notice procedures remain deficient. Among other shortcomings, the notice is not in plain language, does not provide notice of the country of removal, is not provided to

immigration and class counsel, and does not provide adequate information about how to challenge removal.

3. Finally, the government must provide the factual basis for its TdA allegations. *See Greene v. McElroy*, 360 U.S. 474, 496 (1959) ("Where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue."). Absent this factual information, AEA detainees will be unable to *meaningfully* challenge the basis of their designation—the critical purpose of notice for due process. *See Memphis Light*, 436 U.S. at 14 (purpose of notice is to "permit adequate preparation for" challenging the deprivation); *City of W. Covina v. Perkins*, 525 U.S. 234, 240 (1999) ("A primary purpose of the notice required by the Due Process Clause is to ensure that the opportunity for a hearing is meaningful."); *Boumediene*, 553 U.S. at 779 ("[T]he privilege of habeas corpus entitles the prisoner to a *meaningful* opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law."). The government's burden is slight, since it has already completed the "Validation Guide." App.209-11. Initial disclosure is necessary to ensure that detainees can file informed habeas petitions, begin gathering evidence, and deter any more frivolous designations based on autism awareness tattoos or the like. Indeed, even during a "period of ongoing combat," a detainee "must receive notice of the factual basis for his classification." *Hamdi*, 542 U.S. at 532-33 (plurality op.); App.446-47 (Dep't of Def., Law of War Manual) (similar).

## IV. THE PROCLAMATION VIOLATES MULTIPLE PROCEDURAL PROTECTIONS.

Even if the Proclamation complied with the AEA, and individuals were given due process, it would still have to conform to the procedures Congress has mandated in the INA, humanitarian statutes, and the AEA itself.

### A. The Government Cannot Bypass the INA's Removal Procedures or Jettison Mandatory Humanitarian Protections.

Congress enacted the INA's comprehensive framework in 1952 as the "sole and exclusive procedure" to govern *all* removals, "[u]nless otherwise specified." 8 U.S.C. § 1229a(a)(3); S. Rep. No. 82-1137, 30 (1952) (INA "supersede[s] all previous laws with regard to deportability"). Congress has explicitly exempted other removal procedures from the INA's "sole and exclusive" framework. 8 U.S.C. §§ 1225(b), 1228, 1229a(a)(3) (expedited removal); *id.* § 1531 *et seq.* (special removal procedures for FTO members and other terror suspects); *id.* § 1226a (same). But it did not exempt the AEA, even though the AEA was used in World War II just a few years prior to the INA's enactment. And the statutes are easily reconcilable. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (where "two Acts of Congress allegedly touch[] on the same topic," court must "strive to give effect to both"). The AEA continues to provide authority to remove (and detain) noncitizens who are otherwise legally present—the same core functions it had prior to the INA. But it does not exempt those removals from the INA's procedures.

Even if AEA removals did not need to comply with the INA's removal procedures, they would still be subject to statutes barring removal to a country where a person faces torture or persecution. *See* 8 U.S.C. § 1231(b)(3)(A) (mandatory withholding of removal); 8 C.F.R. §§ 208.16, 1208.16 (withholding of removal procedures); 8 U.S.C. § 1231 note (mandatory protection under the Convention Against Torture);[4] 8 C.F.R. §§ 208.16-208.18, 1208.16-1208.18 (CAT

[4] *See also* U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20, at 20 (1988); Foreign Affairs

procedures). These protections apply here by their plain terms. Both rules apply to removals generally, with no limitation that would exclude the AEA. 8 U.S.C. § 1231(b)(3)(A) (applying withholding to any effort to "remove" a person); *id.* § 1231 note (applying CAT to any effort to "expel, extradite, or otherwise effect the involuntary return of any person"). The AEA, which itself speaks of "removal," falls squarely within both statutes' terms. 50 U.S.C. § 21. While Congress included specific exceptions to both withholding and CAT, 8 U.S.C. § 1231(b)(3)(B); *id.* § 1231 note, it made no exception for AEA removals.

This tracks Judge Walker's reasoning in *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022). There, the D.C. Circuit addressed whether the government could expel noncitizens under a public health statute that, like the AEA, lies outside the INA and authorizes removal. The Court explained that because the public health law "says nothing about where the Executive may expel," it does not displace Congress's specific commands regarding humanitarian protections. *Id.* at 731-32. The same is true here. Congress's "specific prohibition[s]" against removal to persecution and torture are an "exception" to the AEA's "general permission" for removal. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

The government therefore may not remove anyone under the Proclamation without screening them for persecution and torture in the country of removal. To be clear, Petitioners do not ask this Court to conduct the screening itself. They merely request that the Court order the government to implement a process for conducting such screening before effectuating an AEA removal.[5]

---

Reform and Restructuring Act of 1998 ("FARRA") § 2242(a), Pub. L. No. 105-277, Div. G. Title XXI, 112 Stat. 2681 (1998) (implementing CAT).

[5] The process requires, at minimum, that the government notify individuals of the country of removal, provide a meaningful opportunity to express fear, and if fear is expressed afford a fair

So far, the government has ignored these congressional mandates, with devastating consequences. Congress enacted withholding and CAT precisely to bar removals to places like CECOT.

