**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| W.M.M., *et al.*, on their own behalf and on behalf of all others similarly situated,<br><br>*Petitioners–Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>*Respondents–Defendants*. | Case No. 1:25-cv-59-H |

# PETITIONERS-PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS

## Alien Enemies Act Proclamation and Removals

1. On March 14, the President signed a Proclamation under the Alien Enemies Act ("AEA") declaring that Tren de Aragua ("TdA"), a Venezuelan criminal gang, is "perpetrating, attempting, and threatening an invasion or predatory incursion against the territory of the United States." 90 Fed. Reg. 13034.

2. The AEA designees removed on March 15, 2025 never had an opportunity to contest their designation by the federal government as alien enemies. App.53 (Reyes Decl.) ¶ 25; App. 95 (Tobin Decl.) ¶ 10; App.375, 385, 407-08.

## Intelligence Community Determinations

3. The National Intelligence Council, which includes representatives from 18 national security agencies, released a "Sense of the Community Memorandum" on April 7, 2025, entitled "Venezuela: Examining Regime Ties to Tren de Aragua." App.241-46.

4. The NIC Memorandum concluded that "the Maduro regime probably does not have a policy of cooperating with TDA and is not directing TDA movement to and operations in the United States." App.242. It noted that "Venezuelan intelligence, military, and police services view TDA as a security threat [redacted] and operate against it in ways that make it highly unlikely the two sides would cooperate in a strategic or consistent way." *Id.*

5. The NIC Memorandum further found that "[t]he small size of TDA's cells, its focus on low-skill criminal activities, and its decentralized structure make it highly unlikely that TDA coordinates large volumes of human trafficking or migrant smuggling." App.241.

**Subsequent Developments**

6. On September 2, 2025, the government began military strikes against boats in the Caribbean on the allegation that they were "transporting illegal narcotics" for cartels, including TdA. App.435-36.

7. In a notification to Congress that became public in early October, the executive branch stated that "the President determined these cartels are non-state armed groups" and "that the United States is in a non-international armed conflict [NIAC] with these designated terrorist organizations." App.438.

8. The government reiterated that same position before the United Nations Security Council on October 10, stating that "President Trump has determined" TdA and Cártel de Los Soles "are non-state armed groups" with whom "the United States is in a non-international armed conflict." App.440.

9. The United States criminally indicted Venezuela's president, Nicolas Maduro. App.143-70.

10. The United States deposed and captured Mr. Maduro. The Administration described the capture as a "law enforcement" operation. *See* App.188.

11. After Mr. Maduro's ouster, President Trump stated that the United States would "run the country until such time as we can do a safe, proper, and judicious transition." App.458.

12. The next day he reiterated that "we're in charge" of Venezuela. App.489.

13. Secretary Rubio has taken a substantial role in Venezuela's operation. App.491-505. The New York Times reported that "Mr. Rubio now effectively controls Venezuela's finances, the distribution of its natural resources and its government." App.492.

14. President Trump has referred to Venezuela as "our new and great friends." App.507.

**Access to Counsel in Detention**

15. There is only one nonprofit organization, the Immigration Detention Project at Texas A&M School of Law ("Immigration Detention Project"), that regularly represents immigration habeas petitioners pro bono in the Northern District. App.546 (Marouf Decl.) ¶ 5.

16. The Immigration Detention Project has only one attorney who focuses exclusively on habeas petitions. App.546 (Marouf Decl) ¶ 2.

17. Funding for the single position at the Immigration Detention Project focused exclusively on habeas petitions is not guaranteed past December 2026. App.548 (Marouf Decl.) ¶ 18.

18. Over 200 people have contacted the Immigration Detention Project for assistance with filing habeas petitions in Texas since it opened in December 2025. App.546 (Marouf Decl.) ¶ 3.

19. The Immigration Detention Project has only been able to represent about 10% of individuals who contact the project. App.546 (Marouf Decl.) ¶ 3.

20. The Immigration Detention Project has over 30 people on its waitlist for the Northern District of Texas. App.546 (Marouf Decl) ¶ 4.

21. The Immigration Detention Project has filed 3 habeas petitions in the Northern District of Texas since it was founded in December 2025. App.546 (Marouf Decl) ¶ 4.

22. The Texas Immigration Law Council's ("TXILC") Texas Habeas Project is the primary organization that matches volunteer pro bono attorneys with prospective habeas petitioners in Texas. App.117 (Etter Decl.) ¶¶ 2-3.

