**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**ABILENE DIVISION**

W.M.M., on their own behalf and on behalf of others similarly situated, *et al.*,

*Petitioners-Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

*Respondents-Defendants*.

Case No. 1:25-cv-59-H

# BRIEF IN SUPPORT OF RESPONDENTS' RESPONSE TO PETITIONERS' MOTION FOR SUMMARY JUDGMENT

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General

TIBERIUS DAVIS
Counsel to the Assistant Attorney General

AUGUST FLENTJE
Deputy Director
Office of Immigration Litigation

/s/ Nancy N. Safavi
NANCY N. SAFAVI
Senior Trial Attorney
TXBN 24042342

Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washinton DC 20001
(202) 514-9875
Nancy.Safavi@usdoj.gov

RYAN RAYBOULD
UNITED STATES ATTORNEY

Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214-659-8626
Facsimile: 214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Respondents-Defendants

**TABLE OF CONTENTS**


INTRODUCTION .....1

BACKGROUND .....3

I. The Alien Enemies Act .....3

II. The President's Proclamation .....5

III. The Present Controversy .....7

A. Petitioners' Suit .....7

B. The Government's Revised Notice Procedure .....8

C. Panel Decision, En Banc Hearing, and Remand .....9

LEGAL STANDARD .....10

ARGUMENT .....10

I. THE PROCLAMATION IS A LAWFUL EXERCISE OF THE PRESIDENT'S BROAD POWERS UNDER THE AEA .....11

A. Judicial Review Under the AEA is Extremely Limited and Deferential. .....11

B. The Proclamation Properly Identifies a "Foreign Nation or Government" Under the AEA. .....15

C. The Proclamation Properly Identifies an Attempted, Threatened, or Actual "Predatory Incursion" and "Invasion" Under the AEA. .....21

1. "Attempted" and "threatened" invasions and incursions include hostilities that have not yet occurred. .....22

2. "Predatory incursions" are not limited to military attacks. .....24

3. The term "invasion" is not limited to military attacks. .....27

4. TdA has perpetrated, attempted, or threatened a predatory incursion or invasion by any metric. .....28

II. THE GOVERNMENT'S AEA NOTICE PROCEDURES SATISFY DUE PROCESS .....31

A. The Revised Procedures Provide Sufficient Opportunity to Seek Habeas Relief. .....31

B. Requiring 30 Days' Notice and Detailed Factual Disclosures is Unwarranted ..........34

C. Petitioners' Other Procedural Objections Fail ..........37

III. PETITIONERS FAIL TO SATISFY THE REMAINING INJUNCTION FACTORS ....39

CONCLUSION ..........40

## TABLE OF AUTHORITIES

### CASES

*A.A. R. P., et al., v. Trump*,
*605 U.S. 91. (2025).* .......... 7, *passim*

*A.S.R. v. Trump*,
782 F. Supp. 3d 224 (W.D. Pa. 2025) .......... 38

*Adams v. Vance*,
570 F.2d 950 (D.C. Cir. 1978) .......... 40

*Al-Bihani v. Obama*,
619 F.3d 1 (D.C. Cir. 2010) .......... 14

*Am. Ins. Ass'n v. Garamendi*,
539 U.S. 396 (2003) .......... 13

*Arevalo v. Trump*,
785 F. Supp. 3d 644 (C.D. Cal. 2025) .......... 11, 12, 13

*California v. United States*,
104 F.3d 1086 (9th Cir. 1997) .......... 12

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......... 10

*Citizens Protective League v. Clark*,
155 F.2d 290 (D.C. Cir. 1946) .......... 11, 31, 35

*DHS v. Thuraissigiam*,
591 U.S. 103 (2020) .......... 33, 37

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) .......... 38

*Ex parte Gilroy*,
257 F. 110 (S.D.N.Y. 1919) .......... 36

*Ex parte Risse*,
257 F. 102 (S.D.N.Y. 1919) .......... 36

*Hamama v. Adduci*,
912 F.3d 869 (6th Cir. 2018) .......... 39

*Hamdi v. Rumsfeld*,
542 U.S. 507 (2004) ........ 36

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) ........ 13, 19

*Huidekoper's Lessee v. Douglass*,
7 U.S. (3 Cranch.) 1 (1805) ........ 25

*Huisha-Huisha v. Mayorkas*,
27 F.4th 718 (D.C. Cir. 2022) ........ 39

*J.A.V. v. Trump*,
781 F. Supp. 3d 535 (S.D. Tex. 2025) ........ 38

*Jones v. Flowers*,
547 U.S. 220 (2006) ........ 32

*Lockington v. Smith,*
*15 F. Cas. 758, 760 (C.C.D. Pa. 1878* ........ 11

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ........ 14

*Ludecke v. Watkins*,
335 U.S. 160 (1948) ........ 1, *passim*

*Martin v. Mott*,
25 U.S. (12 Wheat.) 19 (1827) ........ 12

*Mullane v. Central Hanover Bank & Trust Co.*,
339 U.S. 306 (1950) ........ 32

*Munaf v. Geren*,
553 U.S. 674 (2008) ........ 21, 39

*New Jersey v. United States*,
91 F.3d 463 (3d Cir. 1996) ........ 12

*Nishimura Ekiu v. United States*,
142 U.S. 651 (1892) ........ 37

*Nken v. Holder*,
556 U.S. 418 (2009) ........ 39, 40

*Ragas v. Tenn. Gas Pipeline Co.*,
136 F.3d 455 (5th Cir. 1998) .......... 10

*Reno v. Flores*,
507 U.S. 292 (1993) .......... 35

*Sparenburgh v. Bannatyne*,
126 Eng. Rep. 837, 840 (1797) .......... 26

*Trump v. Hawaii*,
585 U.S. 667 (2018) .......... 13, 19

*Trump v. J. G. G.*,
604 U.S. 670 (2025) .......... 11, 36, 39

*United States ex rel. Schlueter v. Watkins*,
67 F. Supp. 556 (S.D.N.Y. 1946) .......... 36

*United States ex rel. Von Heymann v. Watkins*,
159 F.2d 650 (2d Cir. 1947) .......... 38

*W.M.M. v. Trump*,
154 F.4th 207 (5th Cir.) .......... 9, *passim*

*W.M.M. v. Trump*,
184 F.4th 780 (5th Cir. 2026) .......... 10, 28

*Worcester v. Georgia*,
31 U.S. 515 (1832) .......... 25

*Yamataya v. Fisher*,
189 U.S. 86 (1903) .......... 32

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
576 U.S. 1 (2015) .......... 13

## STATUTES

**Immigration and Nationality Act of 1952, as amended:**

Section 101(a)(13)(A),
8 U.S.C. § 1101(a)(13)(A) .......... 38

Section 212(b)(3)(B),
8 U.S.C. § 1182(b)(3)(B) .......... 7

Section 219(a)(1),
8 U.S.C. § 1189(a)(1) ... 6

Section 219(d)(4),
8 U.S.C. § 1189(d)(4) ... 6

Section 235(b),
8 U.S.C. § 1225(b) ... 33

Section 235(b)(1)(A)(i),
8 U.S.C. § 1225(b)(1)(A)(i) ... 33

Section 235(b)(1)(B)(iii)(III),
8 U.S.C. § 1225(b)(1)(B)(iii)(III) ... 33

Section 237(a)(4)(B),
8 U.S.C. § 1227(a)(4)(B) ... 7, 40

Section 241(b)(2),
8 U.S.C. § 1231(b)(2) ... 40

Section 240(a)(3),
8 U.S.C. §1229a(a)(3) ... 38

**OTHER STATUES**

50 U.S.C. § 21 ... 1, *passim*

50 U.S.C. § 22 ... 4

**RULES**

Fed. R. Civ. P. 56(a) ... 10

**REGULATIONS**

90 Fed. Reg. 10,030 ... 6

90 Fed. Reg. 13,034 ... 16

90 Fed. Reg. 13,033 ... 2

90 Fed. Reg. 53,045 ... 15

**OTHER AUTHORITIES**

1 Annals of Cong. 722 .......... 28

8 Annals of Cong. 1574 .......... 22

8 Annals of Cong. 1581 .......... 27

8 Annals of Congress 1574 .......... 5

*Enemy Aliens, Enemy Property, and Access to the Courts*,
11 Lewis & Clark L. Rev. 963 (2007) .......... 25

Exec. Order No. 14,157 .......... 29

*The Constitution, Invasion, Immigration, and the War Power of States*,
13 Brit. J. Am. Legal Stud. 21 (2024) .......... 27, 28

Proclamation No. 10,903, Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, 90 Fed. Reg. at 13,033 (Mar, 20, 2025) .......... 2, *passim*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**ABILENE DIVISION**

| | |
|---|---|
| W.M.M., on their own behalf and on behalf of others similarly situated, *et al.*,<br><br>*Petitioners-Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>*Respondents-Defendants*. | Case No. 1:25-cv-59-H |

**BRIEF IN SUPPORT OF RESPONDENTS' RESPONSE TO PETITIONERS' MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Nearly a year and half from their first filing, Petitioners-Plaintiffs (Petitioners) seek summary judgment for a class action Alien Enemies Act (AEA) case for which this Court lacks jurisdiction. In 1798, Congress enacted the Alien Enemies Act (AEA) so the President could act swiftly to designate, detain, and remove enemy aliens from the United States. That grant of authority to the President is about "as unlimited as the legislature could make it." *Ludecke v. Watkins*, 335 U.S. 160, 169 (1948). Congress was not just concerned with ensuring that the President could detain and remove any agents of hostile foreign powers that successfully mounted military attacks. Congress also expressly empowered the President to invoke the AEA's broad powers against enemy aliens to address a "threatened" or "attempted" "invasion or predatory incursion." 50 U.S.C. §21.