**A. The Proclamation Violates the AEA's Right to Voluntary Departure.**

In enforcing the Proclamation, the government has been summarily removing people without giving them an opportunity to depart voluntarily. But the AEA explicitly provides a right to voluntary departure. The Act pointedly states that the President may "provide for the removal of those who, not being permitted to reside within the United States, *refuse or neglect to depart therefrom*." 50 U.S.C. § 21 (emphasis added); *see J.G.G.*, 2025 WL 890401, at *14 (recognizing this right).

Even during World War II, courts consistently recognized that "alien enemies" had the right to voluntary departure. *See Ludwig*, 164 F.2d at 457 (Section 21 establishes a "right of voluntary departure"); *Von Heymann*, 159 F.2d at 653 (removal without opportunity to voluntarily depart is unlawful); Br. for Respondents, *Jaegeler*, 342 U.S. 347, 1952 WL 82533, at *11 (same); *U.S. ex rel. Dorfler v. Watkins*, 171 F.2d 431, 432 (2d Cir. 1948) ("An alien must be afforded the privilege of voluntary departure before the Attorney General can lawfully remove him against his will."); *see also* 10 Fed. Reg. 12189 (permitting those "deemed to be dangerous to the public peace and safety of the United States" 30 days to voluntarily depart). The right of voluntary departure provided by Section 21 is a "statutory condition precedent" to removal. *Ludwig*, 164 F.2d at 457.

Section 22 provides a separate right to take time "for the recovery, disposal, and removal of [one's] goods and effects" prior to departure. 50 U.S.C. § 22. This additional time to settle

---

and serious adjudication of the claim. *See Nasrallah v. Barr*, 590 U.S. 573, 575 (2020); 8 C.F.R. §§ 1240.10(f), 1240.11(c)(1).

affairs would have been meaningful in 1798—departing from the United States meant that noncitizens would need to sell or transport all of their possessions at a time when doing so was not straightforward. The Act's structure also tracks the law of nations, which provided that a nation was "bound to allow [alien enemies] a reasonable time for withdrawing" once war begins. Vattel, Chitty ed. at 318. By contrast, providing the "full time for the settlement of their affairs" was considered optional and subject to bilateral agreements and exceptions. *Id.* Accordingly, regardless whether Petitioners are owed time to settle their affairs, they are plainly entitled to voluntary departure, irrespective of whether they are "chargeable with actual hostility, or other crime against the public safety." 50 U.S.C. § 22.

Finally, even if Section 22's exception applied to Section 21, the government cannot invoke the exception categorically and without evidence. Whether "an alien," singular, has committed "actual hostility" is a fact-specific question. 50 U.S.C. § 22. And as discussed, the government's criteria for applying the Proclamation fails to reliably determine even TdA membership, much less that a person has engaged in "actual hostility." *Supra* 3-4.

## V. PERMANENT INJUNCTIVE RELIEF IS WARRANTED.

Petitioners and the members of the putative class will suffer irreparable harm absent a permanent injunction. The government has designated Petitioners as alien enemies under the Proclamation. SUF.59. It has already sought to remove Petitioners under the AEA, with no meaningful notice and opportunity to contest their designation under the AEA. SUF.66-67. All AEA designees previously removed under the AEA were subjected to severe abuse and horrific conditions amounting to torture at the notorious CECOT prison in El Salvador. SUF.68-70. "The Government has represented . . . that it is unable to provide for the return of an individual deported in error to" CECOT, and "[t]he detainees' interests at stake are accordingly particularly weighty." *A.A.R.P.*, 605 U.S. at 95. Petitioners and members of the putative class are therefore subject to

irreparable harm absent injunctive relief. The balance of equities and the public interest likewise weigh in favor of Petitioners: "Of course there is a public interest in preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken v. Holder*, 556 U.S. 418, 436 (2009).

## CONCLUSION

The Court should grant summary judgment.

Dated: September 10, 2026

Respectfully submitted,

*/s/Lee Gelernt*
Lee Gelernt
Daniel Galindo
Kathryn Huddleston*
Ashley Gorski
Patrick Toomey
Sidra Mahfooz*
Omar Jadwat*
Hina Shamsi*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
E: lgelernt@aclu.org
E: dgalindo@aclu.org
E: khuddleston@aclu.org
E: agorski@aclu.org
E: ptoomey@aclu.org
E: smahfooz@aclu.org
E: ojadwat@aclu.org
E: hshamsi@aclu.org

Noelle Smith*
Oscar Sarabia Roman*
My Khanh Ngo
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
T: (415) 343-0770
E: nsmith@aclu.org
E: osarabia@aclu.org
E: mngo@aclu.org

Brian Klosterboer
Tx Bar No. 24107833
Thomas Buser-Clancy
TX Bar No. 24078344
Savannah Kumar
TX Bar No. 24120098
Charelle Lett
TX Bar No. 24138899
Ashley Harris
TX Bar No. 24123238
Adriana Piñon
TX Bar No. 24089768
ACLU FOUNDATION OF TEXAS, INC.
1018 Preston St.
Houston, TX 77002
(713) 942-8146
bklosterboer@aclutx.org
tbuser-clancy@aclutx.org
skumar@aclutx.org
clett@aclutx.org
aharris@aclutx.org
apinon@aclutx.org

Attorneys for Petitioners-Plaintiffs

**Pro hac vice applications forthcoming*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 10, 2026, a true and correct copy of the foregoing document was electronically filed via the Court's CM/ECF system, which sends notice of electronic filing to all counsel of record.

Dated: September 10, 2026

*/s/Lee Gelernt*
Lee Gelernt