23. Most of TXILC's pro bono attorneys have no prior experience with habeas petitions or immigration law. App.117 (Etter Decl.) ¶ 4.

24. TXILC's Texas Habeas Project is not designed to place complicated immigration habeas cases because its pro bono attorneys are first-time habeas litigators with no prior immigration experience. App.117 (Etter Decl.) ¶ 5.

25. The TXILC's Texas Habeas Project would therefore not accept AEA habeas cases. App.117 (Etter Decl.) ¶ 5.

26. TXILC does not place cases where the individual has a serious criminal history, because the organization struggles to find volunteers interested in taking those cases. App.118 (Etter Decl.) ¶ 9.

27. TXILC does not currently make pro bono placements in the Northern District of Texas due to resource allocation constraints. App.117 (Etter Decl.) ¶ 8.

28. Other pro bono options in the Northern District of Texas, beyond TXILC and the Immigration Detention Project, are limited. App.123 (Fife Decl.) ¶ 22 ("nearly impossible to find a pro bono referral"); App.133 (Justice Decl.) ¶ 10 ("It can take weeks for me to successfully refer my client to a habeas attorney."); *see also* App.546-47 (Marouf Decl.) ¶ 6 (Immigration Detention Project has successfully placed less than 15 pro bono cases across the state since December 2025); App.115 (de la O Decl.) ¶ 6 (American Bar Association Commission on Immigration ("ABA COI") hotline had no successful referrals in the Northern District of Texas in the past year).

29. It can take a month or more for pro bono attorneys, who are not experienced in immigration habeas law, to file a habeas petition. App.118-19 (Etter Decl.) ¶¶ 10-17 (describing pro bono process); App.547 (Marouf Decl.) ¶ 7 ("It often takes weeks, or even months, for pro bono counsel to file a habeas petition. No pro bono attorney has ever filed a habeas petition in a week.").

30. Finding a paid referral for an immigration habeas petition is difficult. App.123 (Fife Decl.) ¶ 22; App.133 (Justice Decl.) ¶ 10.

31. Detainees searching for counsel on their own must have money in their accounts to make outgoing calls to seek consultation and representation. App.136 (Babaie Supp. Decl.) ¶ 8.

32. Hiring an attorney to file a habeas petition can cost between $5,000 and $20,000. App.133 (Justice Decl.) ¶ 11 (attorney fees between $5,000 to $7,500); App.547 (Marouf Decl.) ¶ 9 (private attorneys charging $10,000 to $20,000 to file habeas).

33. It can take weeks or more for a detained individual to raise the money required to pay habeas counsel who is not pro bono, particularly if the detainee's family has expended their already limited resources on immigration counsel or if the detainee is the primary income-earner in the household. App.133 (Justice Decl.) ¶ 12.

34. Even $5,000 is often unaffordable for many families. App.547 (Marouf Decl.) ¶ 9.

35. Confidential legal video or phone visits must be scheduled in advance. App.110 (Smulian Decl.) ¶ 5; App.548 (Marouf Decl.) ¶ 17.

36. It can take a week or more to get an initial meeting with a client. *See* App.122 (Fife Decl.) ¶ 10 ("I have had to wait up to a week to get a meeting with a client" at Prairieland); App.110 (Smulian Decl.) ¶ 5 ("waited over a week for a scheduled video call" at Bluebonnet Detention Facility ("Bluebonnet") and 2-4 days to schedule at Eden Detention Center ("Eden")); *see also* App.122 (Fife Decl.) ¶ 12 (for attorneys using online scheduling system for the first time, it takes 24-72 hours to review and approve account before online scheduling is available).

37. Meetings are limited to one hour. App.126 (Briseno Decl.) ¶ 3; App.548 (Marouf Decl.) ¶ 17 (when the one-hour time slot ends, "facility staff end the meeting regardless of whether I need further time with my client"); App.122 (Fife Decl.) ¶ 14.

38. Bluebonnet and Eden are both located at least three hours from any urban center, where most attorneys able to take these cases are located. App.126 (Briseno Decl.) ¶ 6 (Bluebonnet is six hours from attorney's office in San Antonio); App.548 (Marouf Decl.) ¶ 13 (Bluebonnet is 3-4 hours from attorney in the Dallas-Fort Worth area); App.132 (Justice Decl.) ¶ 4 (same for Eden and Bluebonnet).