That broad, preventive scope was no coincidence. The AEA was enacted during the Quasi-War with France, when Americans feared French infiltrators might launch surprise attacks before

war was declared. Congress accordingly empowered the President to remove would-be attackers before they could launch any such attacks. And, by augmenting the President's Article II authorities with wide, discretionary powers, Congress created a regime with highly circumscribed and deferential judicial review. *Ludecke*, 335 U.S. at 170.

Petitioners' attempt to enjoin President Trump's invocation of the AEA thus faces extraordinarily steep odds. The President has determined that members of a foreign terrorist organization—Tren de Aragua (TdA)—have "infiltrated" this Nation at the behest of the hostile former Maduro regime in Venezuela. Proclamation No. 10,903, Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, 90 Fed. Reg. at 13,033 (Mar, 20, 2025). And he found that TdA members are working to "destabiliz[e] … the United States" by "undertaking hostile actions and conducting irregular warfare" at the regime's direction. *Id*.

Those determinations are subject to the utmost deference, as is the President's conclusion that TdA members may be summarily detained and removed to prevent them from accomplishing further hostile acts. And the Executive Branch's revised procedures for facilitating expeditious but responsible removal of enemy aliens—under which such aliens receive notice in a language they understand, information about how to challenge their removal, the option to request a list of available attorneys, and seven days to file a habeas petition—plainly comports with due process.

Petitioners' contrary view would transform the AEA from a Founding-era bulwark against foreign subversion into an inexplicably toothless tool. Under Petitioners' view, aliens aligned with hostile foreign governments or nations who are actively plotting assassinations on U.S. soil—as the FBI has warned TdA may be doing in conjunction with the former Maduro regime, ECF No. 79-2, 16-17—would fall outside the AEA entirely. The AEA would cover such aliens only after a formal "military attack" or "declared war" transpired—at which point the Executive could not

detain or remove them without exhaustively detailing all reasons for designating them alien enemies; providing 30 days' notice before removal; and applying all of the procedures that the immigration laws prescribe for ordinary removals of non-enemy aliens. All the while, would-be assassins would remain in the United States to wreak additional havoc while obtaining information in the notice that a hostile foreign power could exploit.

That cramped, nonsensical interpretation of the AEA defies text, history, and precedent at every turn. Petitioners would limit the AEA to times of "active military hostilities" or "declared war"—ignoring the wide scope that courts must give to these terms under the AEA, the AEA's plain authorization to avert "threatened" incursions or invasions, and the broad contemporaneous meanings of "predatory incursion" and "invasion." Petitioners would replace deference to the President's national-security judgments with skepticism, demanding judicial second-guessing and a *Chenery*-esque adequate-explanation requirement for Proclamations.

Furthermore, Petitioners would revamp the Due Process Clause into a discovery juggernaut, ignoring compelling national security interests in favor of a regime where the Government would have to provide enemy aliens with 30 days to file habeas petitions and a roadmap for litigating them. At bottom, Petitioners would perversely subject the President's invocation of the AEA to more scrutiny than any administrative agency would receive under the Administrative Procedure Act (APA)—a result that the Founding generation would have considered inconceivable and that this Court should not countenance. Thus, this Court should deny Petitioners' Motion for Summary Judgment.

## BACKGROUND

### I. The Alien Enemies Act

Enacted in 1798, the AEA grants the Executive broad power to designate, detain, and remove enemy aliens not only during a "declared war," but also in response to an "invasion or predatory incursion" that is "perpetrated, attempted, or threatened." 50 U.S.C. §21. The first sentence of Section 21—the Act's most significant source of authority— provides:

> Whenever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies.

50 U.S.C. §21.

Section 21's second sentence elaborates on related powers granted to the President upon his proclamation. These include the powers "to provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom; and to establish any other regulations which are found necessary in the premises and for the public safety." *Id*.

The Act's remaining provisions outline procedures for implementing the President's broad authority. Relevant here, section 22 provides that "an alien who becomes liable as an enemy" but who "is not chargeable with actual hostility, or other crime against the public safety," may be afforded some time to settle his affairs before departing. 50 U.S.C. §22.

The AEA was enacted at the start of the Quasi-War against France—an episode called the "Quasi-War" because no war was ever declared. Instead, for years, France and the United States raided each other's vessels in the Caribbean, primarily through privateers—private sailors

commissioned by the government. *See* Alexander DeConde, *The Quasi-War: The Politics and Diplomacy of the Undeclared War with France 1797-1801*, at 8-9, 124 (1966).

Congress thus enacted the AEA against the backdrop of concerns about the dangers posed by Frenchmen in the United States. *See* 8 Annals of Congress 1574. Congress ultimately drafted the statute to empower the President to address not only instances of declared war, but also "attempted" and "threatened" "invasion or predatory incursion." 1 Stat. 577 (1798). Presidents relied on the AEA to detain and remove alien enemies during the War of 1812, World War I, and World War II.

## II. The President's Proclamation

In March 2025, the President invoked the AEA to proclaim that members of Tren de Aragua (TdA) are alien enemies. TdA is a transnational criminal organization, supported and directed by members of the former Maduro regime. ECF No. 79-2, 16-19*, FBI Intelligence Assessment: Venezuelan Government Officials Use Tren de Aragua to Undermine Public Safety*, 23 January 2025; ECF No. 79-2, 5, ¶7. The group originated in Venezuelan prisons and has since expanded—first to neighboring countries, and, by leveraging Venezuelan nationals' migration flow, into North America. ECF No. 79-2, 6-9, Smith Declaration ¶¶9, 12, 15-16. TdA has "conducted kidnappings, extorted businesses, bribed public officials, authorized its members to attack and kill U.S. law enforcement, and assassinated a Venezuelan opposition figure." Office of the Spokesperson, Dep't of State, Designation of International Cartels (Feb. 20, 2025).

Over the past three years, TdA has established a strong presence in "at least 40 states" and Canada. ECF No. 79-2, 8, Smith Declaration ¶16. Further, TdA's proliferation has fostered crime and endangered communities, committing murder, robbery, human trafficking, hostage taking, narcotics trafficking, and firearms violations. *Id*. at 7, ¶6, *Id*. at 9-10, ¶12, *Id*. at 11, ¶16, *Id*. at 13,

¶¶23-25. TdA has even taken over several apartment complexes across the country, including one in Aurora, Colorado, where TdA members kidnapped and abused Venezuelan migrants. *Id*. at 9 ¶¶6, 19.

Behind TdA stands the former regime of Nicolas Maduro who was arrested on January 3, 2026, on federal narcoterrorism charges. The former Maduro regime used groups like TdA to intimidate, kidnap, and kill dissidents abroad. *Id*. at 19. The FBI assessed it is "likely" that the regime would similarly "leverage TdA members in the United States as proxy actors to threaten, abduct, and kill members of the U.S.-based Venezuelan diaspora who are vocal Maduro critics," *id.*, as part of a long-term strategy to "destabilize" democratic countries by releasing TdA members from prison and directing and financing them to create "political, social, and security issues" for the United States. *Id*. at 16-18. The FBI determined that Maduro himself oversaw decisions to use TdA strategically. *Id.*

Shortly after President Trump took office, the Secretary of State designated TdA as a "foreign terrorist organization." 90 Fed. Reg. 10,030. That designation reflects the Secretary's finding that TdA engages in "terrorist activity" or "terrorism" or "retains the capability and intent" to do so, and thereby "threatens the security of United States nationals or the national security of the United States." 8 U.S.C. §1189(a)(1), (d)(4).

On March 14, 2025, the President signed a proclamation invoking his authorities under the AEA, 50 U.S.C. §21 *et seq.*, citing TdA's entwinement with the former Maduro regime and its hostile designs on the United States. *See* 90 Fed. Reg. 13,033. That Proclamation outlines the President's findings that TdA members meet the AEA's statutory criteria for removal. The President found that TdA was entwined with the former Maduro regime—in which Maduro "claims to act as Venezuela's President and asserts control over the security forces and other

authorities in Venezuela." *Id.* That entwinement effectively created a "hybrid criminal state," "closely aligned with" the former Maduro regime in Venezuela, in which TdA "infiltrated" the regime's "military and law enforcement apparatus." *Id.* Further, at the direction of the former Maduro regime, TdA is "conducting irregular warfare and undertaking hostile actions against the United States," *id.*, and "is perpetrating, attempting, and threatening an invasion or predatory incursion against the territory of the United States," posing "a substantial danger" to the Nation. *Id.* at 13,033-13,034.

Based on these determinations and "a review of TdA's activities," the President proclaimed that, pursuant to the AEA, "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." *Id.* Further, "all such members of TdA are" "chargeable with actual hostility against the United States" and "are a danger to the public peace or safety of the United States." *Id.* The Proclamation also deemed all such TdA members "subject to immediate apprehension, detention, and removal." *Id.* The President directed the "issu[ance of] any guidance necessary to effectuate the prompt apprehension, detention, and removal of all Alien Enemies described" above. *Id.*

TdA members remain deportable under other authorities, including under Title 8 as members of a foreign terrorist organization or otherwise. 8 U.S.C. §§1182(b)(3)(B), 1227(a)(4)(B); *see A.A.R.P.*, 605 U.S. at 99. But the Proclamation provides an essential tool to use the AEA's expeditious removal methods for particularly dangerous individuals.

## III. The Present Controversy

### A. Petitioners' Suit

On April 16, 2025, Petitioners A.R.P. and W.M.M. jointly petitioned for a writ of habeas

corpus, challenging the legality of their prospective removal under the AEA. ECF No. 1. Simultaneously, they moved for a temporary restraining order (TRO), ECF No. 2, and certification of a class of aliens detained pursuant to the AEA, ECF No. 1, 15-18. The case quickly reached the Supreme Court. *A.A. R. P., et al., v. Trump*, 605 U.S. 91 (2025).