39. Prairieland is located about 45 minutes from Dallas and further from other major cities. App.132 (Justice Decl.) ¶ 4; App.548 (Marouf Decl.) ¶ 13; App.121 (Fife Decl.) ¶ 4 (Prairieland is three-and-a-half hours from Houston and two-and-a-half hours from Austin).

40. Sometimes attorneys have no choice but to go in person if they need to get a client's signature, review documents with a client, or have the client read through a declaration carefully and provide handwritten edits to incorporate. App.548 (Marouf Decl.) ¶ 15.

41. Bluebonnet and Prairieland have very few attorney meeting rooms, insufficient to accommodate attorney-client meetings for hundreds of detainees within a single week. App.547-48 (Marouf Decl.) ¶ 12 (about four attorney rooms at Prairieland); App.132 (Justice Decl.) ¶ 7 (two attorney rooms at Bluebonnet); App.452-54 (about 1,000 detainees at Bluebonnet and 900 at Prairieland).

42. Attorneys can wait hours to use attorney-client meeting rooms if they are already occupied upon arrival. App.547-48 (Marouf Decl.) ¶ 12 (waited over four hours for attorney room at Prairieland and ultimately left).

43. Attorneys are not permitted to bring their phones or laptops into detention facilities, so there is no way to draft a petition or declaration while meeting with a client. App.548 (Marouf Decl.) ¶ 14; App.121 (Fife Decl.) ¶ 7.

44. Scheduled attorney-client meetings at detention centers in the Northern District of Texas are frequently delayed or canceled App.547-48 (Marouf Decl.) ¶ 12 (attorney unable to meet with client because of six-hour count—a routine procedure during which facility staff verify the presence and location of every detained person—with no expected end); App.122 (Fife Decl.) ¶ 10 ("not unusual to wait multiple hours to see a client, or to have to return the next day to try again" due to lockdown); App.132 (Justice Decl.) ¶ 6 (three hour wait at Bluebonnet during count); App.129-30 (Collins Decl.) ¶¶ 6-7 ("very common" that client fails to appear for video call due to technical issues, lunch, count, or the fact that staff were unaware of the scheduled call; sometimes staff "have no idea at all" why client was not on the call); App.126 (Briseno Decl.) ¶ 3 (25% success rate with scheduled calls at Bluebonnet); App.122 (Fife Decl.) ¶ 11 (client unavailable for meeting when receiving outside medical care).

45. Attorneys cannot schedule virtual meetings or request to meet with detainees in person at detention facilities in the Northern District of Texas unless they already know their name and A-number. App.548 (Marouf Decl.) ¶ 16; App.107 (Sarabia Roman Decl.) ¶ 3 (attorney "had to provide a list of names and A-numbers in advance in order to speak with individuals" and "w[as] not permitted to speak with individuals whose names or A-numbers [h]e did not have").

46. Detainees are frequently transferred between facilities, which regularly disrupts attorney-client communication for several days at a time. App.133 (Justice Decl.) ¶ 9 ("at least two

days to re-establish contact" and "several days" to locate clients after transfer); App.136 (Babiae Decl.) ¶ 8 ("at least several days' delay" in setting up call when client is transferred).

47. Once an attorney-client relationship is established, it can take weeks to gather necessary facts and prepare a habeas petition. App.137 (Babaie Supp. Decl.) ¶ 10; App.123 (Fife Decl.) ¶ 18 (drafting a habeas petition "can take weeks" including "at minimum, eight hours meeting with the client").

48. Attorneys first conduct an initial intake to gather facts about the client's case. App.126-27 (Briseno Decl.) ¶ 6; App.123 (Fife Decl.) ¶ 19; App.118 (Etter Decl.) ¶ 12.

49. They then schedule follow-up meetings as needed to complete the fact gathering. App.126-27 (Briseno Decl.) ¶ 6; App.123 (Fife Decl.) ¶ 19 (client limited to one attorney call per day); App.118 (Etter Decl.) ¶ 14.

50. They must also gather supporting evidence. App.130 (Collins Decl.) ¶ 10 (week for Prairieland staff to respond regarding document exchange); App.123 (Fife Decl.) ¶ 20.