On May 16, 2025, the Supreme Court vacated the Fifth Circuit's judgment and enjoined the Government from removing class members under the AEA until this Court issues a further decision, and the Supreme Court disposes "of the petition for a writ of certiorari." *A.A.R.P.*, 605 U.S. at 95. The Court held that aliens subject to removal under the AEA "must have sufficient time and information to reasonably be able to contact counsel, file a petition, and pursue appropriate relief" before removal. *Id.* at 95. The Supreme Court did not specify what process is due, but deemed insufficient "notice roughly 24 hours before removal" that did not contain information as to how to contest removal. *Id.*

The Supreme Court remanded the case to the Fifth Circuit to "address (1) all the normal preliminary injunction factors, including likelihood of success on the merits, as to the named plaintiffs' underlying habeas claims that the AEA does not authorize their removal … and (2) the issue of what notice is due, as to the putative class's due process claims against summary removal." *Id.* at 98-99. The Court clarified that the injunction bars removals only "under the AEA," not other authorities. *Id.* at 99.

**B. The Government's Revised Notice Procedure**

In light of *A.A.R.P.*, the Government revised its notice policy for aliens designated for removal under the AEA. *See* ECF No. 78-1(revised notice). The new notice form tells aliens, in a language they can understand, that they can contest their removal under the AEA by filing a habeas petition in the district where they are detained. *Id.* The notice further informs aliens that they may

retain counsel, make calls for that purpose, and will be given a list of potential counsel upon request. *Id.*

Alien enemies will be given seven days from receipt of that notice to file habeas petitions, during which time the aliens will not be removed under the AEA. *Id.* Aliens who petition for habeas will not be removed until that petition is resolved. *Id.* To date, over thirty aliens detained under the AEA have filed habeas petitions, and for many of them, it has now been over 100 days since notice was served. ECF No. 78-1

### C. Panel Decision, En Banc Hearing, and Remand

On remand from the Supreme Court, a divided panel of the Fifth Circuit granted Petitioners a preliminary injunction and remanded for further fact-finding. *W.M.M. v. Trump*, 154 F.4th 207, 211 (5th Cir.), reh'g en banc granted, opinion vacated, 154 F.4th 319 (5th Cir. 2025), and on reh'g, 184 F.4th 780 (5th Cir. 2026). The majority held the Government's updated notice procedures comported with due process, *W.M.M.*, 154 F.4th at 207, explaining that on the limited factual record available, "the updated notice appears to comply with the Supreme Court's directive" in *A.A.R.P.* Op.47. Judge Ramirez dissented; she would have required at least a 21-day notice period. *W.M.M.*, 154 F.4th at 239.

A separate majority held that the court could review the proper interpretation and application of the AEA, *W.M.M.*, 154 F.4th at 214-228, and deemed Petitioners likely to succeed on the merits. All three panel members agreed with the Government that the Proclamation properly identifies hostilities by a "foreign nation or government," given the President's finding that "the Maduro regime is directing TdA in this country." *W.M.M.*, 154 F.4th at 231. The majority held, however, that the Proclamation does not identify a "predatory incursion" or "invasion" within the meaning of the AEA. The panel majority read those terms to require attacks by a "military force"

or "armed forces." *W.M.M.*, 154 F.4th at 223. The panel determined that the Proclamation did not identify such an incursion or invasion and held that Petitioners were likely to succeed on their statutory claim. *Id*. The panel further held that the other injunctive factors favored Petitioners. *W.M.M.*, 154 F.4th at 234.

Judge Oldham dissented. *W.M.M.*, 154 F.4th at 240-312. He explained that the Court lacked authority to assess if the AEA's preconditions have been satisfied and would have held that the President's "power to find that an invasion, or similar hostility is being perpetrated or threatened" is "conclusive." *W.M.M.*, 154 F.4th at 256. He also would have held that the equities favored the Government. *Id*.

The court of appeals vacated the panel decision and granted rehearing en banc, rendering it unbinding on this Court. *W.M.M.*, 154 F.4th at 319. After oral argument en banc, the Fifth Circuit dismissed the appeal for lack of jurisdiction as the named plaintiffs had all been removed from the United States under provisions of the INA, no class had been certified, and thus, the appeal was moot. *W.M.M. v. Trump*, 184 F.4th 780, 787 (5th Cir. 2026). The Fifth Circuit denied a motion to add new class members on appeal. *Id*.

Petitioners moved to substitute in three new class members, to certify a new class and for summary judgment. ECF Nos. 88, 96-99.

## LEGAL STANDARD

The Court shall grant summary judgment when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

## ARGUMENT

### I. THE PROCLAMATION IS A LAWFUL EXERCISE OF THE PRESIDENT'S BROAD POWERS UNDER THE AEA.

To start, the AEA authorizes the President to direct the removal of alien enemies if (1) a "foreign nation or government" has (2) "perpetrated, attempted, or threatened" an "invasion" or a "predatory incursion" against U.S. territory. 50 U.S.C. §21. The Proclamation readily satisfies both requirements, especially under the highly limited and exceedingly deferential standard of review that applies.

#### A. Judicial Review Under the AEA is Extremely Limited and Deferential.

The AEA's grant of authority to the President is about "as unlimited as the legislature could make it." *Ludecke*, 335 U.S. at 169 (quoting *Lockington v. Smith*, 15 F. Cas. 758, 760 (C.C.D. Pa. 1878 (Washington Circuit Justice)). The AEA grants the President alone discretion to find that an "invasion" or "predatory incursion" by a hostile nation or government has been "perpetrated, attempted, or threatened." 50 U.S.C. §21; *Arevalo v. Trump*, 785 F. Supp. 3d 644, 664 (C.D. Cal. 2025). Courts have long recognized that "[u]nreviewable power in the President" is the "essence" of the AEA. *Citizens Protective League v. Clark*, 155 F.2d 290, 294 (D.C. Cir. 1946). As the Supreme Court recently reiterated, the AEA "largely 'preclude[s] judicial review.'" *Trump v. J. G. G.*, 604 U.S. 670, 672 (2025) (quoting *Ludecke*, 335 U.S. at 163).

Accordingly, courts may engage in only "limited" judicial review, to decide "questions of interpretation and constitutionality" of the AEA (or whether the petitioner is an alien enemy at least 14 years old)." *Id.* (quoting *Ludecke*, 335 U.S. at 163, 172 n.17). Courts may define statutory terms, but they must allow the President a wide berth. For instance, unduly narrow interpretations of terms like "predatory incursion" and "invasion" could preclude the President from responding to evolving forms of warfare and conflict. *See Ludecke*, 335 U.S. at 164 n.7. Further, courts must

be particularly deferential to the President's factual determinations and the application of law to those facts. That deference reflects the AEA's breadth, the range of sensitive national-security situations that may arise, and the President's underlying constitutional authority over national security and foreign affairs. *See Arevalo*, 785 F. Supp. 3d at 665.

The Supreme Court's analysis in *Ludecke* underscores how limited judicial review is under the AEA. There, the Court upheld the President's decision to direct the removal of German nationals under the AEA even long after Germany's unconditional World War II surrender. 335 U.S. at 170. The Court engaged in statutory interpretation when it agreed that the statutory term "declared war" does not mean only "actual hostilities." *Id.* at 170-71. But, critically, the Court "construed the AEA only to the extent necessary to reject the argument that the President had exceeded the scope of his authority under the AEA." *Arevalo*, 785 F. Supp. 3d at 663.

Underscoring the point, many determinations closely related to those which the AEA vests in the President are nonjusticiable in other contexts. Take the question whether the President validly determined that TdA is engaged in an actual or threatened "predatory incursion" or "invasion" under the AEA. Nearly 200 years ago, the Supreme Court considered a challenge to the President's exercise of authority under a similarly worded statute, which authorized the President to call up the militia "whenever the United States shall be invaded, or be in imminent danger of invasion." *See Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 29 (1827). The Court refused to second-guess the President's assessment of the danger of such an invasion, explaining that his determination was "conclusive." *Id.* at 30. Moreover, until recently, courts uniformly held that challenges under the Constitution's Invasions Clause provided "no manageable standards to ascertain whether or when an influx of illegal immigrants should be said to constitute an invasion."

*California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997); *New Jersey v. United States*, 91 F.3d 463, 470 (3d Cir. 1996) (same).

More broadly, the President bears the "vast share of responsibility for the conduct of our foreign relations." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (citation omitted). Thus, in matters involving "sensitive and weighty interests of national security and foreign affairs," courts must defer to the "evaluation of the facts by the Executive." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010). To that end, the President has the exclusive "power to recognize foreign states." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 28 (2015). The President's determination that a particular group's attempted, threatened, or completed incursion or invasion is attributable to a foreign sovereign similarly involves sensitive foreign-policy considerations that courts are not well equipped to second-guess. Courts are particularly ill-suited to question the President's "predictive judgments," *Trump v. Hawaii*, 585 U.S. 667, 708 (2018), such as whether such invasion or incursion is "threatened," 50 U.S.C. §21.

Petitioners constant refrain is that the Supreme Court in *J.G.G.*, *Ludecke*, and in this case indicated that courts could reach constitutional issues and interpret statutory text. ECF No. 97 at 6-9. But Petitioners fail to grapple with the deferential language and facts of *Ludecke*. Clearly some deference is owed in the scope of interpreting the terms of the AEA, the President's factual determinations, and the application of the terms to the facts. Here, deferential review means deferring conclusively to the President's factual determinations and asking (at most) whether the AEA's terms can bear the President's statutory interpretation. That is the type of deferential review the Supreme Court employed in *Ludecke*, and such deference is essential to stop courts from usurping the President's constitutional authority over national-security affairs.