51. Then, they must draft the habeas petition. App.118 (Etter Decl.) ¶ 13 (volunteer attorneys take one to three weeks to draft petition); App.546-47 (Marouf Decl.) ¶¶ 6-7 ("pro bono attorneys often require substantial assistance from [Immigration Detention Project attorneys], including with legal research and writing, to file a single habeas petition").

52. Finally, they must schedule a meeting to verify the facts in the habeas petition before filing, as required by 28 U.S.C. § 2242. App.126-27 (Briseno Decl.) ¶ 6; App.123 (Fife Decl.) ¶ 21; App.118 (Etter Decl.) ¶ 16.

53. Pro bono practitioners would at best be able to handle no more than a few AEA habeas cases at the same time. App.127 (Briseno Decl.) ¶ 8; App.546 (Marouf Decl.) ¶ 4 ("we would have capacity to file no more than one habeas petition a week, on top of our preexisting caseload").

**Filing a Pro Se Habeas Petition from Detention**

54. Detainees have little knowledge of habeas law, and any knowledge they do have is often inaccurate. App.124 (Fife Decl.) ¶ 23; App.111 (Smulian Decl.) ¶ 7; App.133 (Justice Decl.) ¶ 14; App.119 (Etter Decl.) ¶ 18; App.546-47 (Marouf Decl.) ¶ 10.

55. Detainees lack basic knowledge about the Alien Enemies Act. App.107 (Sarabia Roman Decl.) ¶ 6.

56. No organization provides "know your rights" presentations or other support for pro se petitioners in immigration detention facilities in the Northern District of Texas. App.547 (Marouf Decl.) ¶ 8.

57. The American Bar Association Commission on Immigration, which provides a detention and information hotline for individuals in detention facilities, has limited hours and is often unable to answer calls. App.115 (de la O Decl.) ¶¶ 3-4.

58. The law libraries in Northern District of Texas facilities—if present at all, and if detainees are actually aware of them—are woefully inadequate. App.547 (Marouf Dec.) ¶ 11; App.124 (Fife Decl.) ¶ 24; App.111 (Smulian Decl.) ¶¶ 8-9; App.133 (Justice Decl.) ¶ 14.

59. Immigration detention facilities in the Northern District of Texas also lack sufficient computers or printers for detainees. App.124 (Fife Decl.) ¶ 24; App.107 (Sarabia Roman Decl.) ¶ 4 ("The detainees we spoke with stated that they do not have access to computers."); App.547 (Marouf Decl.) ¶ 11 (single computer for all of Prairieland).

60. Some detainees are not literate in their native language, let alone in English. App.111 (Smulian Decl.) ¶¶ 7-8; App.136 (Babaie Supp. Decl.) ¶ 9; App.107 (Sarabia Roman Decl.) ¶ 5; App.547 (Marouf Decl.) ¶ 11.

61. Electronic filing is not available for detainees. App.124 (Fife Decl.) ¶ 25.

62. Mail processing at detention facilities is slow, so a habeas petition filed by mail by a detainee within seven days would not arrive to the courthouse for days or even weeks. App.123 (Fife Decl.) ¶ 20.

63. It is virtually impossible for a detained prospective petitioner to draft and file a habeas petition without counsel within seven days. App.124 (Fife Decl.) ¶ 26 ("It is hard to imagine a pro se petitioner successfully petitioning for their release with an *unlimited* amount of time."); App.111 (Smulian Decl.) ¶ 7 (client "simply would not be able to draft a habeas petition on his own"); App.133 (Justice Decl.) ¶ 14 ("I'm not aware of anyone who has successfully petitioned for release pro se in the Northern District of Texas."); App.119 (Etter Decl.) ¶ 18 ("Without counsel, based on my experience, filing a successful habeas petition would not be feasible for individuals subject to AEA designations."); App.547 (Marouf Decl.) ¶ 10 (pro se habeas petitions "are often rejected for deficiencies or simply fail to raise the relevant legal issues properly"); *see also* App.137 (Babaie Supp. Decl.) ¶ 12 ("It is practically impossible for an unrepresented detained person to file a habeas petition on their own in a matter of days.").

**Named Petitioners**

64. The government has designated named Petitioners D.A.A., T.I.A., and E.A.A. as alien enemies under the Proclamation. ECF No. 88-1 (Feb. 10 Collins Decl.) ¶ 8; ECF No. 88-1 (Renaud Decl.) ¶ 7; ECF No. 88-1 (E.A.A. Decl.) ¶¶ 3, 5.