Afterall, there is "no way to strike such a balance" between "attempt[ing] to construe the terms contained in the AEA while purporting to defer to the President's judgment about the existence of either an invasion or predatory incursion." *Arevalo*, 785 F. Supp. 3d at 664. There is a "deeply rooted tradition of judicial restraint when the President is executing national security or foreign affairs statutes pursuant to a broad congressional authorization" that is completely consistent with "basic tenets of statutory interpretation and the tripartite separation of powers." *Al-Bihani v. Obama*, 619 F.3d 1, 38-39 (D.C. Cir. 2010) (Kavanaugh, J., concurring in denial of rehearing en banc).

The "'best reading of a statute sometimes is that it delegates discretionary authority to the Executive." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). And such discretion is ubiquitous in the national-security sphere, where Congress recognizes the President's unique competence and delegates latitude accordingly. As the Supreme Court concluded in *Ludecke*, "Congress has constitutionally placed" the "full responsibility for the just exercise of this great power" on "the President of the United States." 335 U.S. at 173.

Of course, highly deferential review under the AEA does not mean "no review" at all. Courts may interpret statutory terms; courts simply must give those terms wide berth. *See* pp. 11, *supra*. Some interpretations would obviously be beyond the pale even under that highly deferential standard. The President does not, for example, have "conclusive interpretative power to proclaim that AEA invasions include … double parking at the grocery store." *W.M.M.*, 154 F.4th at 260 (Oldham, J., dissenting). Further, the President's ability to invoke the AEA requires the President to publicly make findings that the statutory criteria are satisfied. But those limits do not grant courts *carte blanche* to narrowly construe the statute and second guess the President's determination.

### B. The Proclamation Properly Identifies a "Foreign Nation or Government" Under the AEA.

The AEA requires the President to find that a qualifying hostile action—a "declared war," or a "perpetrated, attempted, or threatened" "invasion or predatory incursion"—has been committed by a "foreign nation or government." 50 U.S.C. §21. The President's AEA Proclamation satisfies the requirement of identifying hostilities by a "foreign nation or government." The President found that TdA was so interconnected with the former Maduro regime as to make its activities in the United States attributable to that regime. That determination—which is consistent with the President's statements concerning the recent strikes against narco-terrorist boats, *contra* *See* p. 15—should be dispositive. Indeed, this is one thing that every member of the Fifth Circuit panel agreed on. *W.M.M.*, 154 F.4th at 230.

1. Petitioners do not dispute that the former Maduro regime qualifies as a "government" for purposes of the AEA. Although the United States has not recognized Maduro's regime since January 2019, the regime asserted control over civil and military authority in Venezuela. As to TdA's entwinement with that regime, the President found that TdA infiltrated the former Maduro regime, "including its military and law enforcement apparatus." 90 Fed. Reg. at 13,033. The President explained that Maduro coordinated with TdA via the regime-sponsored narcoterrorism enterprise Cártel de los Soles.[1] *Id.* The Cártel de los Soles, in turn, "coordinates with and relies on TdA … to carry out its objective of using illegal narcotics as a weapon to 'flood' the United States." *Id.* Thus, the President found that Maduro controlled and ceded control over territory to TdA, and that Venezuela operated as a hybrid-criminal state with TdA and other criminal organizations. *Id*. FBI intelligence also reveals that former Maduro regime officials

[1] The Secretary of State has also designated Cártel de los Soles as a foreign terrorist organization. *See* 90 Fed. Reg. 53,045 (Nov. 24, 2025).

"likely use TdA members as proxies," and "deliberately releas[ed] members of TdA" from Venezuelan prisons and encouraged their "travel to the United States." ECF No. 79-2, 17.

2. When an organization is so closely bound up with a foreign regime as to create a "hybrid criminal state," hostilities by that organization *are* hostilities by a "foreign nation or government" within the meaning of the AEA. *W.M.M.*, 154 F.4th at 278 (J. Oldman dissenting). That interpretation tracks conflicts that precipitated the enactment of the AEA, like the Quasi-War. *See* pp.15-16 *supra*. At that time, "France was using privateers to attack American shipping," and the British had recently hired Hessian mercenaries in its attempt "to suppress the American Revolution." *W.M.M.*, 154 F.4th at 231. Against that backdrop, an "enemy using forces … that are not part of the country's regular military does not prevent use of the AEA." *Id*.

To be sure, the President could have gone further and designated all Venezuelans living under Maduro's former regime, rather than only TdA members. *See* 50 U.S.C. §21. Instead, the President chose to designate only TdA members, *see* 90 Fed. Reg. at 13,034, consistent with the President's authority under the AEA to prescribe "in what cases" enemy aliens shall be restrained and removed, 50 U.S.C. §21. The President's decisions should not be second-guessed by courts simply because he exercised power "within narrower limits than Congress authorized" in the AEA. *Ludecke*, 335 U.S. at 166.

3. Petitioners challenge both the factual determination that TdA is intertwined with the Maduro regime and the legal conclusion that such intertwinement satisfies the AEA's "foreign nation or government" requirement. Both lines of argument fail.

a. On the facts, Petitioners urge this Court not to defer to the President's determination that TdA has formed a "hybrid criminal state" with the former Maduro regime on the grounds that "the government has taken contradictory positions in this litigation." ECF No. 97 at 21-22. That is

just another plea to disregard the particular deference owed to the President's application of the AEA to particular facts. In all events, it is incorrect.

Petitioners invoke recent letters from the Executive Branch to Congress and to the United Nations explaining that "the President has determined" that "cartels" including TdA "are non-State armed groups," and that "the United States is in a non-international armed conflict with these designated terrorist organizations." *Id*. (citing Notice to Congress; Remarks to the UN Security Council). Those determinations are consistent with the President's AEA findings. Indeed, Petitioners own evidence shows that the President has consistently found that "TDA is a designated Foreign Terrorist Organization, operating *under the control of Nicolas Maduro*." Truth Social (Sept. 2, 2025) (emphasis added); Remarks to the UN Security Council ("Nicolas Maduro is a fugitive from American justice and the head of the vicious narco-terrorist Cartel de Los Soles.").

Moreover, the term "non-international armed conflict" reflects current international law concepts that do not correspond to whether TdA constitutes a "foreign nation or government" under the AEA. International law sets a demanding standard for when conduct by a group or other entity other than a State itself can be attributed to a State. As a leading commentary explains, under international law, "conduct will be attributed to [a] State only if it directed or controlled *the specific operation* and the conduct complained of was an integral part of that operation." U.N. International Law Commission, *Draft Articles on Responsibility of States for Internationally Wrongful Acts*, commentary to art. 8 (2001) (emphasis added). Even when a State is "responsible for the 'planning, direction and support' given" to a group, international law does not treat "all the conduct" of the group as "attributable to the [State] by reason of its control over them." *Id.*

Even groups that are closely entwined with foreign States, such as Hezbollah, may be deemed non-State actors. *See, e.g.*, Israeli Ministry of Foreign Affairs, *Operation 'Rising Lion':*

*Key Factual and Legal Aspects of the Iran-Israel Hostilities* 11 (Aug. 12, 2025, update) (describing Hezbollah, Hamas, and Houthis as "non-State armed groups"). And a conflict between the United States and such a non-State group would not necessarily qualify as an "international armed conflict," even if some aspects of the group's conduct are directed by a foreign State. *See* Department of Defense Law of War Manual §3.3.1 (July 2023 update).

By contrast, the phrase "foreign nation or government" in the AEA does not impose the modern-day international-law standard for attribution of conduct to a State. A group may qualify based on its close entwinement with a foreign power, even if that group takes some actions that are not directly attributable to that government. After all, "the AEA was enacted at a time when France was using privateers to attack American shipping." *W.M.M.*, 154 F.4th at 231. Hostilities by those privateers surely could be attributed to a "foreign nation or government," even though France did not specifically direct each attack (indeed, the French government was unable "to control many of the greedy privateers which flew the flag of France," DeConde, *supra*, at 125). The AEA, in short, recognizes that armed groups affiliated with foreign states can trigger preventive emergency measures even when the foreign state does not specifically direct or coordinate each of the armed group's hostile acts or attempted acts.

Another key distinction between international-law concepts and the AEA turns on the fact that the United States has not recognized the former Maduro regime as the government of Venezuela since January 2019. *See U.S. Mission to the U.N. Statement*. A group associated with an entity that is not recognized as the government of a State is by definition a "non-State" group, and a conflict with such a group is inherently "non-international" in character. By contrast, Petitioners dispute that the Maduro regime qualified as a "government" for purposes of the AEA, even in the absence of recognition of Maduro as head of state. As Judge Oldham explains, it would be highly

"anomalous" if a President's decision to withhold recognition from a regime deprived him of the power to remove the regime's subjects as alien enemies. *W.M.M.*, 154 F.4th at 277, n. 17.

Petitioners' remaining challenges to the President's factual determinations are equally meritless. Petitioners urge the Court to weigh the President's findings against other intelligence assessments. ECF No. 97 at 25. "[I]t is not for a court to review a President's findings about the facts when he is employing the AEA." *W.M.M.*, 154 F.4th at 216. When "it comes to collecting evidence and drawing factual inferences in this area, 'the lack of competence on the part of the courts is marked,' and respect for the Government's conclusions is appropriate." *Humanitarian Law Project*, 561 U.S. at 34 (citation omitted); *see Trump*, 585 U.S. at 708.