65. Named Petitioners D.A.A., T.I.A., and E.A.A. were detained in the Northern District of Texas at the time this lawsuit was filed. ECF No. 88-1 (Feb. 10 Collins Decl.) ¶ 8; ECF

No. 88-1 (Renaud Decl.) ¶¶ 6-7; ECF No. 88-1 (E.A.A. Decl.) ¶ 5. D.A.A. remains detained in the Northern District of Texas. ECF No. 88-1 (Aug. 24 Sarabia Roman Decl.) ¶ 3.

66. On April 17 and 18, 2025, immigration detention officers instructed D.A.A., T.I.A., and E.A.A. to sign Notices of Removal under the Alien Enemies Act. ECF No. 88-1 (Renaud Decl.) ¶ 7; ECF No. 88-1 (Collins Decl.) ¶ 7; ECF No. 88-1 (E.A.A. Decl.) ¶ 5. Officers did not translate or explain the Notice of Removal. ECF No. 88-1 (Renaud Decl.) ¶ 7; ECF No. 88-1 (Collins Decl.) ¶ 7; ECF No. 88-1 (E.A.A. Decl.) ¶ 5.

67. On April 18, 2025, the government took D.A.A., T.I.A., and E.A.A. from Bluebonnet and loaded them onto buses with other Venezuelan men. The government drove them toward an airport and then drove them back to Bluebonnet. ECF No. 88-1 (Renaud Decl.) ¶ 7; ECF No. 88-1 (Collins Decl.) ¶ 8; ECF No. 88-1 (E.A.A. Decl.) ¶ 5.

**Centro de Confinamiento del Terrorismo (CECOT)**

68. The AEA designees removed on March 15, 2025 were sent to CECOT. App.509.

69. At CECOT, they experienced routine severe beatings, sexual abuse, and psychological abuse. App.413, 419-20 (routine severe beatings and acts of humiliation); App.427-30 (sexual abuse, beatings, denial of food); App.509-44 (describing "serious physical and psychological abuse on a virtually daily basis").

70. That is consistent with typical treatment in Salvadoran prisons. App.39, 42-44 (Bishop Decl.) ¶¶ 21, 33, 37, 39, 41 (beatings, forced labor, torture, indefinite detention without trial typical for Salvadoran prisons); App.28, 30-34 (Goebertus Decl.) ¶¶ 3, 8, 10, 17 (similar).

Dated: September 10, 2026

Respectfully submitted,
_/s/Lee Gelernt_

Lee Gelernt
Daniel Galindo
Kathryn Huddleston*
Ashley Gorski
Patrick Toomey
Sidra Mahfooz*
Omar Jadwat*
Hina Shamsi*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660

Noelle Smith*
Oscar Sarabia Roman*
My Khanh Ngo
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
T: (415) 343-0770
E: nsmith@aclu.org
E: osarabia@aclu.org
E: mngo@aclu.org

Brian Klosterboer

Tx Bar No. 24107833
Thomas Buser-Clancy
TX Bar No. 24078344
Savannah Kumar
TX Bar No. 24120098
Charelle Lett
TX Bar No. 24138899
Ashley Harris
TX Bar No. 24123238
Adriana Piñon
TX Bar No. 24089768
ACLU FOUNDATION OF TEXAS, INC.
1018 Preston St.
Houston, TX 77002
(713) 942-8146
bklosterboer@aclutx.org
tbuser-clancy@aclutx.org
skumar@aclutx.org
clett@aclutx.org
aharris@aclutx.org
apinon@aclutx.org

E: lgelernt@aclu.org
E: dgalindo@aclu.org
E: khuddleston@aclu.org
E: agorski@aclu.org
E: ptoomey@aclu.org
E: smahfooz@aclu.org
E: ojadwat@aclu.org
E: hshamsi@aclu.org

Attorneys for Petitioners-Plaintiffs

**Pro hac vice applications forthcoming*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 10, 2026, a true and correct copy of the foregoing document was electronically filed via the Court's CM/ECF system which sends notice of electronic filing to all counsel of record.

Dated: September 10, 2026

Respectfully submitted,
*/s/Lee Gelernt*

Lee Gelernt
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
E: lgelernt@aclu.org

Attorney for Petitioners-Plaintiffs