Petitioners also contend that the Proclamation lacks sufficient information about the relationship between Maduro and TdA to justify the President's findings. ECF No. 97 at 25-27. Again, that substitutes the deferential review standard with APA-style substantial-evidence review (or worse). In all events, the AEA requires the President only to "make[] public proclamation of the event"—*i.e.*, the existence of a declared war, or an actual, attempted, or threatened predatory incursion or invasion by a "foreign nation or government"—not to explain in detail the bases for those findings. 50 U.S.C. §21. That statutory requirement protects against disclosure of sensitive intelligence sources in a public proclamation.

b. On the law, Petitioners argue that a "hybrid criminal state" such as TdA cannot qualify as a "foreign nation or government" under the AEA. ECF No. 97 at 23-24. Petitioners suggest that a President can name only a foreign sovereign in his Proclamation, not a terrorist group and its members. *Id.* By identifying TdA rather than the former Maduro regime itself, the President "in effect narrowed what he otherwise would be entitled to do"—an action that "does not by itself invalidate use of the AEA." *W.M.M.*, 154 F.4th at 231.

Petitioners also contend that when the AEA was enacted, a private group's activities could not be attributed to a State without a "formal public commission" such as a letter of marque. ECF No. 97 at 27-29. Petitioners ignore that States also contracted with other types of proxies such as pirates and mercenaries, who did not "possess a letter of marque or any other formal, public documentation." *W.M.M.*, 154 F.4th at 279. What "mattered was not some formal, public documentation," but rather "whether the 'hostilities' were authorized or 'unauthorized' by the sovereign." *Id.* (quoting 1 William Blackstone, *Commentaries* *249).

Petitioners' contrary theory would prevent the President from addressing threats posed by States through clandestine proxies—an increasingly prevalent dynamic in modern warfare. That would "raise severe national security risks." *Id*. Under any metric—especially the deferential standard that the Supreme Court has prescribed—the President's findings abundantly satisfy the AEA's "foreign nation or government" requirement.

c. Petitioners' only new argument is that since the *en banc* argument the United States arrested Maduro and relationships with the Rodriquez regime are better, thus there can no longer be a hostile foreign nation for purposes of the Proclamation. ECF No. 97 at 24-25. That is not for Petitioners or this Court to decide. Indeed, this case is much easier than *Ludecke*, 335 U.S. at 166–70. There, in 1948, three years after the end of World War II, the Supreme Court forcefully rejected an argument that an AEA Proclamation "did not survive cessation of actual hostilities" because that would "in effect nullif[y] the power to deport alien enemies, for such deportations are hardly practicable during the pendency of what is colloquially known as the shooting war." *Id.* This "includes the power 'to remedy the evils which have arisen from its rise and progress' and continues during that emergency" and is thus "plainly adequate to deal with problems of law

enforcement which arise during the period of hostilities but do not cease with them. Id. at n.10 (cleaned up).

The same is true here. Maduro was arrested less than a year ago. He still has many supporters and his party remains in power. TdA's hostility, violence, presence in the United States, and even influence in Venezuela remains. In fact, in the common law a "perpetual" "alien enemy" was one who maintained that status "though there be no wars by fire and sword between them." *Calvin's Case*, 7 Co. Rep. 1, 29 (1773). That is the case here. The United States thus must be able to continue to deport the alien enemies within our borders as either part of an ongoing hostility or as law enforcement after the fact. Imagine if after the ceasefire with Germany the United States automatically lost the ability to use the AEA to quickly remove the Nazi saboteurs or sympathetic German nationals. That is, of course, absurd.

And as the Supreme Court made clear, the termination of hostilities "is a political act" and is a "question too fraught with gravity even to be adequately formulated when not compelled" for courts to answer. *Ludecke*, 335 U.S. at 169–70. That is certainly true here where the situation with Venezuela is still fluid. Having a court come into this sensitive realm of foreign affairs and declare that the United States is effectively running Venezuela so any hostilities have ended usurps the President's authority and imperil the ability of the United States to speak with "one voice." *Munaf v. Geren*, 553 U.S. 674, 702 (2008).

### C. The Proclamation Properly Identifies an Attempted, Threatened, or Actual "Predatory Incursion" and "Invasion" Under the AEA.

The AEA also requires the President's Proclamation to identify a "predatory incursion" or "invasion" that has been "perpetrated, attempted, or threatened" by a foreign power. Here, the President found that TdA engages in "mass illegal migration to the United States" to advance the former Maduro regime's goal of "destabilizing democratic nations in the Americas, including the

United States," and that it uses "illegal narcotics as a weapon to 'flood' the United States." 90 Fed. Reg. 13,033. The statutory terms "attempted" and "threatened" make clear that the President can invoke the AEA *before* any predatory incursion or invasion occurs. Further, the terms "predatory incursion" and "invasion" cover a wide range of hostile entries, not just organized military hostilities. Regardless, the Proclamation properly identified an actual or threatened predatory incursion or invasion.

**1. "Attempted" and "threatened" invasions and incursions include hostilities that have not yet occurred.**

By its plain terms, the AEA extends to "attempted" or "threatened" predatory incursions and invasions, *i.e.*, not just incursions or invasions that have actually been "perpetrated." 50 U.S.C. §21. Those words—particularly "threatened"—authorize the President to invoke the Act to protect against predicted incursions and invasions that have not yet materialized. *See Threatened*, *Adj., Sense 2."* Oxford English Dictionary, June 2025, https://doi.org/10.1093/OED/1034958671 ("Held out or presented as impending"); *see also* 2 Noah Webster, *An American Dictionary of the English Language* (1828) (defining "threaten" as "to present the appearance of *coming* evil") (emphasis added). The statutory text thus unambiguously refutes Petitioners' insistence that the AEA only applies to an actual "military attack" by armed forces; the prospect of such an attack would be a "threatened" invasion or incursion even under Petitioners' unduly narrow interpretation of an "incursion" or "invasion." *See* Sections I.C.2-3.

Historical context confirms that the President can invoke the AEA as a preventive measure. The AEA was partially grounded in concerns regarding innumerable alien "agents and spies" who might have been ready to join in an attack. 8 Annals of Cong. 1574 (Rep. Rutledge). The AEA was premised on the notion that expelling such aliens would *prevent* France from attacking by depriving them of agents acting from within the United States. As Representative Sitgreaves put

it, "there could be no doubt" that the United States should not "wait till the enemy landed, before any measures were taken to remove persons from the country, who would be ready to join them by thousands or take advantage of knowledge we have of their hostile intentions towards us." *Id.* at 1577.

Thus, the AEA was drafted with a reference to "attempted" or "threatened" invasions and predatory incursions to allow the President to address potential future threats to United States territory. Justice Iredell recognized the importance of this aspect of the statute, observing that "equal danger may be apprehended from the citizens of a hostile power, before war is actually declared as after, perhaps more, because less suspicion is entertained." James Iredell, *Charge to the Grand Jury* (1799), *in* Francis Wharton, *State Trials of the United States* 468 (1849).

Any attempt to downplay the statutory terms "attempted" and "threatened" as extending the AEA to failed efforts to commit an invasion or incursion would render the term "threatened" surplusage. "Threatened" refers to hostilities that may occur in the future, as distinct from "attempted" prior acts that fell short of accomplishing an invasion or incursion. Regardless of what an "incursion" or "invasion" entails, the words "attempted" and "threaten" further broaden the President's powers under the AEA by confirming that the President can remove alien enemies before an attack actually takes place—to prevent such attacks from wreaking destruction.

Petitioners concede that the Act's reference to "threatened" invasions and incursions extends to "impending" hostilities. ECF No. 97 at 14-15. They contend, however, that an incursion or invasion is "threatened" only during a defensive war when an enemy is already bent upon attacking but is still engaged in preparations. *Id*. That is pure *ipse dixit* unmoored from the statutory text or any definition of the word "threatened." Petitioners attempt to graft international law concepts onto the Alien Enemies Act such as offensive and defensive wars. *Id.* But nothing in the

text or history of the law indicate Congress meant to incorporate those concepts. Again, the law was passed in light of the Quasi-War and the threat of internal spies, not an impending full military invasion.

**2. "Predatory incursions" are not limited to military attacks.**

Statutory text, structure, and history demonstrate that the term "predatory incursion" covers a broad range of hostile entries into U.S. territory—not only military aggressions.

Starting with the text, contemporaneous dictionaries define "incursion" broadly and without reference to formal military warfare. Eighteenth- and nineteenth-century dictionaries defined "incursion" as an "[a]ttack; mischievous occurrence," or an "[i]nvasion without conquest; inroad; ravage." Samuel Johnson, *A Dictionary of the English Language* (4th ed. 1773); *see* Webster, *supra* ("Literally, a running into; hence entering into a territory with hostile intention; an inroad."). And those dictionaries defined "predatory" to mean "plundering," "pillaging," and "rapine." Johnson, *supra*; Webster, *supra*. Thus, the contemporaneous meaning of the phrase "predatory incursion" was an entry or attack for a hostile and destructive purpose, regardless of whether the act was perpetrated by an army.

Neighboring text confirms the point. The AEA applies in times of "declared war … *or* … invasion or predatory incursion." 50 U.S.C. §21 (emphasis added). Congress's use of different terms—and the disjunctive "or"—signals that "predatory incursion" means something different from "declared war" and "invasion," covering less-formal hostilities. And again, the AEA authorizes removal of alien enemies when a predatory incursion is "perpetrated, *attempted, or threatened*," demonstrating that the actual use of armed forces was not required. 50 U.S.C. §21 (emphasis added); *see* p.4 *supra*.

Historical context and usage reinforce the plain text. As noted, the AEA's impetus "was meant to give the President broad authority over potential spies and saboteurs at home" during the

Quasi-War, an undeclared conflict between the United States and France largely waged by privateers. Stephen I. Vladeck, *Enemy Aliens, Enemy Property, and Access to the Courts*, 11 Lewis & Clark L. Rev. 963, 968 (2007). Contemporary commentators thus understood that the "alien enemy bill" was enacted "against the French." *Communications*, Pa. Weekly Telegraph (Oct. 3, 1798), at 2.

Consistent with that history, the contemporaneous use of "predatory incursion" was not limited to aggressions by organized armed forces. In a 1796 address to Congress, President Washington addressed measures to protect American settlements "from the predatory incursions of those unruly individuals who cannot be restrained by their tribes." President George Washington, Eighth Annual Address to Congress (Dec. 7, 1796). The "predatory incursion" was not conducted by an army, but by "unruly individuals" not necessarily aligned with the tribe. Likewise, *Worcester v. Georgia*, 31 U.S. 515 (1832), discussed state charters that referred to "incursions" by Indians and by "other enemies, pirates, and robbers." *Id.* at 545; *see also Huidekoper's Lessee v. Douglass*, 7 U.S. (3 Cranch.) 1, 7 (1805) ("watch and repel the predatory incursions of the Indians.").

Regardless, the phrase "predatory incursion" was used to describe attacks by other nonmilitary groups as well. Not long after the AEA's enactment, the Massachusetts Governor wrote to the Secretary of War that although citizens "had no apprehensions of invasion by an authorized British force, … there were many lawless people on the borders from whom they were in danger of predatory incursions." Letter from Caleb Strong to William Eustis (Aug. 5, 1812), *in* 1 *American State Papers: Military Affairs* 323 (1832). In another instance, a Creek Nation representative asked the Governor of the Bahamas for protection from "the predatory incursions of the back Georgians"—that is, private Georgian citizens—who plundered Creek cattle herds.

Letter from A. Arbuthnot to Charles Cameron (1818), *in* 1 *American State Papers: Military Affairs* 722-723 (1832). These uses exemplify the broad, flexible meaning of the term "predatory incursion"—a phrase not limited to encroachments by armies. Petitioners response to this mountain of evidence is to say the term is also used for organized military attacks. ECF No. 97 at 10-15. It is of course also used in that way. But predatory incursion is a broad definition that includes both military actions and less formal hostile actions. Petitioners' response to this is to claim the broader meaning is merely colloquial. ECF No. 97 at 12. That is another way of saying ordinary public meaning. Even so, Petitioners liken it to ants invading a kitchen or a business incurring on another turf. That is quite flippant given the examples of pirates, Indians, and robbers provided above that clearly includes hostile acts like a military action but without the formal organization Petitioners demand.

Petitioners rely on statutory context to argue that the term "predatory incursion" should carry a narrower meaning in the AEA. ECF No. 97 at 12-16. Petitioners say that "alien enemies" was "a well-established term of art in the law of nations that required military conflict," and that it would have been "unheard of " to apply it "outside of actual or imminent war." *Id*. at 15. That view of "alien enemies" is incorrect. A leading treatise recognized that for a person to be "said an alien enemy," "open acts done by his prince are sufficient, and … it is not necessary that a war be proclaimed." 1 Matthew Bacon, *A New Abridgment of the Law* 138 n.b (5th ed. 1798). Contemporaneous English sources likewise recognized that a citizen of a neutral country could "bec[o]me an enemy in consequence of having participated in one single act of hostility" against the country, even if his country was formally neutral. *Sparenburgh v. Bannatyne*, 126 Eng. Rep. 837, 840 (1797); *see Vaughan's Trial*, 90 Eng. Rep. 1280, 1281 (1696). Edward Coke even addressed the notion of a "perpetual" "alien enemy," such as an "infidel[]," who maintained that

status "though there be no wars by fire and sword between them." *Calvin's Case*, 7 Co. Rep. 1, 29 (1773). And, during the Quasi-War, French citizens were described as "alien enemies" even though no war had been declared. *See* 8 Annals of Cong. 1581 (1798); *see id.* at 1574-1576.

Nor does the contemporaneous Alien Friends Act support Petitioners' interpretation. That peacetime statute would have allowed the President to remove "all such aliens as he shall judge dangerous to the peace and safety of the United States," *without* requiring any finding of hostilities between nations, 1 Stat. 571 (1798), whereas the AEA "demands specific categories of hostility by another nation or government." *W.M.M.*, 154 F.4th at 227. Under Petitioners' theory, the two statutes overlapped, as Petitioners acknowledge that the Alien Friends Act would have applied during times of "military conflict," not only during times "without" such conflict. ECF No. 97 at 17.

**3. The term "invasion" is not limited to military attacks.**

As discussed, the AEA can be invoked to guard against an "invasion *or* predatory incursion," 50 U.S.C. §21 (emphasis added), as well as a "declared war." While the incursion prong alone justifies the Proclamation, TdA's hostilities against the United States also constitute an "invasion" under the AEA.

In 1798, an "invasion" broadly referred to a "hostile entrance," *e.g.*, 1 John Ash, *The New and Complete Dictionary of the English Language* (1775), or "hostile encroachment" on another's territory, *see* Thomas Sheridan, *A Complete Dictionary of the English Language* (2d ed. 1789). While other definitions include "formal military operations," they also mention "other kinds of encroachments or intrusions," including hostile acts of mass migration. Robert G. Natelson & Andrew T. Hyman, *The Constitution, Invasion, Immigration, and the War Power of States*, 13 Brit. J. Am. Legal Stud. 21, 23-24 (2024). In short, "[e]ighteenth-century dictionaries" indicate that "the

scope" of the term "invasion" "was not limited to incursions by a foreign army." Natelson & Hyman, *supra*, 20.

Both the Federalist Papers and the early acts of Congress reinforce that broad understanding. *See* Natelson & Hyman, *supra*, 23. For example, when debating the Constitution, the Founders referred to "hostile invasions of lawless and ambitious men" seeking to "introduce anarchy, confusion, and every disorder." *Id.* (quoting 4 *The Documentary History of the Ratification of the Constitution* 116, 117 (John P. Kaminski et al. eds., 1976-2023)). Madison warned of "the *predatory* spirit of licentious adventurers" and "daring and sudden *invaders*" along the Atlantic Coast. *The Federalist* No. 41 (Madison) (emphases added).

Much like "predatory incursion," numerous sources refer to pirates, Indians, and other non-military organizations engaging in invasions.[2] Indeed, the term "invasion" sometimes even described hostile acts of mass migration. For example, in 1783, the Pennsylvania legislature passed a resolution that unauthorized immigration from Connecticut had become an invasion, referring to "invaders of the State." Natelson & Hyman, *supra*, 23-24. In short, "invasion" was used far more broadly than just military aggressions. *W.M.M. v. Trump*, 184 F.4th 780, 788 (5th Cir. 2026) (J. Ho. concurring).

**4. TdA has perpetrated, attempted, or threatened a predatory incursion or invasion by any metric.**

Applying the proper definitions, the Proclamation plainly identifies a "predatory incursion" or "invasion" that has been "perpetrated, attempted, or threatened" by TdA. 50 U.S.C. §21. But even under a more narrow definition, the President's findings of "irregular warfare" should satisfy

[2] *See, e.g.,* 1 Annals of Cong. 722 (1789) (statement of Rep. Jackson) ("Georgia has been invaded [by Creek Indians]; the fact is absolute and notorious."); Henry Knox, Department of War, *Plan for the Arrangement of the Militia*, *in* III Thomas Lloyd, *The Congressional Register* 132, 154 (1790) (similar); William Bartram, *Travels* 65 (1792) (pirates).

the AEA's requirements. Reaching a contrary conclusion requires a failure to properly defer to the President's factual determinations.

1. Under the proper definitions of the terms, the Proclamation plainly identifies a predatory incursion or invasion—at the very least, one that has been threatened. In the Proclamation, the President found that TdA shares with the former Maduro regime a common "goal of destabilizing democratic nations in the Americas, including the United States." 90 Fed. Reg. at 13,033-34. TdA has entered the United States with the hostile purpose of fulfilling that destructive goal. The President has found that TdA operates "both within and outside the United States." *See* Exec. Order No. 14,157, *Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*, 90 Fed. Reg. 8439 (Jan. 29, 2025). TdA uses "illegal narcotics as a weapon to 'flood' the United States" and destabilize our security. 90 Fed. Reg. at 13,033. TdA engages in "mass illegal migration" and "used drug trafficking as a weapon against our citizens." *Id.* These actions plainly qualify as a hostile encroachment or "predatory incursion." *See* pp. 40-46, *supra*.

And by flooding weapons, drugs, and illegal migrants into the United States, TdA is plainly committing that incursion "against the territory of the United States..." 50 U.S.C. §21; *see* ECF No. 79-2 at 17, ¶¶5, 8 (describing TdA's infiltration of American cities and violent acts against Americans). Moreover, the FBI believes the former Maduro regime may have directed TdA to carry out targeted attacks on Venezuelan dissidents on American soil as it has elsewhere. *See* FBI Assessment, *id*. At the very least, that amounts to a "*threatened* " "predatory incursion" against U.S. territory. 50 U.S.C. §21 (emphasis added).

The Proclamation also appropriately identifies an "invasion." There is substantial evidence that TdA is physically "encroaching" on U.S. territory. For example, several recent reports explain

that TdA is present in over 40 states and has taken control over particular apartment complexes in U.S. cities.[3] Moreover, TdA has demonstrated a pattern of "setting down roots" in multiple South American countries—indicating that its *modus operandi* is encroaching on foreign territory with the hostile purpose of taking control.[4] That pattern of TdA "violat[ing] the territorial sovereignty of Venezuela's neighbors" was documented in U.S. intelligence reports preceding the Proclamation. *See* FBI Intelligence Assessment, ECF No. 79-2 at 17. Those actions plainly satisfy the historical meaning of an "invasion" as a hostile attack or encroachment. At the very least, TdA has "attempted" or "threatened" an "invasion"—which would suffice to satisfy the AEA. 50 U.S.C. §21.

2. TdA's hostilities also satisfy even the definition of a "predatory incursion" adopted in the now-vacated panel majority decision. The panel majority recognized that an "enemy using forces … that are not part of the country's regular military does not prevent the use of the AEA." *W.M.M.*, 154 F.4th at 231. And it recognized that the former Maduro regime was using TdA's forces in that way. *Id.* The panel also acknowledged that today's enemies may engage in "modern warfare" which "involves different categories of weapons" and "actions altogether different from the past." *Id*. at 227. Combining those points, TdA's use of modern weapons—drug trafficking and illegal migration—should meet even the panel majority's definition of a "predatory incursion": namely, "armed forces of some size and cohesion, engaged in something less than an invasion, whose objectives could vary widely, and are directed by a foreign government or nation." *Id*.

---

[3] *See* Jonathan Limehouse, *Colorado Apartment to Close After Multiple Arrests, Claims of Venezuelan Gang Takeover*, USA Today (Jan. 14, 2025), https://perma.cc/Y2UM-3K9L; Nicole C. Brambila, *Venezuelan TdA Gang Uses Similar Aurora Tactics to Take Over Building in San Antonio, Texas*, Denver Gazette (Dec. 21, 2024), https://perma.cc/S9NQPDWV; *see also* ECF No 79-2 at 8, Smith Decl ¶¶9, 12, 15-16.

[4] *Tren de Aragua: From Prison Gang to Transnational Criminal Enterprise*, InSight Crime (Oct. 2023), https://perma.cc/GKB8-2KPD.

The panel majority held otherwise only by committing another significant error: failing to defer to the President's factual determinations and myopically focusing only on the facts in the Proclamation itself. *See*, p. 31 *supra*. The panel majority ignored all statements in the Proclamation that it deemed conclusory or unsupported, and refused to credit information outside the four corners of the Proclamation. Petitioners refuse to defer to the President's factual determinations, disregard parts they deem "conclusory," and yet ignore other facts that support the proclamation. ECF no. 97 at 20-21. But that ignores the FBI findings that TdA has threatened assassinations of dissidents in the United States. *See* Smith Declaration 15-16. Ignoring such evidence and requiring specificity and dot connecting in the Proclamation effectively requires the President to include every sensitive intelligence source in a Proclamation as if it were a rule issued under the APA. As the D.C. Circuit has put it, "it is inconceivable that before an alien enemy could be removed," the "President should be compelled to spread upon the public record in a judicial proceeding" such sensitive information. *Citizens Protective League*, 155 F.2d at 294.

## II. THE GOVERNMENT'S AEA NOTICE PROCEDURES SATISFY DUE PROCESS.

Separate from the AEA statutory analysis, the panel majority correctly rejected Petitioners' due-process and procedural objections to the Government's revised notice, which informs a detainee in a language that he understands of his designation and that he has seven days to challenge that notice in a habeas proceeding filed in his district of confinement. *W.M.M.*, 154 F.4th at 237; *see* Notice, ECF No. 78-1. Petitioners' contrary arguments and remaining procedural objections lack merit.

### A. The Revised Procedures Provide Sufficient Opportunity to Seek Habeas Relief.

A governmental notice complies with due process when it is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them

an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). The Supreme Court has clarified how that standard applies in the context of AEA removal notices: "AEA detainees must receive notice that they are subject to removal under the Act within a reasonable time and in such a manner as will allow them to actually seek habeas relief before removal." *A.A.R.P.*, 605 U.S. at 95 (citation and ellipses omitted). To "'actually seek habeas relief,' a detainee must have sufficient time and information to reasonably be able to contact counsel, file a petition, and pursue appropriate relief.'" *Id.*

The adequacy of a particular notice is a case-specific inquiry that depends on "all the circumstances," *A.A.R.P.*, 605 U.S. at 95, including the interests of the Government and the individual, *see Jones v. Flowers*, 547 U.S. 220, 229 (2006). Importantly, where the Government has a strong interest in "prompt, vigorous action"—especially in matters of national security—due process does not forbid the Government from requiring illegal aliens to move with "appropriate" expedition. *Yamataya v. Fisher*, 189 U.S. 86, 101 (1903).

The Government's revised notice procedures here readily pass muster. The notice provides a detainee with seven days to challenge their removal and informs him, in a language that he can understand: (1) that he has been designated an alien enemy; (2) that he can challenge his designation by filing a habeas petition in his district of confinement; and (3) that he can request a list of available attorneys. *See* ECF No. 78-1. That is more than "reasonable time" and "sufficient information" to "contact counsel" and "file a petition," *A.A.R.P.*, 605 U.S. at 95, especially since AEA detainees across the country, including members of this putative class, have pursued relief through counsel in far less time.

Indeed, seven days to merely *file* a habeas petition is far greater process than what the federal immigration laws offer in analogous contexts. For one, the expedited-removal process

under 8 U.S.C. §1225(b) subjects certain illegal aliens to immediate removal "without further hearing or review," 8 U.S.C. §1225(b)(1)(A)(i), subject only to a limited window to establish a "credible fear of persecution," *DHS v. Thuraissigiam*, 591 U.S. 103, 109 (2020). Within that window, credible fear determinations are often made within a matter of hours, and any review must be completed within a week—and "to the maximum extent practicable within 24 hours." 8 U.S.C. §1225(b)(1)(B)(iii)(III). The Supreme Court has held that these procedures satisfy due process. *Thuraissigiam*, 591 U.S. at 140. Rightly so. "[I]n general," the English common law only required "several days" between the "time of summons and a hearing." 2 Chitty's General Practice 176 (1834). Given the President's national-security determination that the presence of TdA members in this country endangers the nation, *see* 90 Fed. Reg. at 13,033, due process permits even swifter removal. *See A.A.R.P.*, 605 U.S. at 96 (recognizing "the significance of the Government's national security interests").

That threat is not alleviated by the fact that some TdA members are currently detained. In April 2025, for instance, detained TdA members barricaded themselves within their housing unit and "threatened to take hostages." ECF No. 79-2 at 34, Johnson Decl., ECF No. 79-2, 34, ¶9. More generally, TdA has long been able to "grow its numbers" from others in detention, creating the risk that current members will "recruit new TdA members." Id. at 35, ¶12. Continued detention of TdA members presents a "grave risk" to national security, *id.*, warranting an expedited process.

And certainly the named Petitioners here have had adequate notice. They have known for months that they are designated under the AEA and how to challenge those designations. Indeed, this case is proof that they had sufficient notice and have challenged the Proclamation. It is thus impossible for named Petitioners to attack a policy that has provided them more than sufficient process.

### B. Requiring 30 Days' Notice and Detailed Factual Disclosures is Unwarranted.

Petitioners counter that the Government must (1) give enemy aliens a month to file a habeas petition and (2) provide each alien with information about the removal process and a factual basis for his detention before habeas proceedings even commence. ECF No. 97 at 40. Those demands lack any constitutional basis and disregard the Government's compelling national-security interests in this context.

1. Petitioners demand a 30-day notice period, claiming that a host of practical barriers necessitate a full month to simply file a habeas petition. *Id*. at 42-44. That argument myopically focuses on alleged barriers to habeas filings without crediting the Government's extraordinarily weighty countervailing national-security interests. And in all events, Petitioners have not established that detainees could not file habeas petitions within a week, least of all when the inquiry at issue—whether the alien is in fact a member of TdA—is straightforward, and could be accomplished via a simple habeas filing contesting TdA membership. Any necessary factual development can occur through amendment or the hearing process itself.

The facts also belie Petitioners' practical concerns. Petitioners themselves sought relief here within hours of learning of their potential removal. ECF No. 1. And AEA detainees across the country have also filed petitions in fewer than seven days.[5] Petitioners posit that some putative class members may have a harder time filing habeas petitions, depending on their lack of literacy and English fluency, their access to relevant documents, and their inability to get free legal counsel. ECF No. 97 at 31-37. Petitioners do not have a right to counsel much less free counsel. The idea they should get more time and process because of their particular limitations is absurd. At bottom,

---

[5] *See, e.g., G.F.F. & J.G.O.* v. *Trump*, No. 25-cv-2886 (S.D.N.Y. Apr. 8, 2025); *J.A.V. v. Trump*, No. 25-cv-72 (S.D. Tex. Apr. 8, 2025); *D.B.U. v. Trump*, No. 25-cv-1163 (D. Colo. Apr. 12, 2025); *A.S.R.* v. *Trump*, No. 25-cv-133 (W.D. Pa. Apr. 15, 2025).

being a pro se alien does not give one more due process rights. And such arguments about potential material variations among class members are classic reasons to reject class certification, not a basis for a facial due-process challenge. As the Supreme Court explained in *Reno v. Flores*, 507 U.S. 292, 300 (1993), a procedural due-process challenge to a policy that had never "yet been applied in a particular instance" is a "facial challenge" that requires a plaintiff class to "'establish that no set of circumstances exists'" in which the relevant procedures would be adequate. *Id.* at 301 (citation omitted). Petitioners plainly cannot make that showing when many of them sought relief in far less time than the Government's revised notice procedure affords. Nor have they shown that the notice procedure is *typically* insufficient for putative class members.

While the Government afforded 30 days-notice to World War II enemy aliens, that was a policy choice, not a constitutional floor. *See Citizens Protective League*, 155 F.2d at 295. The Constitution permits a more expedited timeline—particularly where, as here, the President has determined that speedy removal is important for national-security reasons. Besides, as the panel majority correctly explained, "[w]hat was reasonable in the 1940s is not automatically what is reasonable today." *W.M.M.*, 154 F.4th at 236. Op.46. Before modern communications, more time was needed to provide notice, reach counsel, file claims, and hold hearings. *Id.* Finally, Petitioners suggest that supposed past due-process violations justify procedural prophylaxis today—but allegations of process fouls under different notice regimes cannot justify inventing an unduly onerous regime going forward.

2. Petitioners would also impose a due-process requirement that the Government's notice supply the factual basis for designation as an alien enemy, as well as "basic information about the process" of removal. ECF No. 97 at 39-40. That objection just underscores Petitioners' recurrent disregard for the highly sensitive information at issue in AEA designations.

When the President issues a proclamation under the AEA, he establishes a class of aliens subject to summary removal. And when the Executive Branch detains an alien pursuant to that proclamation, it necessarily determines that the alien is a member of that class. That designation provides everything that an alien needs to "actually seek habeas relief in the proper venue before such removal occurs"—*i.e.*, to assert he is not subject to the proclamation. *J.G.G.*, 604 U.S. at 673.

Given the exigencies and the presidential responsibilities involved in AEA designations, courts have held that it "must be presumed that the President has acted lawfully" in detaining an enemy alien. *Ex parte Risse*, 257 F. 102, 104 (S.D.N.Y. 1919). The "burden" is on the alien to show he is "not" part of that "hostile" invasion or incursion. *Id.* It is "not upon the United States to show that he is." *Ex parte Gilroy*, 257 F. 110, 114 (S.D.N.Y. 1919); *see also United States ex rel. Schlueter v. Watkins*, 67 F. Supp. 556, 565 (S.D.N.Y. 1946), *aff'd*, 158 F.2d 853 (2d Cir. 1946) (describing procedures during World War II).

Petitioners' proposal would improperly flip that burden by requiring the Government to disclose to an enemy alien the basis for its determination before that alien even decides whether to contest his removal. Petitioners assert (ECF No. 97 at 40) that such burden-flipping is consistent with *Hamdi v. Rumsfeld*, 542 U.S. 507, 532-33 (2004) (plurality opinion), which stated that a U.S. citizen detained as an enemy combatant "must receive notice of the factual basis for his classification." *Id.* at 533. But *Hamdi* "did *not* specify that factual bases must be provided as soon as the detainee receives a notice of removal," and does not apply to noncitizen alien enemies. *W.M.M.*, 154 F.4th at 302.

Moreover, to the extent the Government must justify its classification before an alien's removal, the proper time is "*in* habeas proceedings," *W.M.M.*, 154 F.4th at 301, not before. Indeed, the evidence showing membership in an enemy class—particularly when that class is a foreign

terrorist organization—is often highly sensitive and may need to be sealed or otherwise protected. *See id*.

Petitioners also contend that the removal notice must specify "basic information about the process" such as the earliest removal date and country of removal. ECF No. 97 at 40. Again, that is pure policy invention, not a legal requirement; the same goes for Petitioners' remaining grab-bag of requests, such as their preferences that the notice be written in more "plain language," and specify "how to challenge removal." *Id.* The Government need not supply enemy aliens with a "Habeas Primer." *W.M.M.*, 154 F.4th at 303. The Government does not need to chart the path to court for each alien. The Government's policy is to provide notice in a language the alien can understand, that explains how to challenge the designation, and that says the detainee can request a list of attorneys. ECF No. 78-1. Due process requires nothing more.

3. Petitioners' demands for additional procedures are especially misguided because "the due process rights of an alien seeking initial entry" are no greater than "[w]hatever procedure[s] [are] authorized by Congress." *Thuraissigiam*, 591 U.S. at 138-39. For aliens who have never been lawfully admitted—a group which undoubtedly includes many of the putative class members here—"the decisions of executive or administrative officers, acting within powers expressly conferred by [C]ongress, *are* due process of law." *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892) (emphasis added); *accord Thuraissigiam*, 591 U.S. at 138-40.

To be sure, tailored review of AEA decisions is available in habeas. *See Ludecke*, 335 U.S. at 163-64, 171 n.17. But Congress chose that process; the Constitution does not impose it, let alone license federal courts to augment those procedures.

**C. Petitioners' Other Procedural Objections Fail**

Petitioners' remaining procedural arguments are baseless.

1. First, Petitioners are wrong that the AEA *requires* the Government to offer a period of voluntary departure. ECF No. 97 at 43-44. The AEA permits the President to "provide for the removal of those who … refuse or neglect to depart therefrom," 50 U.S.C. §21, but also dictates that they "*shall be* liable to be … removed as alien enemies." *Id.* (emphasis added). Here, where the alien enemies are members of the hostile force itself, the President may immediately effectuate removal; the AEA does not provide hostile foreign actors a grace period for potential further mayhem.

Petitioners cite a handful of 1940s Second Circuit cases, but those cases did not involve detainees "chargeable with actual hostility" under Section 22. *See, e.g.*, *United States ex rel. Von Heymann v. Watkins*, 159 F.2d 650, 651-52 (2d Cir. 1947). By contrast, the President has made such a determination for all alien enemies who are members of TdA. 90 Fed. Reg. 13033. "[T]he President acting under the AEA need not offer voluntary departure to alien enemies who the Executive Branch has concluded are engaged in chargeable actual hostility." *J.A.V. v. Trump*, 781 F. Supp. 3d 535, 555 (S.D. Tex. 2025); *see also A.S.R. v. Trump*, 782 F. Supp. 3d 224, 250-51 (W.D. Pa. 2025).

2. Next, Petitioners remarkably contend that the INA supplants the AEA such that all AEA removals must follow the INA's terms. ECF No. 97 at 41. That position is meritless. To begin, the INA states that Title 8 proceedings are the "exclusive" procedures for removal only for an alien who "has been… admitted," meaning "lawful entry." 8 U.S.C. §§1229a(a)(3), 1101(a)(13)(A). That is unlikely to apply to the vast majority of putative class members. *W.M.M.*, 154 F.4th at 309. Even as to putative class members who were lawfully admitted, however, the INA did not impliedly repeal the distinct procedures that the AEA applies to alien enemies under Title 50. "[R]epeals by implication are 'disfavored,'" *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510

(2018), and that goes doubly for the notion that the INA—a statute governing removal of all sorts of aliens—would silently supplant the highly specific procedures that Congress since the Founding has prescribed for alien enemies.

3. Finally, Petitioners are mistaken that the AEA procedures are defective in light of the withholding-of-removal statute and the Convention Against Torture (CAT). *See* ECF No. 97 at 41-42. The exclusive remedy under the AEA is habeas. *See J.G.G.*, 604 U.S. at 672. But claims for withholding-of-removal and CAT protection—which govern *where* an alien may be removed, not *whether* he may be removed—do not sound in habeas at all, and cannot be raised here, *Hamama v. Adduci*, 912 F.3d 869, 876 (6th Cir. 2018). Moreover, the United States' longstanding policy remains "not to transfer an individual in circumstances where torture is likely to result." *Munaf v. Geren*, 553 U.S. 674, 702 (2008). And in any event, individuals subject to removal under Title 50 can be barred from asylum and withholding of removal. *See Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 730-31 (D.C. Cir. 2022).

## III. PETITIONERS FAIL TO SATISFY THE REMAINING INJUNCTION FACTORS

All else aside, Petitioners are not entitled to an injunction because the remaining equitable factors strongly favor the Government.

To begin, Petitioners have not shown irreparable harm. "[T]he burden of removal alone cannot constitute the requisite irreparable injury." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Petitioners contend that if removed under the Proclamation, they may be tortured in CECOT. ECF No. 97 at 44. Again, the Government does not remove aliens to countries where it believes they will be tortured. *See Munaf*, 553 at 702. Moreover, the TdA members removed by the United States are no longer in CECOT, and Petitioners' assertions that they could be sent there are speculative. Regardless, a preliminary injunction barring AEA removals would (as Petitioners have conceded)

not preclude Petitioners' removal under the INA (including as designated members of a foreign terrorist organization), and the INA's third-country removal procedures would allow for the possibility of removal to El Salvador. *See* 8 U.S.C. §§1227(a)(4)(B), 1231(b)(2).

On the other side of the balance, the Supreme Court has already "recognize[d] the significance of the Government's national security interests." *A.A.R.P.*, 605 U.S. at 96. The Government has a strong interest in the "prompt" execution of removal, *Nken*, 556 U.S. at 436, and an especially "heightened" interest where, as here, "the alien is particularly dangerous." *Id.* Petitioners "come nowhere close to clearly showing that their interests overcome the weighty interests favoring enforcement." *W.M.M.*, 154 F.4th 207, 290 (Oldham, J., dissenting).

Finally, a preliminary injunction in this case would stymie the President's ability to respond to the significant national-security threat imposed by TdA. An injunction in this case would thus deprive the President of his chosen tool to respond to the threat posed by TdA. *See* p. 10-12, *supra*. Such an injunction thus would "intrude[] into the core concerns of the executive branch," *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978), and undermine the public interest.

**CONCLUSION**

For the foregoing reasons, the Court should deny Petitioners' Motion for Summary Judgment and grant judgment for the Government.

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General

TIBERIUS DAVIS
Counsel to the Assistant Attorney General

AUGUST FLENTJE
Deputy Director
Office of Immigration Litigation

/s/ Nancy N. Safavi
NANCY N. SAFAVI
Senior Trial Attorney
TXBN 24042342

Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washinton DC 20001
(202) 514-9875
Nancy.Safavi@usdoj.gov

RYAN RAYBOULD
UNITED STATES ATTORNEY

Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214-659-8626
Facsimile: 214-659-8807
brian.stoltz@usdoj.gov

*Attorneys for Respondents-Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 2, 2026, I filed the foregoing document with the Clerk of the Court through the Court's ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney